**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**HOT SPRINGS DIVISION**

**MIKKI HASTINGS as Personal Representative And SPECIAL ADMINISTRATRIX of the Estate of WILLIS PAUL LEE, JR., DECEASED, on behalf of the individual and survival heirs and Wrongful Death Beneficiaries of WILLIS PAUL LEE, JR., deceased,** **PLAINTIFF**

**V.** **CASE NO.: 6:25-CV-06053-SOH**

**MONTANA CARRIERS, INC. et al.** **DEFENDANTS**

**MEMORANDUM BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

## I. INTRODUCTION

On the morning of October 31, 2024, Plaintiff's decedent, Willis Paul Lee, Jr., a 67-year-old man, was driving east on Interstate 30 near Arkadelphia, Arkansas in intermittent rain. Defendant Jagdeep Dhillon, hauling for Montana Carriers in a 2025 Freightliner, was operating his tractor-trailer unit behind Mr. Lee. Mr. Lee suddenly slowed his vehicle, and Mr. Dhillon struck the rear of Mr. Lee's pickup. On January 30, 2025, Mr. Lee died.[1]

Plaintiff's claims against Montana Carriers, Inc. include, *inter alia,* vicarious liability and negligent hiring, training, and supervision; but, Montana Carriers, Inc. has conceded vicarious liability. Plaintiff also seeks damages (a) as a wrongful-death beneficiary without evidence that her uncle, Mr. Lee, stood *in loco parentis* to her; (b) for a life care plan for care that will never be delivered to the decedent, Mr. Lee; and (c) more than a year of accumulated towing and storage charges for Mr. Lee's pickup that Plaintiff elected not to retrieve.

[1] The parties dispute whether Mr. Lee's death was proximately caused by the injuries he sustained in the accident, but that has no bearing on the issues presented in this motion for partial summary judgment.

Each of these claims fails as a matter of Arkansas law; thus, Defendants move this Court for partial summary judgment and dismissal of same.

## II. UNDISPUTED STATEMENT OF FACTS

This lawsuit arises out of a motor vehicle accident that occurred on October 31, 2024. Plaintiff Mikki Hastings is the niece of Mr. Lee. [SOF 1].

Mr. Lee was driving his 1996 Dodge Ram eastbound on Interstate 30 near Arkadelphia. [SOF 2]. Defendant Dhillon was driving a 2025 Freightliner in the right lane. [SOF 3]. Mr. Lee was driving in the same lane in front of Mr. Dhillon. [SOF 4]. At the time, there was intermittent rain. [SOF 5]. As a result, Mr. Lee began to slow his vehicle. [SOF 6]. Mr. Dhillon struck the rear of Mr. Lee's vehicle ("collision"). [SOF 7].

As a result of the collision, Mr. Lee sustained injuries. [SOF 8]. Mr. Lee passed away on January 30, 2025. [SOF 9]. Deputy Steven Holt responded to the collision, [SOF 10], and had the vehicle towed from the scene. [SOF 11]. Mr. Lee's vehicle was towed to Automobill's in Arkadelphia "due to disabling damage." [SOF 12 & 14]. The damage estimate on Deputy Holt's crash report is $5,000. [SOF 13]. Automobill's is owned by Bill Rogers. [SOF 15]. Mr. Lee's vehicle remained impounded at Automobill's after the collision. [SOF 16]. Plaintiff did not retrieve Mr. Lee's vehicle after learning it was at Automobill's. [SOF 17]. At the time of the collision, Mr. Lee was living in Chidester, Arkansas. [SOF 18].

At the time of the collision, Mr. Dhillon was employed by Defendant Montana Carriers, Inc. [SOF 19]. Mr. Dhillon was acting as an employee at the time of the collision. [SOF 20]. Montana Carriers, Inc. leased the tractor/trailer unit operated by Mr. Dhillon during the collision. [SOF 21].

Plaintiff did not learn of Mr. Lee's collision until January 29, 2025, almost three months

after the fact. [SOF 22]. Bill Rogers was a friend of Plaintiff, but he was unaware of Plaintiff's family relationship with Mr. Lee. [SOF 23 & 24].

Mr. Lee used to help Plaintiff when she was a teenager living on her own. [SOF 25]. Mr. Lee did not provide any other financial support to Plaintiff throughout her life. [SOF 26]. Mr. Lee was previously married and formerly lived in Arizona, Florida, and Memphis, Tennessee. [SOF 27]. Plaintiff did not attend Mr. Lee's wedding. [SOF 28]. Plaintiff visited Mr. Lee in Memphis, but not when he lived in Arizona or Florida. [SOF 29 & 30].

Mr. Lee moved back to Arkansas after he separated from his ex-wife. [SOF 31]. Plaintiff did not know for sure when Mr. Lee moved back. [SOF 32]. After moving back, Mr. Lee started visiting Plaintiff. [SOF 33]. Mr. Lee would sometimes text and call Plaintiff and her husband. [SOF 34]. The last time Plaintiff saw Mr. Lee was June 2024, [SOF 35], and they had a family squabble and did not speak again. [SOF 36]. Plaintiff did not reach out to Mr. Lee or interact with him when she returned to Arkansas in September 2024. [SOF 37]. Additionally, when Plaintiff came to Arkansas for Christmas 2024, she did not check on her uncle. He was in the hospital at that time following the accident. [SOF 38]. Plaintiff learned from Mr. Lee's preacher that he was a regular churchgoer in Gurdon, Arkansas. [SOF 39 & 40].

Plaintiff's expert Dr. Tanya Owen prepared a life care plan, [SOF 42], despite the fact that Mr. Lee passed away and will not receive the care contemplated in her report. Dr. Owen's life care plan projected significant costs for spinal cord injury care over five (5) years. [SOF 43]. Defendants' economist expert, Dr. Thomas Ireland, testified that an economist's standard role is to put a present value on a life care plan, [SOF 44]; however, Plaintiff has not retained an expert who determined the present value of the costs in the life care plan. More importantly, Plaintiff has

no medical expert who has opined that the costs in the life care plan are reasonable and medically necessary.

Plaintiff's life care plan relied on aggregate population statistics maintained by the National Spinal Cord Injury Statistical Center. [SOF 45]. Dr. Owen's projections were applied to a generic patient with paraplegia, at a generic injury level. But, the report does not provide an individualized assessment of Mr. Lee's preexisting cardiac disease, cardiac arrest, diabetes, chronic wound infection, acute kidney injury, or his other comorbidities documented by Dr. Owen. [SOF 46]. Defendants' wound-care expert, Dr. Anthony Lamkin, testified that Mr. Lee had a chronic infected wound since 2017 that caused sepsis and bacteremia on multiple occasions and put his life at risk. [SOF 41].

Plaintiff disclosed Dr. Owen's report on February 24, 2026, which was after the expert-disclosure deadline had run according to this Court's Scheduling Order. [SOF 47].

## III. LAW & ARGUMENT

### A. Legal Standard

A motion for summary judgment shall be granted when the moving party can show there is no genuine dispute of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. See *Lovelace v. Wash. Univ. Sch. Of Med.*, 931 F.3d 698, 705 (8th Cir. 2019) (citing *Ebersole v. Novo Nordisk, Inc.*, 758 F.3d 917, 923 (8th Cir. 2014)). The moving party bears the burden of proof and all evidence, including the reasonable inferences derived thereof, must be taken in the light most favorable to the non-movant. *Celotex Corp. v. Catreet*, 477 U.S. 317, 322-23 (1986). On each discrete issue addressed below, the record meets that standard.

### B. One Collision. One Recovery.

Plaintiff is attempting to pursue two concurrent theories of negligence against Defendant

Montana Carriers, Inc. Defendant Jagdeep Dhillon was employed by Defendant Montana Carriers, Inc. on the date of the collision. Montana Carriers, Inc. has conceded that Mr. Dhillon was in the course and scope of his employment at the time of the collision and that it is vicariously liable for his negligence. [SOF 20]. Under Arkansas law, this concession bars Plaintiff's separate claims for negligent hiring, training and supervision.

**1. Vicarious Liability Conceded.**

In Arkansas, courts have held that an employee's tortious conduct may cause the employer to be held liable if the conduct of the employee or agent occurred within the scope of his employment. *Boudwin v. Hastings*, 614 F.3d 780, 783 (8th Cir. 2010) (citing *Med. Assurance Co., Inc. v. Castro*, 2009 Ark. 93, 302 S.W.3d 592, 597; *Cooper Clinic, P.A. v. Barnes*, 366 Ark. 533, 237 S.W.3d 87, 92 (2006)). Accordingly, plaintiffs often seek to hold employers responsible for the negligent acts of their employees through the doctrine of respondeat superior. *Id.*

In Arkansas, to determine whether an employee acted within the scope of his employment, Arkansas courts look to whether the employee is acting in the interests of his employer, as opposed to acting solely in his personal interest. *Id.* (citing *Barnes*, 366 Ark. at 92-93, 237 S.W.3d at 92-93). Arkansas courts have held that "[t]he liability of the employer for the acts of his employee is wholly derivative based upon the theory of respondeat superior." *Builders Transp. Co. v. Smith*, 2024 Ark. App. 561, at 9, 701 S.W.3d 22, 30 (quoting *Barnett v. Isabell*, 282 Ark. 88, 90, 666 S.W.2d 393, 394 (1984)).

Defendant Montana Carriers, Inc. admits that the accident occurred within the scope of Defendant Dhillon's employment. [SOF 20]. Defendant Dhillon was not acting solely in his personal interest; he was acting in the course of his employment and on behalf of Montana Carriers,

Inc. [SOF 19 & 20]. Defendant Montana Carriers, Inc. has accepted vicarious liability for any negligence that may be apportioned to Defendant Dhillon during his employment. [SOF 20].

**2. Negligent Supervision is a Separate Theory of Negligence.**

In *Addington v. Wal-Mart Stores, Inc.*, 81 Ark. App. 441, 458, 105 S.W.3d 369, 381 (2003) (citing *Madden v. Aldrich*, 346 Ark. 405, 58 S.W.3d 342 (2001)), the Court of Appeals provided that liability for a negligent supervision claim is based upon the unique relationship between employer and employee. Further, under this theory, employers are subject to direct liability for the negligent supervision of employees when third parties are injured as a result of the tortious acts of employees. *Id.*

Under the theory of negligent supervision, the employer's liability rests upon proof that the employer knew or, through exercise of ordinary care, should have known that the employee's conduct would subject third parties to an unreasonable risk of harm. *Hall v. Gage's Powersports, Inc.*, 2022 Ark. App. 406, at 6, 654 S.W.3d 353, 358. The Court in *Hall* further provided,

> [a]s with any other negligence claim, to prove negligent supervision, a plaintiff must show that the employer's conduct was a proximate cause of the injury and that the harm to third parties was foreseeable. It is not necessary that the employer foresee the particular injury that occurred, only that he or she reasonably foresee an appreciable risk of harm to others.

*Id.* at 6-7.

**3. *Elrod* Precludes Multiple Negligence Theories.**

Plaintiff's Amended Complaint alleges negligence against Defendant Montana Carriers, Inc., as her Cause of Action No. 2, on the theory of negligent hiring, training, and supervision. (D.E. 21, at ¶¶ 69-76). Plaintiff also alleges vicarious liability against Defendant Montana Carriers, Inc. as her Cause of Action No. 3. (D.E. 21, at ¶¶ 77-88). Plaintiff is pursuing two separate theories of negligence against Defendant Montana Carriers, Inc. for the same collision.

In *Elrod v. G&R Constr. Co.*, 275 Ark. 151, 154, 628 S.W.2d 17, 19 (1982), the Arkansas Supreme Court adopted the view which allows a plaintiff to proceed on only one theory of recovery in cases where liability has been admitted as to one theory of recovery. In other words, when an employer admits vicarious liability, the plaintiff is allowed to maintain only one theory of recovery. *See Kyser v. Porter*, 261 Ark. 351, 358, 548 S.W.2d 128, 132 (1997).[2]

In *Hamilton v. Brewster*, 2021 WL 4236607, at *2 (W.D. Ark. Sep. 16, 2021), this Court applied the holding in *Elrod* and found that "[b]ecause [employer] has conceded vicarious liability for any negligent acts of [employee], Plaintiff cannot proceed against [employer] on additional theories of negligent hiring, supervision, or training."

Without admitting liability of Defendant Dhillon, Defendant Montana Carriers, Inc. has admitted that Mr. Dhillon was acting as an agent and employee at all times relevant to this case. [SOF 19 & 20]. In so doing, Defendant Montana Carriers, Inc. has conceded vicarious liability for any negligent acts of Defendant Dhillon. [SOF 20]. Accordingly, Arkansas law prevents Plaintiff from pursuing the additional theories of negligence against Defendant Montana Carriers, Inc., and no exception applies. Plaintiff's second cause of action for negligent hiring, training, and supervision cannot proceed as a matter of law and, therefore, should be dismissed with prejudice.

**C. <u>An Estranged Niece, Not a Daughter.</u>**

Plaintiff is Mr. Lee's niece. She is unable to establish that the totality of the circumstances of her relationship with Mr. Lee amounts to Mr. Lee putting himself in the situation of a lawful parent of Plaintiff by assuming the obligations incident to the parental relation. As such, Plaintiff

[2] Courts have made an exception for cases where a plaintiff has a valid claim for punitive damages against the employer based on its independent negligence in hiring and retaining the employee. *See Wheeler v. Carlton*, 2007 WL 30261, at *12 (E.D. Ark. Jan. 4, 2007). Here, Plaintiff does not allege punitive damages in her Amended Complaint, (D.E. 21); therefore, the narrow exception to this rule is inapplicable.

cannot establish that Mr. Lee stood *in loco parentis* to Plaintiff at any point, and summary judgment must be granted.

**1. Plaintiff's Uncle was not her Father or a Father Figure.**

In order for Plaintiff to recover as the wrongful death beneficiary of Mr. Lee, she needs to establish that Mr. Lee stood *in loco parentis* to her; however, their relationship did not amount to that of a parent and child. In most cases, a finding that a nonparent is *in loco parentis* to an individual is sought where the nonparent is a stepparent. Here, Mr. Lee is further removed because he is Plaintiff's uncle.

In *Daniel v. Spivey*, 2012 Ark. 39, at 6, 386 S.W.3d 424, 428, the Arkansas Supreme Court defined *in loco parentis* as charged factitiously with a parent's rights, duties, and responsibilities:

> A person who stands *in loco parentis* to a child puts himself or herself in the situation of a lawful parent by assuming the obligations incident to the parental relation without going through the formalities necessary to a legal adoption. … This relationship involves more than a duty to aid and assist, and more than a feeling of kindness, affection, or generosity.

(Internal citations omitted). The Arkansas Court of Appeals, in *Williams v. Davis*, 2021 Ark. App. 199, at *8, 625 S.W.3d 243, 247-48, stated:

> One's mere status as a stepparent does not support a finding of *in loco parentis*. Something more must be shown to qualify as standing *in loco parentis*. *In loco parentis* refers to a person who has *fully* put himself in the situation of a lawful parent by assuming all the obligations incident to the parental relationship and who actually discharges those obligations. A stepparent who furnishes necessities for a minor child of his or her spouse and who exercises some control over the child does not, by those acts alone, establish a parental relationship.

(Emphasis added) (internal citations omitted). "In making a determination as to whether a nonparent stands *in loco parentis*, courts consider the totality of the circumstances and cannot lightly infer the intent of the person seeking to be considered as standing in *loco parentis*." *Spivey*, 2012 Ark. 39, at 6, 386 S.W.3d at 428 (citing *Smith v. Smith*, 922 So. 2d 94, 99 (Ala. 2005)).

In *Zulpo v. Blann*, 2013 Ark. App. 750, at *4, 2013 WL 6712532, at **2, the court found that the relationship between the appellant stepchildren and the stepfather never rose to the level of *in loco parentis*, even though the stepfather loaned the stepchildren money and gave one of them a watch. The evidence established a warm relationship and that the stepfather was a caring stepparent; however, an *in loco parentis* relationship did not exist. Based on the record available, the relationship under scrutiny in *Blann* is closer than the relationship between Plaintiff and Mr. Lee, and the stepfather in *Blann* was not found to be standing *in loco parentis*.

Mr. Lee's relationship with Plaintiff did not amount to a relationship where he stood *in loco parentis* with her. Plaintiff's testimony revealed that the nature of their relationship was not akin to father-daughter; and Mr. Lee never assumed the obligations incident to the parental relationship regarding Plaintiff.

When Mr. Lee's car was towed and stored by a friend of Plaintiff's, that friend did not know of their family relationship. [SOF 23 & 24]. It is expected that a friend of Plaintiff would be aware of a parent-like relationship between Plaintiff and Mr. Lee, if one existed.

Mr. Lee did not provide support to Plaintiff aside for some help when she was a teenager living on her own. [SOF 25 & 26]. Mr. Lee never filled a caregiver role in Plaintiff's life, and instead only offered aid for a brief period in her life as a generous uncle. Something more is required to find that Mr. Lee was standing *in loco parentis* to Plaintiff.

Plaintiff did not attend Mr. Lee's wedding or know when it was. [SOF 27 & 28]. Mr. Lee lived outside of Arkansas during the majority of his marriage, and Plaintiff did not visit Mr. Lee when he lived in Florida or Arizona. [SOF 29 & 30]. After his marriage ended, Mr. Lee returned to Arkansas, but Plaintiff did not know when he returned. [SOF 31 & 32]. Plaintiff learned from Mr. Lee's preacher that he was a regular churchgoer in Gurdon, Arkansas. [SOF 39 & 40]. If Mr.

Lee were a parental role in Plaintiff's life, she would know when he got married, when he moved back to live in the same state as her, and that he regularly attended church in a nearby town.

In June 2024, Plaintiff and Mr. Lee had a disagreement, such that they no longer spoke. [SOF 35 & 36]. As a result, Plaintiff did not even know that Mr. Lee had an accident until January 29, 2025, [SOF 22], the day before he died. Plaintiff did not reach out to Mr. Lee when she was back in Arkansas in September 2024; nor when she came home for Christmas that same year. [SOF 37 & 38]. Mr. Lee was in the hospital at Christmas due to his injuries. [SOF 38]. The ease with which Mr. Lee and Plaintiff fell out of contact indicates that Mr. Lee was not standing *in loco parentis* with Plaintiff.

Plaintiff and Mr. Lee had a niece-uncle relationship before it became non-existent a few months before his automobile accident. Nothing more. This Court should rule as a matter of Arkansas law that Mr. Lee was not *in loco parentis* with Plaintiff because he never assumed the obligations or responsibilities associated with the parental relationship. The totality of the circumstances regarding the relationship between Mr. Lee and Plaintiff fails to establish a caregiving role, let alone something more.

**2. Ark. Code. Ann. § 16-62-102(d) Defines a Closed Class.**

Plaintiff is not a beneficiary to the wrongful death action because she is not the surviving spouse, child, parent, or sibling of Mr. Lee; Plaintiff is not standing *in loco parentis* to Mr. Lee; and Mr. Lee was not standing *in loco parentis* to Plaintiff at any time. In an Arkansas wrongful death action, Ark. Code. Ann. § 16-62-102(d) states:

> (d) The beneficiaries of the action created in this section are:
>
> (1) The surviving spouse, children, father, mother, brothers, and sisters of the deceased person;
>
> (2) Persons, regardless of age, standing in loco parentis to the deceased; and
>
> (3) Persons, regardless of age, to whom the deceased stood in loco parentis at any time during the life of the deceased.

The statute enumerates three categories of wrongful-death beneficiaries -- the surviving spouse, children, father, mother, brothers, and sisters of the deceased; persons standing *in loco parentis* to the deceased; and persons to whom the deceased stood *in loco parentis* during the deceased's life. The list is closed. Arkansas defines *in loco parentis* as putting oneself in the situation of a lawful parent by assuming the obligations incident to the parental relation without going through legal adoption. *Spivey*, 2012 Ark. 39, at 6, 386 S.W.3d at 428. Plaintiff is not Mr. Lee's spouse, child, parent, or sibling; and for the reasons set out, *supra,* neither stood *in loco parentis* to the other. She fits no category the statute supplies, and the statute is exhaustive.

For these reasons, Mr. Lee did not stand *in loco parentis* with Plaintiff; thus, Plaintiff is not a wrongful death beneficiary. Therefore, Defendants respectfully request this Court to enter summary judgment and rule as a matter of law that Plaintiff has no right to any such recovery.

**D. <u>A Life Care Plan for Damages that Cannot be Incurred.</u>**

Mr. Lee died on January 30, 2025. A life care plan tendered by Plaintiff's expert projects significant costs for medical care that will not be delivered, services that will not be rendered, and dollars that will never be spent. Plaintiff nonetheless asks a jury to award this fictional amount as compensatory damages while at the same time asking for damages for wrongful death – two competing damages that cannot mesh.

**1. The Survival Statute Bars the Life-care Plan.**

Arkansas confines the recoverable damages of a deceased plaintiff's estate to the losses Mr. Lee himself sustained while living, augmented by the discrete categories the legislature has authorized to survive. Under the survival statute, Ark. Code Ann. § 16-62-101, a personal injury cause of action survives the death of the injured party and may be prosecuted by the personal representative. The recovery, however, is limited to the damages that Mr. Lee could have recovered

had he lived to judgment, plus the discrete additional categories authorized by Ark. Code Ann. § 16-62-101(b). Those statutory categories do not include projected future medical care of a decedent, such as Mr. Lee, who will never receive any such care.

The Arkansas Supreme Court's decision in *Durham v. Marberry* confirms the structure – identifying the historical pre-death recoverable categories as "medical expenses due to the injury, lost wages between injury and death, [and] pain and suffering," and treating the 2001 amendment adding loss-of-life damages as a discrete legislative enlargement. *Durham v. Marberry*, 356 Ark. 481, 486-92, 156 S.W.3d 242, 244-49 (2004). The Arkansas Court of Appeals' decision in *Estate of Shockley v. Bassett* applies the same architecture, distinguishing the survival categories under Ark. Code Ann. § 16-62-101 from the wrongful-death pecuniary, mental-anguish, and consortium categories under Ark. Code Ann. § 16-62-102. *Estate of Shockley v. Bassett*, 2021 Ark. App. 326, at *4, 634 S.W.3d 787, 790. Future medical care that Mr. Lee will not and cannot receive appears in neither statute.

Compensatory damages in Arkansas are designed to make the plaintiff whole, not to enrich the estate beyond the loss actually sustained. The survival action exists to recover what Mr. Lee himself was owed for the harm he suffered prior to his death. *McDonald v. Pettus*, 337 Ark. 265, 277, 988 S.W.2d 9, 15 (1999). Future medical expenses, while not requiring the same specificity as past medical expenses, must nonetheless be supported by evidence that they are reasonably certain to be incurred. *West Union v. Vostatek*, 302 Ark. 219, 222–23, 788 S.W.2d 952, 953–54 (1990); *Wal-Mart Stores, Inc. v. Londagin*, 344 Ark. 26, 37–38, 37 S.W.3d 620, 627–28 (2001).

The undisputed facts collapse the Owen life care plan against this framework. Mr. Lee died on January the 30, 2025, ninety-one days after the collision. [SOF 29]. The life care plan, by contrast, projects costs over five (5) years, [SOF 43] – a horizon Mr. Lee will not live to fill. Every

line item beyond January 30, 2025, is, as a matter of mathematical certainty, a charge that will never be billed and a service that will never be rendered.

Arkansas does not permit recovery of projected medical care that will never be delivered. The life care plan is not compensation. It is a windfall. *See Durham*, 356 Ark. at 486, 156 S.W.3d at 244. Arkansas does not compensate the projected cost of medical care that a decedent will never receive. *Id.* The estate's loss is the loss Mr. Lee sustained while he lived, together with any wrongful-death beneficiary's separately authorized recoveries. Ark. Code Ann. §§ 16-62-101(b) and 16-62-102; *Estate of Shockley*, 2021 Ark. App. 326 at *4, 634 S.W.3d 787, 790. None of those statutory categories is a future medical care line item. Arkansas Model Jury Instruction 2216, which outlines the elements of damage for wrongful death recovery, does not list a life care plan for one who is deceased. Simply put, life-care costs for a deceased plaintiff are not within the survival or wrongful-death recovery framework at any horizon and thus not recoverable.

The court in *Shockley* enumerated what Ark. Code Ann. § 16-62-101 permits an estate to recover for wrongful death: medical bills, conscious pain and suffering, funeral expenses, and loss-of-life damages. *Shockley*, 2021 Ark. App. 326, at *4, 634 S.W.3d at 790. The list is not illustrative. It is the General Assembly's considered choice about which pre-death losses carry forward to the estate and which do not. Projected future medical care that Mr. Lee will never receive is not listed. Each statute enumerates its own categories. Each category is the product of legislative choice. Neither statute enumerates a life care plan for a decedent. Ark. Code Ann. §§ 16-62-101(b) & 16-62-102. To submit the plan to a jury is to recognize a fifth survival category the legislature chose not to write. That is a legislative act dressed up as a jury instruction.

**2. No Physician Supplies the Causation Predicate.**

Arkansas law requires that future medical expenses be supported by physician testimony,

given to a reasonable degree of medical certainty, that future medical treatment will be necessary. *Wal-Mart Stores, Inc. v. Londagin*, 344 Ark. 26, 37–38, 37 S.W.3d 620, 627–28 (2001); *West Union v. Vostatek*, 302 Ark. 219, 222–23, 788 S.W.2d 952, 953–54 (1990). Where no physician supplies that testimony, the issue may not be submitted to the jury, because the jury would be forced to resort to speculation and conjecture. *Wal-Mart Stores*, 344 Ark. at 38, 37 S.W.3d at 628 (distinguishing *Arthur v. Zearley*, 337 Ark. 125, 992 S.W.2d 67 (1999), which reversed a future-medical-expenses submission where no physician testified to the necessity of future care). A life care planner is not a physician. Her role is to assign costs to medical needs that a physician has first identified and causally connected to the injury at issue. Where the physician predicate is missing, the planner's report is a price list without a buyer, and Arkansas does not permit such a report to reach a jury. *See id.*; *Arthur*, 337 Ark. at 142-43, 992 S.W.2d at 77.

The medical-causation predicate is absent here. No physician has opined that Mr. Lee was in need of future medical treatment, nor the associated costs. Further, Dr. Thomas Ireland, Defendants' economist, testified that in cases where a life care plan is tendered, the economist's standard role is to "put a present value on a life care plan." [SOF 44]. That work was not done here.

Dr. Owen's methodology also compounds the problem. Her projections are drawn from aggregate population statistics maintained by the National Spinal Cord Injury Statistical Center, applied to patients with paraplegia, at a generic injury level, but without individualized assessment related to Mr. Lee's preexisting cardiac disease, cardiac arrest, diabetes, chronic right-lower-extremity infection, acute kidney injury, or any of the other comorbidities documented in the life care plan. [SOF 45 & 46] Dr. Owen's report also does not account for the fact that Mr. Lee's chronic infected wound since 2017 had caused sepsis and bacteremia on multiple occasions and

put his life at risk. [SOF 41]. Aggregate statistics applied to a non-aggregate man do not satisfy Arkansas' requirement that future medical costs rest on physician testimony establishing necessity to a reasonable degree of medical certainty. *See Wal-Mart Stores*, 344 Ark. at 37–38, 37 S.W.3d at 627–28; *West Union*, 302 Ark. at 222–23, 788 S.W.2d at 953–54. No physician of record has reviewed Dr. Owen's plan and testified that the items projected in the life care plan would have been necessary to a reasonable degree of medical certainty. Without that predicate, the plan cannot reach a jury. Plaintiff has not met her burden of proof to recover damages related to Dr. Owen's life care plan.

Finally, Plaintiff disclosed Dr. Owen's life care plan on February 24, 2026, [SOF 56], – after the scheduling order's expert-disclosure deadline had run on January 27, 2026. (D.E. 9, at 2–3).

For the reasons set forth above, Defendants respectfully move this Court to enter partial summary judgment and dismiss any claim for damages related to the life care plan tendered by Dr. Tanya Rutherford Owen. The Court should likewise preclude Plaintiff from offering testimony, evidence, or argument at trial regarding the projected costs set forth in that plan.

**E. <u>Ark. Code. Ann. § 27-53-401 Fixes the Measure of Recovery</u>**

**1. The Statute Fixes the Measure.**

The measure of damages for injury to a motor vehicle in Arkansas is fixed by statute. Ark. Code Ann. § 27-53-401 provides that the measure of recovery is "the difference between the value of the vehicle immediately before the damage occurred and the value after the damage occurred, plus a reasonable amount of damages for loss of use." *See Southwestern Bell Tele. Co. v. Harris Co. of Fort* Smith, 353 Ark. 487, 109 S.W.3d 637 (2003) (noting damages for loss of use for personal property is not allowed, except in the case of damage to motor vehicles). The Arkansas

Supreme Court in *Fryar v. Sanders*, 301 Ark. 379, 381, 784 S.W.2d 168, 169 (1990), applied that statutory measure. *See also Zhan v. Sherman*, 323 Ark. 172, 913 S.W.2d 776, 778-79 (1996). The statute lists diminution in value and a reasonable amount for loss of use. It does not list towing or storage as recoverable components.

Plaintiff seeks to recover, in addition to diminution in value, the towing fee charged by Automobill's of Arkadelphia for removing Mr. Lee's 1996 Dodge Ram pickup from the accident scene, together with all storage fees that have accrued at the wrecker's lot in the months and now more than a year since the collision. The towing was arranged by Deputy Holt. [SOF 11]. The crash report of Deputy Holt identifies Automobill's as the wrecker, lists the tow destination as 211 High School Road in Arkadelphia, and characterizes the pickup as "[t]owed due to disabling damage." [SOF 12]. The damage estimate on the same report is $5,000. [SOF 13]. That figure, together with whatever loss-of-use damages Plaintiff can prove on competent evidence, is the universe of Plaintiff's permissible recovery on the pickup.

**2. Storage is not Loss of Use.**

The related towing and storage costs are not properly recoverable as elements of "loss of use." The argument confuses the rental value of a vehicle the owner cannot use with the storage of a vehicle the owner has chosen not to retrieve. Loss of use, as the term is used in Ark. Code Ann. § 27-53-401, measures the value of the deprivation of use during a reasonable repair or replacement period; it does not convert open-ended impound charges into compensable damages, particularly where the owner had notice of the location and elected not to act. *See Fryar*, 301 Ark. at 381, 784 S.W.2d at 169. Plaintiff knew the pickup was at Automobill's by late January 2025 and elected not to retrieve it. [SOF 17]. Plaintiff allowed the storage clock to continue and refused to mitigate these costs. That is not a "loss" that Defendants inflicted; it is a charge Plaintiff permitted to accrue.

The Court should grant partial summary judgment limiting Plaintiff's property-damage recovery on the pickup to the diminution in value plus a reasonable amount for loss of use, as fixed by Ark. Code Ann. § 27-53-401, and preclude any recovery for towing and storage charges. The statute says what it says. Plaintiff is owed what the statute allows, and not a dollar more.

## IV. CONCLUSION

For the reasons stated above, Defendants respectfully move this Court for judgment as a matter of law regarding Plaintiff's claims: (1) against Defendant Montana Carriers, Inc. for negligent hiring, supervision and training; (2) as a wrongful death statutory beneficiary; (3) for damages related to a life care plan; and (4) for storage or towing fees. Defendants' motion for partial summary judgment should be granted as set forth.

Respectfully submitted,

Brian Del Gatto (admitted *pro hac vice*)
WILSON ELSER MOSKOWITZ EDELMAN
& DICKER, LLP
2231 East Camelback Road, Suite 200
Phoenix, AZ 85016
(914) 584-9187
Brian.DelGatto@wilsonelser.com

and

Jeffrey W. Puryear (93109)
Mark Mayfield (93180)
PURYEAR MAYFIELD & McNEIL, P.A.
3000 Browns Lane
Jonesboro, Arkansas 72401
(870) 932-0900
jpuryear@pmmlawfirm.com
mmayfield@pmmlawfirm.com

By: /s/ Jeffrey W. Puryear
*Attorneys for Defendants,*
*Montana Carriers, Inc. and Jagdeep Dhillon*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 27th day of May, 2026, I electronically filed the foregoing with the clerk of the Court by using the CM/ECF system, which will send electronic notice to counsel of record.

Bryce Brewer
Rainwater, Holt & Sexton
P.O. Box 17250
Little Rock, Arkansas 72222
bbrewer@rainfirm.com

/s/ Jeffrey W. Puryear
Jeffrey W. Puryear