**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**HOT SPRINGS DIVISION**

**MIKKI HASTINGS, AS PERSONAL REPRESENTATIVE AND SPECIAL ADMINISTRATRIX OF THE ESTATE OF WILLIS PAUL LEE, JR., DECEASED, ON BEHALF OF THE INDIVIDUAL AND SURVIVAL HEIRS AND WRONGFUL-DEATH BENEFICIARIES OF WILLIS PAUL LEE, JR., DECEASED** **PLAINTIFF**

**v.** **No. 6:25-CV-06053-SOH**

**MONTANA CARRIERS, *ET AL.*** **DEFENDANTS**

**RESPONSE TO MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff offers this response in opposition to Defendants' motion for partial summary judgment.

**INTRODUCTION**

Willis Paul Lee, Jr., who was known as Paul, was driving down Interstate Highway 30 near Arkadelphia in his little Dodge pick-up truck when Jagdeep Dhillon rear-ended him in a fully-loaded 18-wheeler, knocked him off the road and into a tree. The collision broke Paul's back and eventually killed him. This suit was filed to recover for the harms and losses caused by that crash.

Defendants want to remove various portions of the case to limit their liability. They say the direct-negligence claims of Montana Carriers are barred by the admission of vicarious liability and that Mikki Hastings is not a wrongful-death beneficiary. They attack a life-care plan on a basis different from what it is used for. And they attack their liability for towing and storage fees. All of these arguments are wrong. Each is addressed in turn.

## FACTS

Defendants' statement of the facts is accurate as far as it goes, but it is incomplete. Some gaps need to be filled. That exercise follows.

Mikki Hastings is Paul's niece. She is Paul's brother's oldest daughter. Hastings and her father did not have a sound relationship. Ex. 1 Affidavit of Mikki Hastings ¶¶ 4,5. Hastings was abused by her birth father, so much so that she moved out of the family home by the time she was 17 along with her infant daughter. Ex. 1 ¶ 5. Paul seemed always to be aware of the strain in the relationship, and he rose to the occasion by giving Hastings financial help in those early years of estrangement from her father, providing groceries, and, more importantly, being around to provide advice, guidance, and emotional support. Ex. 1 ¶¶ 7-11. From that time onward, Paul was the only father figure in Hastings' life. She viewed him as her father, and he treated her as a daughter.

As time passed, Hastings became financially stable, married, and life moved on. Paul did not provide financial assistance to her because she did not need it. Ex. 1 ¶ 11. He did help with used appliances for her budding family as that was a trade of his, Ex. 2, depo. of Adam Hastings at 20, and he was able to get Hastings' husband a job when he badly needed one. Ex. 1 ¶ 9; Ex. 2 at 20. But for the most part, Paul's "support" for Hastings was of the less concrete sort; advising, nurturing, caring, and undergirding. Ex. 1 ¶¶ 7-11, 13-21.

Pausing here for a moment, it is worth noting that this evidence was not produced during Hastings' deposition simply because she was not asked questions that would call for a response including it. Defendants' lawyer was diligent in examining Hastings about her knowledge of Paul's medical condition, his hospital stays, where he lived and when, and his work history. But no one ever explored the nature of the relationship deeply enough to mine for the information about their

father-daughter relationship. Thus, an affidavit was necessary to fill that void. Should counsel wish to explore the information set forth there, Hastings will be made available for another deposition.

Carrying on, as time passed, routine set in as it normally does. In recent years, Paul would regularly visit Hastings' home to see her and her husband. Ex. 3, depo. of Mikki Hastings at 66; Ex. 1 ¶ 22. He spent the holidays like Christmas and Thanksgiving with Hastings as part of the family. Ex. 3 at 66. When Hastings' grandfather suffered a stroke, Paul moved him to Memphis for long-term-care and Hastings helped with that and visited often. Ex. 1 ¶¶ 16-18.

One event stands out as a truly telling father-daughter instance. When Hastings' birth father was taken very ill and on life support, Hastings was looked to as the person who would decide whether extraordinary life support would be continued. She was exceedingly uncomfortable serving in that position given the estrangement of their relationship and the history of abuse. Ex. 1 ¶ 12. Once again, Paul rose to the occasion as fathers often do. He counseled her and helped her find peace with the decision to terminate life support. Ex. 1 ¶ 13. Then he stood by her at the funeral and actually helped with the expenses of it. Ex. 1 ¶ 15.

Thus, from her 17th year onward, Hastings had one father and it was Paul. He did everything a father would naturally do for Hastings. He advised her, nurtured her, cared for her, and even argued with her. Defendants will doubtlessly point out that shortly before his death, Paul and Hastings had an argument and were in a huff with each other. Ex. 2 at 35. Fathers and daughters do that too, but that doesn't mean they quit being fathers and daughters.

This lawsuit was filed to recover for the injuries Paul suffered and for the injuries Hastings suffered because of his death as a wrongful-death beneficiary. Doc. 21, Amended Complaint. Negligence was alleged against Dhillon, the driver, and his employer, Montana Carriers, which admits that Dhillon was in the course and scope of his employment at the time of the collision, so

it is vicariously liable for any negligence Dhillon committed. The complaint also alleges direct liability against Montana Carriers for negligent hiring, training, and supervision as well as for negligent policies and procedures regarding drivers keeping a lookout for others on the highways, proper speeds, distracted driving, and driving in traffic. Doc. 21 ¶¶ 71, 72.

Paul suffered a T12 spinal fracture, among other things, and was paralyzed below the waist. Ex. 4 Report of Dr. David Rainosek. He could not walk. Eventually, the injuries suffered in the wreck were too great for him to overcome, and his system shut down. Willis Paul Lee died. E. 4. Defendants disagree. They offer an expert, Dr. B. Mark Landrum, who they want to testify that Lee would have lived only about three to five years anyway due to his underlying health conditions. Ex. 5, report of Dr. Mark Landrum, attached. But Dr. Landrum paints only part of the picture. He leaves out that Lee would spend that three to five years bedfast or wheelchair bound, unable to care for himself, in need of rehabilitation and other care because of the broken back and paraplegia besetting him as a result of Defendants' negligence. Hastings offers the testimony of Dr. Tanya Owen to fill that gap. Ex. 6 Owen Report. It describes how Paul was facing a life of expensive rehabilitation, unable to walk and care for himself. Dr. Owen finishes the story by detailing what that three to five years would have been like because of Defendants' negligence.

**ARGUMENT**

Summary judgment is available only when the moving party shows "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). But the evidence is viewed in the light most favorable to the party opposing summary judgment, and that nonmoving party is given all reasonable inferences to which the evidence may lead. Fed. R. Civ. P. 56(c); *P.H. v. Sch. Dist. Of Kan. City, Mo.*, 265 F.3d 653, 656-57 (8th Cir.

2001); *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir 1994). Arkansas substantive law applies to this diversity case. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938).

The question at the summary-judgment stage, of course, is not whose evidence is ultimately believed by a fact finder, is the weightier, or the more credible, nor is it what inferences should be drawn from the evidence. Those are fact finder functions for trial, not judge functions when deciding summary-judgment motions. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.") "[D]isputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. That is why the Eighth Circuit Court of Appeals cautions "summary judgment should not be granted in 'close' cases. '[T]he need to resolve factual issues in close cases is the very reason we have juries.'" *Torgerson v. City of Rochester*, 605 F.3d 584, 594 (8th Cir. 2010) (quoting *First Nat'l Bank of Omaha v. Three Dimension Systems Products, Inc.*, 289 F.3d 542, 545 (8th Cir. 2002)).

**1. Direct liability is cognizable.**

Defendants want to squeeze the case into a liability mold where it does not belong by eliminating the fault of Montana Carriers for its direct liability for negligent hiring, training, and supervision. They say *Elrod v. G&R Constr. Co.*, 275 Ark. 151, 628 S.W.2d 17 (1982), shields them from those claims. The problem for them is that Act 649 of 2003 abrogated *Elrod* legislatively. It requires all fault of all possible wrongdoers to be allocated and compared. Leaving one liable tortfeasor out is not allowed by that legislative measure.

*Elrod* involved an employee truck driver operating his employer's truck in the course and scope of his employment and shoving the plaintiff out of the way. The plaintiff sued the employee

for negligence but also sued the employer under theories of *respondeat superior* liability and negligent entrustment. The employer admitted *respondeat superior* liability and was dismissed from the case in chambers just before trial started. The Arkansas Supreme Court affirmed, holding that the admission of *respondeat superior* liability displaced the direct liability negligent entrustment claim against the employer. While no Arkansas state appellate decision extends *Elrod* to a negligent hiring or retention claim, federal district court opinions do. See *e.g., Wheeler v. Carlton*, 2007 WL 30261 (E.D. Ark. 2007). Thus, according to *Elrod* and *Wheeler*, direct liability claims for negligent hiring, negligent retention, and negligent entrustment that do not include request for punitive damages are barred where the employer admits liability for its employee's negligent acts. It is this reasoning on which Montana Carriers relies.

But actions of the Arkansas General Assembly since *Elrod* was decided abrogate *Elrod's* rule and require assessment of the fault of all tortfeasors whose negligence causes an indivisible injury. Indeed, at least three states have recently rejected *Elrod's* reasoning because the abrogation of joint and several liability is contrary to the system of fault allocation and comparative fault replacing it. *Quynn v. Hulsey*, 850 S.W.2d 725 (Ga. 2020); *Ramon v. Nebo School Dist.*, 493 P.3d 613 (Utah 2021); *Binns v. Trader Joe's East, Inc.*, 690 S.W.3d 241 (Tenn. 2023).

A brief word about labels and nomenclature is useful before going too far. The rule of law Defendants claim shelter in goes by many names in the cases. *Binns, supra* referred to it as the "preemption rule." Some refer to it as the "*McHaffie* rule" after the well-known and oft-cited Missouri case adopting it. See *Ramon, supra*. The Georgia Court refers to it as the "*Respondeat Superior* rule." *Quynn, supra*. By whatever name it is called, to borrow Chief Justice Drowota's phrase, it was "conceived in the judicial womb," *McIntyre v. Ballentine*, 833 S.W.2d 52, 56 (Tenn. 1992), and is a rule of law some states recognize wholly as a matter of judicial fiat. The cases and

scholarship on which the immunity is primarily based make that clear. See, *e.g., McHaffie v. Bunch*, 891 S.W.2d 822 (Mo. 1995); Mincer, *The Viability of Direct Negligence Claims Against Motor Carriers in the Face of an Admission of Respondeat Superior*, 10 Wyo. L. Rev. 229 (2010) (hereafter Mincer). That means it is subject to legislative undercutting and abrogation.

Defendants will inevitably also strain to refer to the position they advocate as a "majority" rule, pointing out an off-hand phrase in *Elrod's* text. Apparently, they feel this Court will find solace in the notion that it might just join the "majority" if it wanders down the immunity path. But that position is at least overstated and arguably outright incorrect. Yes, Mincer, *supra*, and some courts refer to the position Montana Carriers advances as a "majority" position. But the reality is "the caselaw throughout the country is more evenly divided. See *MV Transportation, Inc. v. Allgeier*, 433 S.W.3d 324, 334 (Ky. 2104) (noting that the 'authorities are split on whether a separate negligent hiring claim should go forward when an employer concedes its liability for the negligent acts of its employee under the doctrine of *respondeat superior*')." *McQueen v. Green*, 202 N.E.3d 268, 278 (Ill. 2022).

With that backdrop in mind, the analysis can begin.

***a. Elrod's rule has been legislatively abrogated.***

**1. *Elrod* cannot coexist with allocation of fault and comparative fault.**

The rule of law *Elrod* adopted had its genesis in an era when contributory negligence was the governing common-law rule. See Burns, *Respondeat Superior as an Affirmative Defense: How Employers Immunize Themselves from Direct Negligence Claims*, 109 Mich. L. Rev. 657 (2011) (hereafter Burns). Some have said the rule made some sense in that era, as the liability of the employer and the employee was unified and any negligence on the part of the injured party completely absolved both the employer and the employee of fault. *Ibid.* Weighing of relative

degrees of fault was not necessary. But as states began to abrogate contributory negligence and replace it with comparative fault, the rule on which *Elrod* is based lost its validity. The logic proceeds that, where fault must be compared, the fault of all parties must be included, or the fault determination is skewed. *Ibid.* Comparative fault by definition requires weighing degrees of fault.

Arkansas, of course, is a comparative-fault state in which the fault or negligence of an injured party does not bar recovery necessarily. Ark. Code Ann. § 16-64-122. Rather, the fault of the injured party must be compared to the fault of the defendant and be allocated accordingly. The defendant's liability is only removed completely when the injured party's fault is equal to, or greater than, the defendant's. Ark. Code Ann. § 16-64-122(b)(2). Thus, *Elrod's* rule is undercut by this requirement to compare the fault of the injured party to the fault of the persons or entities causing the injury. *Burns*, *supra*.

Subsequent acts of the Arkansas legislature do more than undercut *Elrod's* rule. They outright abrogate it by requiring the fault of all who contribute to an injury to be compared, weighed, and allocated. This abrogation is seen by tracing the development of Arkansas law aimed at assessing the fault of all those who cause a tortious injury, including those who aren't even sued by the plaintiff, otherwise known as non-party fault.

The analysis begins with Act 649 of 2003, commonly known as the Civil Justice Reform Act, which did away with the common law doctrine of joint-and-several liability and replaced it with separate proportional liability, called "several" liability by the Act. This created a right in each defendant sued to a judgment in which he or she is liable for no more than his or her proportional share of damages. 2003 Acts of Ark. No. 649 § 1(b), codified at Ark Code Ann. § 16-55-201(b). Act 649 initially directed that the fact finder was to consider the fault of all persons or entities contributing to the injury or death whether sued or not, Ark. Code Ann. § 16-55-202(a), but this

legislatively created procedural device implementing Act 649's change in the common law was declared unconstitutional by *Johnson v. Rockwell Automation, Inc.*, 2009 Ark. 241, 308 S.W.3d 135 (2009). But *Johnson* did not replace that procedural device with something else. Thus, after *Johnson*, no procedural device existed requiring a jury to allocate fault to an alleged tortfeasor who was not made a party.

Defendants in cases where absent tortfeasors could be held responsible for some of the plaintiff's injuries looked to a contribution action to accomplish a mathematical allocation of fault to every tortfeasor whether or not that tortfeasor was a party to the case from whom the plaintiff sought a money judgment at the time of the verdict. This approach was ineffective as well. *ProAssurrance Indemnity Co., Inc. v. Metheny*, 2012 Ark. 461, 425 S.W.3d 689, and *St. Vincent Infirmary Medical Center v. Shelton*, 2013 Ark. 38, 425 S.W.3d 761, held that Act 649 contained no right to allocation and that a contribution action seeking only an allocation of fault was not cognizable due to the then-existing language of the Uniform Contribution Among Tortfeasors Act (UCATA). So, the Arkansas legislature enacted Act 1116 of 2013, which alters the UCATA in a clear effort to remedy the flaws identified by *Metheny* and *Shelton*: want of a "right" to allocation and lack of a cognizable cause of action for contribution solely to allocate fault.

Those amendments worked in this manner. "Joint tortfeasors" were defined to be persons or entities "who may have joint liability or several liability in tort for the same injury to person or property…." Ark. Code Ann. § 16-61-201(1). And "joint tortfeasors" were given a right to contribution that included "the right to an allocation of fault as among all joint tortfeasors…." Ark. Code Ann. § 16-61-202(c). Under Act 1116's alterations, a right to allocation of fault exists between all of those "who may have … liability in tort" for the plaintiff's indivisible harm exists. Subsequent amendments to Ark. R. Civ. P. 9, 49, and 52 implement these allocation rules in

Arkansas state court cases. In summary fashion, the Rules require juries to allocate fault between all joint tortfeasors, whether sued or not, when assessing responsibility and liability for a plaintiff's harm. See *In re Special Task Force on Practice and Procedure in Civil Cases—Ark. R.Civ. P. 9, 49, 52 and Ark. R.App. P—Civ. 8*, 2014 Ark. 340 (Aug. 7, 2014).

Thus, reading Arkansas's comparative fault statute in conjunction with Act 649 of 2003 and Act 1116 of 2013, the following is apparent. Juries must assess and allocate fault to ***all those who may have contributed to an injured person's injury***. This includes each defendant, the injured party, and anyone else who may have liability but who was not sued. This is a legislative declaration that all fault of all negligent actors must be determined, weighed, and compared.

This requirement to assess, and allocate, the fault of all tortfeasors cannot coexist with *Elrod's* rule. Indeed, the direct fault of one tortfeasor whose conduct should be weighed is eliminated from the equation, namely the direct liability of an employer who admits to vicarious liability of its employee. This result is squarely at odds with the assessment, weighing, and allocation requirements enacted by Arkansas's legislature through Acts 649 of 2003 and 1116 of 2013 as well as the comparative-fault statute. *Elrod's* rule does not survive those legislative actions.

**2. The cases uniformly accept this very reasoning.**

Hastings' reading of the effect of the abrogation of joint-and-several liability and the adoption of allocation of fault and comparative fault on the employer immunity *Elrod* imposes is not just in the creative minds of her lawyers. The cases asking the question uniformly answer it the same way. The employer immunity does not survive.

A 2020 decision from the Supreme Court of Georgia, *Quynn v. Hulsey*, 850 S.W.2d 725 (Ga. 2020), is the first in the line. Prior Georgia case law declared that where an employer admitted it would be vicariously liable for the negligent acts of its employee, direct-liability claims for

negligent supervision, retention, and entrustment were barred. *Id.* at 727-728 (citing cases). So, when Brandon Lanier's widow, as administrator of his estate, sued the driver of the truck who struck and killed Brandon and the driver's employer, the trial court granted summary judgment to the employer on the estate's direct-liability claims.

The Georgia Supreme Court reversed that decision. The Georgia legislature enacted what the Georgia court termed the apportionment statute in 2005 that, like Arkansas's statutory scheme, required assessment and allocation of fault to all those responsible for a plaintiff's injury. *Id.* at 728-729 (quoting and discussing OGCA § 51-12-33). This apportionment statute, the Georgia court held, abrogated the Georgia version of the *Elrod* rule, referred to as the *Respondeat Superior* Rule. The Georgia court wrote,

> the claims encompassed by the Respondeat Superior Rule are claims that the employer is at "fault" within the meaning of the apportionment statute. Adherence to the Respondeat Superior Rule would preclude the jury from apportioning fault to the employer for negligent entrustment, hiring, training, supervision, and retention. Any allocation of relative fault among those persons at fault, which may include the plaintiff, could differ if one person's fault was excluded from consideration. It follows that the Respondeat Superior Rule is inconsistent with the plain language of the apportionment statute.

*Id.* at 729.

The Georgia court then systematically rejected each of the employer's arguments to the contrary. The employer contended that introduction of evidence of direct liability was intended merely to inflame the jury. *Ibid.* The court was "not persuaded" by this argument. *Ibid.* "Evidence tending to establish the employer's fault would be of consequence to the determination of the action as the jury is required to consider the fault of 'the persons who are liable' and 'all persons or entities who contributed to the alleged injury or damage.'" *Id.* at 729-730 (quoting OCGA § 51-12-33(b),(c)). Thus, "evidence of the employer's fault is neither irrelevant nor required to be excluded in all cases as unfairly prejudicial." *Id.* at 730.

The Georgia court also rejected the idea that the apportionment statute would not apply because damages are not to be apportioned between an employer and an employee for claims that derive from the agency relationship. *Ibid.* In other words, the employer asked the court to apply the Georgia version of the *Elrod* rule because the employer would be liable for the acts of the employee as a matter of agency law. This argument was rejected because, even if accepted, it "would not relieve the jury from apportioning fault under the plain language of the apportionment statute." *Ibid.* The statute required apportionment of all fault that was divisible, and direct-negligence claims against an employer are divisible from the negligence of the employee. *Ibid.* Further, as for damages, while the employer would be liable for the fault of the employee, the converse is not true. The employee is not necessarily liable for the fault of the employer. *Ibid.*

Last, the Georgia court rejected the employer's argument that the Georgia legislature did not intend to abrogate the Georgia version of the *Elrod* rule when it enacted the apportionment statute. The Georgia court wrote,

> a plaintiff's claims for an employer's negligent entrustment, hiring, training, supervision, and retention are allegations of fault within the meaning of the apportionment statute, and OCGA § 51-12-33 mandates that the jury be allowed to consider the fault of all persons who contributed to the alleged injury or damages. Adherence to the plain and explicit terms of OCGA § 51-12-33 requires the elimination of the Respondeat Superior Rule.

*Id.* at 732.

Georgia was not alone very long in rejecting the concepts of the *Elrod* doctrine based on legislative mandates to assess the fault of all tortfeasors. The Supreme Court of Utah did the same thing in *Ramon v. Nebo School Dist.*, 493 P.3d 613 (Utah 2021). A Nebo School District bus driven by its employee Duane Ludlow turned in front of Anthony Ramon's car causing a crash. Ramon sued Nebo alleging it was vicariously liable for Ludlow's negligence and also that it was negligent in hiring, training, supervising, and retaining Ludlow. Nebo admitted it would have *respondeat*

*superior* liability for Ludlow's negligence and moved to dismiss the direct-liability claims by asking the trial court to adopt what it called the *McHaffie* rule, named after a Missouri case, *McHaffie v. Bunch*, 891 S.W.2d 822 (Mo. 1995). The trial court agreed with Nebo and dismissed the claims. It made the order final under Utah R. Civ. P. 54(b) and Ramon appealed.

The Utah Supreme Court reversed. Preliminarily, it questioned the viability of the *McHaffie* rule by doubting the reasoning on which it is based. "Jurisdictions that adopt the rule appear to be motivated, at least in part, by a belief that the rule prevents a plaintiff from enjoying a double recovery." *Ramon*, 493 P.3d at 619, ¶ 21. The Utah court was unconvinced. "The *McHaffie* rule is, however, a blunt instrument to deal with a potential issue. A district court has myriad other tools to address a potential double recovery: it can instruct the jury, provide special verdict forms, or even remove the doubly-recovered portion through post-trial motions. … As a result, refusing to allow a plaintiff to move forward with a well-plead claim is an unnecessarily harsh method to solve a problem that the *McHaffie* jurisdictions identify." *Ibid.*

The Utah court was equally unmoved by the notion that "the *McHaffie* rule" is "a bulwark against unfairly turning the jury against a party." *Id.* at 619, ¶ 22. The idea is that evidence of an employee's bad driving history or other evidence supporting direct-negligence claims will inflame the jury. *Ibid.* But the Utah court believed the Rules of Evidence, particularly Rule 403, was ample to protect against this danger.

> Unlike the courts that embrace the *McHaffie* rule, we prefer a system that permits a district court to review the specific items of evidence in context to decide whether rule 403 should prevent their admission. Adopting the *McHaffie* rule would, in essence, take away a district court's discretion. We do not think we can accurately predict that the evidence needed to prove a negligent employment claim will always flunk the rule 403 balancing test. Instead, we leave the evidentiary concerns Nebo presents to the district court to consider under the bounds of the Utah Rules of Evidence.

*Id.* at 620, ¶ 24.

These doubts about the viability of the *McHaffie* rule notwithstanding, the Utah court rejected it for another, more fundamental reason: it conflicts with a legislative mandate to assess the fault of all wrongdoers.

> All that having been said, we ultimately reject the *McHaffie* rule for an even more basic reason: it is incompatible with Utah's Liability Reform Act. The Act provides that "[a] person seeking recovery may recover from any defendant or group of defendants whose fault, combined with the fault of persons immune from suit and nonparties to whom fault is allocated, exceeds the fault of the person seeking recovery." Utah Code § 78B-5-818(2). And the trial court may, at any party's request, direct a jury to determine the "percentage or proportion of fault attributable to each person seeking recovery, to each defendant, to any person immune from suit, and to any other person . . . for whom there is a factual and legal basis to allocate fault." *Id.*

*Id.* at 620, ¶ 25.

Ramon alleged that part of the cause of the accident was Nebo's employment, training, and supervision of Ludlow. That provided a "legal basis to allocate fault for the accident to the school district." *Id.* at 620, ¶ 26. It did not matter that Ludlow's liability might pass through to Nebo as a matter of *respondeat superior*. "Under the Act's plain language, Ramon is entitled to request that the jury determine the proportions of fault attributable to Ludlow's negligence in driving and Nebo's negligence in its supervision of Ludlow." *Ibid.*

Last, the Utah court rejected Nebo's "push[] back" that "the jury might wind up assigning more fault to the combination of Nebo and Ludlow than the jury would if it was only asked to consider the fault of Ramon and Ludlow." *Id.* at 620, ¶ 27. That proposition might or might not be true. *Ibid.* But even if it is, the legislature mandated that result:

> But even if Nebo has correctly handicapped the jury's behavior, that result is what the Act envisions. The statute allows a plaintiff, or a defendant, to ask the jury to apportion fault to anyone a party identifies as being legally responsible for the injury.

*Id.* at 620-621, ¶ 27. This legislative mandate precluded adoption of anything like the *McHaffie* rule.

Our Tennessee neighbor to the East is the latest to join this reasoning. *Binns v. Trader Joe's East, Inc.*, 690 S.W.3d 241 (Tenn. 2023), was a slip-and-fall case. Melissa Binns slipped and fell on a clear liquid left in Trader Joe's floor by an employee. She sued Trader Joe's alleging it was liable vicariously for the acts of the employee and also directly liable for negligent training and supervision. An interlocutory appeal under a discretionary Tennessee appellate rule was allowed to determine if Trader Joe's admission of *respondeat superior* liability for the acts of the employee eliminated the direct-liability claim.

Some context on Tennessee law is necessary. Tennessee did not adopt comparative fault and abrogate joint and several liability by legislative act. Rather, it did so by judicial decision in *McIntyre, supra,* a sea-change in Tennessee tort law.

Two concepts, contributory negligence and joint-and-several liability, dominated pre-*McIntyre* tort law. Contributory negligence meant that if a plaintiff's own negligence, however slight, caused or contributed to his or her injury, the plaintiff could not recover at all. *McIntyre*, 833 S.W.2d at 54 (citing cases). On the other end of the spectrum, joint-and-several liability meant that any actor who caused any of the plaintiff's injury could be liable to the plaintiff for the entirety of the damages suffered even if others also contributed to the injury in greater proportions. *Id.* at 58. Much time and effort was spent prior to *McIntyre* by the parties to cases attempting to fit themselves into exceptions to contributory negligence or joint and several liability because of the all-or-nothing impositions worked by them.

*McIntyre*, as a general proposition, change all of that. It adopted a tort-law system of comparative fault based on "considerations of fairness." *Id.* at 58. As for the plaintiff, so long as

his or her fault was less than the fault of all of the defendants, the plaintiff could still recover. *Id.* at 57. The recovery would simply be reduced by the plaintiff's proportion of fault as determined by the jury. *Ibid.* As for the defendant or defendants, their liability would no longer be for the whole of the plaintiff's harm but would be limited to their proportion of fault. *Id.* at 58. Indeed, after *McIntyre*, defendants were allowed to plead and prove the liability of non-parties in order to reduce their proportionate liability. *Ibid.*

The general construct of the law following *McIntyre* is this: Juries must assess and allocate fault to *all those who may have contributed to an injured person's injury*. This includes each defendant, the injured party, and anyone else who may have liability but who was not sued. This is a mandate that all fault of all negligent actors must be determined, weighed, and compared.

*Binns* reduced to its essence, held that the employer immunity *Elrod* and like cases represent is fundamentally at odds and incompatible with a system of comparative fault and allocation of fault among all who contribute to an injury. To get there, the Tennessee court first rejected Trader Joe's argument that the mere existence of vicarious liability is an exception to the general rule that all fault must be allocated. Fault is not allocated only when the sole basis for an employer's liability is *respondeat superior*. *Binns*, 690 S.W.3d at 250. Where the employer is separately liable for direct acts of negligence, though, the liability of the employer must be compared to all other wrongdoers' in order to be true to comparative fault and allocation of fault. This is so because the direct negligence of an employer is a separate basis of liability, *id.* at 251, and because not considering the fault of the employer skews the allocation of fault by requiring the jury to allocate the employer's portion of fault to another actor where it doesn't belong. *Id.* at 251-252. The Tennessee court also noted that the employer immunity *Elrod* represents is

inconsistent with the notion that plaintiffs are the masters of their complaint. *Id.* at 253. Tennessee, like Arkansas, allows alternative pleading.

Then the Tennessee court recognized a fundamental point. The "preemption rule," as it was referred to in that case, "is not entirely consistent with the principle of deterrence, which we have long considered an operative policy of tort law." *Ibid.* (cleaned up). The liability and fault arising from a direct-negligence claim "involve the employer's own negligence. A rule that allows a defendant to eliminate evidence of its own direct negligence by admitting to vicarious liability eliminates *some* of the deterrence that direct negligence causes of action provide." *Ibid.* This effect benefits the "especially-blameworthy employers" the most by allowing them to hide those actions from the fact finder. *Ibid.* "Permitting employers to prevent the admission of this type of evidence does not serve the goal of deterrence in tort law." *Ibid.*

The Tennessee court, like the Georgia and Utah courts, made short work of Trader Joe's argument that the evidence of direct negligence would merely inflame the jury. Trial judges and Tenn. R. Evid. 403 are more than adequate to address any such issue. "We prefer to entrust the trial judges of Tennessee to make the determination of whether a particular piece of evidence involving a direct negligence claim fails the balancing test under Rule 403." *Id.* at 252-253.

The reasoning of the Georgia, Utah, and Tennessee courts is absolutely correct and applies with full force to the *Elrod* rule. Arkansas law requires juries to apportion fault between all of those who may have liability for a plaintiff's injuries. That cannot be done if the direct liability of a tortfeasor's employer is excluded from consideration. *Elrod* was, thus, abrogated by the Arkansas legislature when it enacted Act 649 of 2003 and Act 1116 of 2013. This Court should so hold and deny the portion of the motion asking that those direct claims against Montana Carriers that would be dismissed under the *Elrod* doctrine remain in the case.

***b.* Elrod *does not apply to all of the direct negligence allegations.***

The discussion above explains that *Elrod* no longer states the law in Arkansas. Direct-liability claims are cognizable even when defendants admit vicarious liability because the legislature proclaimed that the fault of all wrongdoers must be taken into consideration. That said, even if *Elrod* were to survive, Defendants are wrong that it reaches all of this case. Defendants contend *Elrod* holds every direct cause of action against an employer is barred whenever an employer admits liability for the wrongs of its employee. That contention is incorrect. A discussion of the cases demonstrates its error.

***1. The policy exception applies.***

Broad exceptions to *Elrod* exist, and they are applicable to this case. Judge J. Leon Holmes' opinion in *Regions Bank v. White* is the place to start. John White parked the tractor-trailer rig he was driving on the side of Interstate Highway 40 in Monroe County, Arkansas. *Regions Bank v White*, 2009 U.S. Dist. LEXIS 94584 at *1. The tractor-trailer rig was owned by Daily Express, Mr. White's employer. *Ibid.* Travis Lynn Hill hit Mr. White's rig and was killed. *Ibid.* His estate sued Mr. White and Daily Express alleging that the rig was parked partially on the shoulder and partially on the roadway. *Id.* at *1-2. The claims against Daily Express included direct liability claims and that it was vicariously liable for Mr. White's negligence. *Id.* at *8-9. No claim for punitive damages was made. *Id.* at *10. Daily Express admitted that Mr. White was in the course and scope of his employment at the time of the accident and asked that evidence of its direct negligence be excluded from the case. *Id.* at *8-9.[1]

[1] Daily Express made its arguments through a motion *in limine* rather than a motion to dismiss or for summary judgment, but the reasoning and arguments are exactly the same.

A significant portion of the Estate's complaint alleged types of negligence other than negligent hiring, retention, and entrustment that are like the allegations in this case. Specifically, the Estate alleged Daily Express was directly

> negligent in failing to: have an adequate policy regarding the placement of triangles; adequately train its drivers regarding the placement of triangles; and have an escort vehicle available during the trip. Regions also alleges that Daily Express negligently drafted and applied its policy regarding accident procedures, and that it was negligent in maintaining White's truck.

*Id.* at *12. Thus, as Judge Holmes put it, *Elrod's* rule "is inapposite here." *Ibid.*

Judge Kristine Baker followed Judge Holmes' reasoning in *McLane*. A Jeep driven by Barbara McLane in which her son and daughters were passengers was involved in a wreck with two tractor trailers, one driven by Florentino Compos in the course and scope of his employment with AAA Cooper Transportation, Inc. and the other driven by Jerry Smith in the course and scope of his employment with Rich Transport, Inc. *McLane*, 2012 U.S. Dist. LEXIS 111885 at *4-5. Ms. McLane and her son were killed and her daughters were injured. *Ibid.* Suit was brought alleging that Rich Transport was directly negligent and vicariously liable for the negligent acts of Mr. Smith. *Id.* at *4. Rich Transport admitted vicarious liability and moved for summary judgment on the direct liability claims relying on *Elrod*. *Id.* at *13.

Judge Baker denied the motion. She agreed with Judge Holmes that *Elrod's* rule is limited to claims for negligent hiring, retention, and entrustment. *McLane*, 2012 U.S. Dist. LEXIS 111885 at *14-15. But the plaintiffs there alleged theories of recovery different from those theories. She wrote,

> The Second Amended Complaint contains several allegations of negligence relating to Rich Transport's failure to maintain adequate policies and procedures. For example, the plaintiffs claim that Rich Transport "failed to train, educate, direct, prepare, set policy, or give guidance to its … drivers" regarding texting and driving. They also allege that Rich Transport should have conducted periodic audits of its drivers' status logs to prevent hours-of-service violations. The rationale articulated

> and applied in *Regions [Bank v. White]* applies to these claims, and the plaintiffs may pursue them.

*Id.* at *15-16.[2] Thus, once again, *Elrod's* rule is limited to negligent hiring, retention, and entrustment, and has no application outside those theories of recovery. Judge Baker recently issued another opinion consistent with *McClane* and *Regions Bank v. White* once again allowing direct negligence claims to survive where an employer admitted *respondeat superior* liability. *Crouch v. Mastercraft Cabinetry, LLC*, 2121 U.S. Dist. LEXIS 172792 (E.D. Ark. 2021).

The Western District also recognizes this limitation on *Elrod's* rule. Judge P.K. Holmes wrote in *Reagan*, "the rule has no bearing on independent claims against an employer regarding negligence in failing to have adequate policies, practices, or procedures in place." *Reagan*, 2011 U.S. Dist. LEXIS 127921 at *3 (citing *Regions Bank v. White*, 2009 U.S. Dist. LEXIS 94583 at *12). He did not preclude the plaintiff in that case from presenting evidence "concerning any independent negligence claims they assert against Defendants regarding negligence in failing to have adequate policies, practices, or procedures in place—to the extent they assert such claims." *Id.* at *6.

Thus, even if *Elrod* survives the legislative changes wrought by Act 649 of 2003 and Act 1116 of 2013 (which it does not), it is limited as follows. When a plaintiff sues an employer for negligently hiring or retaining that driver, or for negligently entrusting that driver with the rig, as well as for vicarious liability for the driver's actions, *Elrod* bars the direct liability theories of recovery when the employer admits vicarious liability for compensatory damages caused by the driver's acts and the plaintiff does not allege liability for punitive damages for that negligence. But

---

[2] The plaintiffs there also alleged negligent hiring and retention, and those claims survived because they supported the case for punitive damages. *Id.* at *16.

*Elrod* is limited to just those theories of recovery. Other types of direct negligence remain viable against the employer as well as a direct claim for punitive damages.

Hastings makes out viable theories of recovery for Montana Carriers' direct negligence other than negligent hiring, supervision, and entrustment. The allegations against it are allegations of direct liability that are "independent claims against [Montana Carriers] regarding negligence in failing to have adequate policies, practices, or procedures in place." *Reagan*, 2011 U.S. Dist. LEXIS 127921 at *3 (citing *Regions Bank v. White*, 2009 U.S. Dist. LEXIS 94583 at *12). They include:

- Failure to train and instruct employees correctly regarding keeping a proper lookout (Doc. 21 ¶ 70(a));
- Failure to design, develop, implement, and failure to train as to, adequate policies and procedures regarding safe driving practices (Doc. 21 ¶ 70(c);
- Failure to design, develop, implement, train, and monitor drivers with respect to driving attentively (Doc. 21 ¶ 71(a), (b));
- Failure to design, develop, implement, train, and monitor drivers with respect to driving in compliance with applicable federal motor safety regulations (Doc. 21 ¶ 72).

Again, these allegations have nothing to do with whether Montana Carriers negligently hired, retained, or entrusted anyone. They are just like the policies and training regarding the placement of triangles and accident procedures Judge Holmes held to be outside of *Elrod* in *Regions Bank v. White*. They are analogous to the failure to train, educate, direct, prepare, set policy, or give guidance to drivers regarding texting and driving Judge Baker identified as outside of *Elrod* in *McLane*. The complaint correctly alleges them, and they should not be dismissed

irrespective of the Montana Carriers' concession that it is vicariously liable for its driver's negligence.

**3. Mikki Hastings is a wrongful-death beneficiary.**

***a. The wrongful-death statute specifically includes adult children.***

Paul had no natural children and no surviving sibling, spouse, or parent. Those are the typical individuals who would be wrongful-death beneficiaries entitled to recover the injuries they suffer because of his death. Ark. Code Ann. § 16-62-102(d). That does not mean that no wrongful-death beneficiaries exist who may recover. A person to whom Paul stood *in loco parentis* may recover, and Mikki Hastings is such a person.

The threshold question is can an adult claim wrongful-death beneficiary status based on another adult standing *in loco parentis* to her? Yes, she can. The wording of the wrongful-death statute, how that wording came about, and the interpretation of the wording by the Arkansas Court of Appeals all lead to that conclusion.

In 2001, the legislature specifically amended Arkansas's wrongful-death statute to include anyone, including adult children, to whom the deceased stood *in loco parentis* as beneficiaries of the deceased. The relevant section of that statute reads "[t]he beneficiaries of the action created in this section are . . . [p]ersons, ***regardless of age***, to whom the deceased stood *in loco parentis* ***at any time during the life of the deceased***." Ark. Code Ann. § 16-62-102(d)(3) (emphasis added). Thus, the words of the statute answer the question. The highlighted words are the key. Any person, "regardless" of that person's age, to whom the deceased ever stood *in loco parentis* is a wrongful-death beneficiary. Under the clear wording of the statute, even if a relationship developed late in the lives of each person, so long as the deceased person stood *in loco parentis* to the person claiming to be a beneficiary, the statute allows recovery irrespective of blood relationship. So, for

example, an unrelated 50-year-old caregiver to a 90-year-old decedent may become a wrongful-death beneficiary if she proves that the 90-year-old stood *in loco parentis* to her at any time during the 90-year-old's life. Where the words of a statute are "plain and unambiguous" the interpretive task before this Court is quite limited because then "there is no room left for judicial construction, and neither the exigencies of a case, nor resort to extrinsic facts will be permitted to alter the meaning of the language used in the statute." *Bishop v. Linkway Stores, Inc.*, 280 Ark. 106, 109, 655 S.W.2d 426, 428 (1983).

Any doubt as to this conclusion is resolved by reviewing how the statutory language came about. The Arkansas Legislature amended the wrongful-death statute following the Arkansas Supreme Court's decision in *Babb v. Matlock*, 340 Ark. 263, 9 S.W.3d 508 (2000). *Babb* held that those claiming to be beneficiaries under the statute due to an *in loco parentis* relationship but who had reached the age of majority were not beneficiaries. *Id.* at 267, 9 S.W.3d at 510. Part of the court's rationale was that because the remedy was statutorily created and did not exist at common law, it must be strictly construed. *Id.* at 265, 9 S.W.2d at 509. The very next year, the Arkansas Legislature amended the wrongful-death statute specifically to include in the list of beneficiaries "[p]ersons, regardless of age, to whom the deceased stood *in loco parentis* at any time during the life of the deceased." Ark. Code Ann. § 16-62-102(d)(3).

The 2001 amendment abrogates Arkansas Supreme Court's holding in *Babb*, and in fact was enacted for that very purpose. Now, adults to whom the deceased stood *in loco parentis* at any time are proper beneficiaries under the statute regardless of age. Professor Brill noticed the change and concluded that the "*in loco parentis* relationship applies, regardless of age." Howard W. Brill, *Arkansas Law of Damages* § 34:2, n.3 (5th ed. 2004) (internal quotations omitted). The statute now includes adults as beneficiaries.

And that is precisely what the Arkansas Court of Appeals held in its recent interpretation of the statute's language. In *Rouse v. Tippit*, 2025 Ark. App. 428, four adult brothers, the Tippits, argued they were in an *in loco parentis* relationship with their stepfather Bill Waymon. They argued that the change in the statute following *Babb* allowed them to be. The Court of Appeals agreed. The use of the words "regardless of age" meant "the Tippits could develop an *in loco parentis* relationship with Waymon beginning in their teenage years and into their adulthood." *Id.* at 11.

***b. Paul stood in loco parentis to Hastings.***

From the time Hastings moved out of her parents' house when she was 17 onward, Paul was her father in every way short of birth or adoption. He provided some financial assistance and helped her husband with a job. More importantly, Paul assumed the duty to teach, nurture and counsel Hastings. That is manifestly what fathers do.

The Arkansas Supreme Court defines *in loco parentis* as a position "in place of a parent; instead of a parent; charged factitiously with a parent's rights, duties, and responsibilities." *Robinson v. Ford-Robinson*, 362 Ark. 232, 239, 208 S.W.3d 140, 144 (2005) (quoting *Standridge v. Standridge,* 304 Ark. 364, 803 S.W.2d 496 (1991)). Temporally, an *in loco parentis* relationship can develop in less than two years. *Golden v. Golden*, 57 Ark. App. 143, 148, 942 S.W.2d 282, 284 (1997).

The cases direct that, when determining an issue of *in loco parentis*, the court should consider the intent of the parties involved. *Standridge*, 304 Ark. at 372, 803 S.W.2d at 500 (citing *Miller v. United States*, 123 F.2d 715 (8th Cir.1942) *reversed on other grounds*, 317 U.S. 192 (1942)); *Dodd v. United States,* 76 F. Supp. 991 (W.D. Ark. 1948)). The "focus should be on what, if any, bond has formed between the child and the nonparent." *Bethany v. Jones*, 2011 Ark. 67, 11, 378 S.W.3d 731, 737 (2011). Although a stepparent-child relationship does not automatically

create an *in loco parentis* relationship, it may lead to one depending on the circumstances. *Dodd*, 76 F. Supp. at 995. Whether an *in loco parentis* relationship is created between the parties depends on the intent of the parties and the factual background. *Ibid.* When a stepparent voluntarily accepts a child into his home and cares for him as he would his own child, he assumes an *in loco parentis* relationship to the child. *Brummitt v. Com.*, 357 S.W.2d 37, 39 (Ky. 1962); *In re Adoption of Cheney*, 59 N.W.2d 685, 687 (Iowa 1953). Or, as the Arkansas Supreme Court put it, "*In loco parentis* refers to a person who has fully put himself in the situation of a lawful parent by assuming all the obligations incident to the parental relationship and who actually discharges those obligations." *Daniel v. Spivey*, 2012 Ark. 39, at 6, 386 S.W.3d 424, 428. Whether an *in loco parentis* relationship exists is a question of fact. *Bethany*, 2011 Ark. 67, at 11, 378 S.W.3d at 737-738.

As with many things in the law, this standard must be placed in context with the facts of particular cases to understand the depth of its meaning. *Robinson* affirmed an *in loco parentis* finding for a stepmother who had raised her stepchild as her own for seven years beginning when the child was 18 months old. *Bethany* affirmed an *in loco parentis* finding for the former same-sex partner of the child's natural mother. The child was born during the relationship and the partner treated the child as if she was the child's mother in every respect. The overriding point from these cases is an *in loco parentis* relationship depends on the parent taking on parental duties and responsibilities for the child. Those duties and responsibilities include nurturing, teaching, and guiding the child as a parent as well as financial support. That is exactly what Paul did with Hastings from the time she moved out of her parents' home at 17 on.

Contrast those cases with the cases where no *in loco parentis* relationship was found. The decedent in *Standridge v. Standridge*, 304 Ark. 364, 803 S.W.2d 496 (1991), merely took the child

to work with him, went hunting, fishing and swimming with him just about every day. The decedent in *Zulpo v. Blann*, 2013 Ark. App. 750, loaned his stepsons money, gave one of them a watch, "helped them out from time to time and engaged in activities with [them], and [the stepsons] visited him frequently until his death." *Id.* at 4. The relationships between the stepparents and stepchildren in these cases were caring, friendly, and enjoyable but not parental. What is missing from them is the element of guiding, nurturing, and, well, parenting, which is what Paul did with the Hastings.

*Williams v. Davis*, 2021 Ark. App. 199, 625 S.W.3d 243, on which Defendants may rely in reply, is nothing like this case. Bailey, the decedent, was Williams' stepfather. But Williams' mother and Bailey were in an on-again, off-again relationship even during the years they were married. *Id.* at 4, 625 S.W.3d at 245. Williams based his claim that Bailey stood *in loco parentis* to him on Bailey teaching him to play chess and shoot a gun, Bailey spanking him once when he shot a dog, and working for Bailey for three years after Williams got out of prison. *Id.* at 5-6, 625 S.W.3d at 246. Thus, as in *Standridge* and *Zulpo*, the relationship was caring, cordial, and enjoyable but not parental.

What characterizes the parental relationship the cases look for to find that someone stands *in loco parentis* to another person? It is the support, nurturing, discipline, teaching, and guidance a parent is obligated to give to a child. See *Apel v. Cummings*, 76 Ark. App. 93, 98, 61 S.W.3d 214, 218 (2001) (holding the rule that natural parents are favored above all others to maintain custody of their children "is premised on the presumption that the natural parent is providing care and support for the children to the best of his [or her] abilities.") That is what distinguishes a parent from a good friend or a confidant. And it is precisely what Paul provided to Hastings. He assumed

the obligation to support to guide, nurture, and teach her even into adulthood. Those bonds remained tight. That is the essence of the father-daughter relationship.

At minimum, enough evidence exists to allow the jury to pass on the *in loco parentis* question. The Arkansas Supreme Court's *Bethany* decision makes it abundantly clear that the question is a fact question. *Bethany*, 2011 Ark. 67, at 11, 378 S.W.3d at 737-738. The court reviewed the facts supporting the finding thoroughly and applied the clear-error standard. It did not weigh the evidence. That was for the fact finder to do. Where we began the argument section of this response is worth repeating: "summary judgment should not be granted in 'close' cases. '[T]he need to resolve factual issues in close cases is the very reason we have juries.'" *Torgerson v. City of Rochester*, 605 F.3d 584, 594 (8th Cir. 2010) (quoting *First Nat'l Bank of Omaha v. Three Dimension Systems Products, Inc*., 289 F.3d 542, 545 (8th Cir. 2002)).

**4. The life-care plan is rebuttal evidence for a specific purpose.**

Defendants spill significant ink explaining why the care needs set forth in Plaintiff's life-care plan cannot be an element of damage in the case because Paul died so the care will never be delivered. This entire argument misapprehends the purpose of the life-care plan. It is offered to rebut the testimony of one of Defendants' experts.

A significant defense offered by Defendants is that Paul's health was so bad that he would not have lived long anyway even without the wreck. They offer an expert, Dr. B. Mark Landrum, who they want to testify that Lee would have lived only about three to five years anyway due to his underlying health conditions. Ex. 5, report of Dr. Mark Landrum, attached. They offer this testimony in a vacuum without explaining what those five years would have been like for Paul, given that he was a paraplegic because Defendants' driver crashed into him and ran him off the road. That paints only part of the picture.

Dr. Owen's report and testimony fill that gap. The life-care plan explains to the jury what Paul would have been required to endure during those five years because of Defendants' negligence had he lived. The life-care plan is a direct response to Dr. Landrum's opinion as to Paul's life expectancy. Without it, the jury will be left with only part of the story. It will never learn that Paul was facing a life of expensive rehabilitation, unable to walk and care for himself. Dr. Landrum's view is merely that Paul was going to die in three to five years anyway, so there is no great loss here. The life-care plan finishes the story by detailing what that three to five years would have been like because of Defendants' negligence.

This is classic rebuttal evidence offered to complete the picture Defendants' evidence opened the door to painting. Rebuttal evidence is evidence offered in response to evidence offered by the other side. *Kincannon v. State*, 85 Ark. App. 297, 304152 S.W.3d 8, 12 (2004). It is offered in reply to new matters raised by the opposing party. *Ibid.* The Eighth Circuit tells us "rebuttal evidence may be used to challenge the evidence or theory of an opponent—and not to establish a case-in-chief." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 759 (8th Cir. 2006).

**5. The towing and storage expenses.**

Ark. Code Ann. § 27-53-401 addresses the "Measure of damages to motor vehicles," and provides "In all cases involving damage to motor vehicles, the measure of damages shall be" the diminution in value of the vehicle plus loss of use of the vehicle. Defendants extrapolate from those words that when a car is damaged and has to be towed and stored, the towing and storage fees ***the tortfeasor caused*** cannot be recovered as an element of damage. That is wrong.

*First*, fees for storage and towing are not part of the "damages to motor vehicles" that the statute covers. The need to tow and store the vehicle is a result of the damage to it, but it is not the damage itself. On the other hand, the loss of the ability to use the vehicle is part of the damage to

the vehicle. Towing and storing the vehicle is a separate element of damage the statute does not address. The statute cannot forbid an element damage it does not address.

An analogy helps. The essence of Defendants' logic is that because the towing and storage fees are related to the damage to Paul's truck, the statute applies. But so too his broken back and paraplegia are "related" to the damage to the truck. Does anyone seriously contend that, because Ark. Code Ann § 27-53-401 does not mention injuries to the human body in its text that those injuries are not compensable? Of course not. the same logic applies to towing and storage fees. They are related to the damages to the vehicle but are not part of the damage to the vehicle so the statute does not apply.

*Second*, Defendants ignore constitutional principles. The Arkansas Constitution promises that "Every person is entitled to a certain remedy in the laws for all injuries or wrongs he may receive in his person, property or character." Ark. Const. Art. 2, § 13. This article was cited as a basis for recognizing loss of use as a compensable element of damages when an automobile is placed out of service by the negligence of another in *Sharp v. Great Southern Coaches, Inc.*, 256 Ark. 773, 510 S.W.3d 266 (1974). The same logic applies to towing and storage expenses. The expense is caused by the negligence of the tortfeasor. To place the injured party in the position he would have been had the negligence not occurred, which is one goal of the tort system, *Bell v. Estate of Bell*, 318 Ark. 483, 490, 885 S.W.2d 877, 880 (1994), an injured person must be allowed to recover this element of damages.

**CONCLUSION**

Defendants' motion should be denied. The direct causes of action are cognizable, Hastings is a wrongful-death beneficiary, and all pleaded elements of damage are available. The Court should so rule.

Respectfully submitted,

Attorney for Plaintiff

BY: *Bryce Brewer*

Bryce Brewer (ABN 2002013)
RAINWATER, HOLT & SEXTON, P.A.
P.O. Box 17250
Little Rock, AR 72222
(501) 868-2928
(501) 868-2990 (Fax)
bbrewer@rainfirm.com