IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

MIKKI HASTINGS as Personal Representative and SPECIAL ADMINISTRATRIX of the Estate of WILLIS PAUL LEE, JR., DECEASED, on behalf of the individual and survival heirs and Wrongful Death Beneficiaries of WILLIS PAUL LEE, JR., deceased. PLAINTIFF

VS. NO. 6:25-cv-06053

MONTANA CARRIERS, INC.; JAGDEEP DHILLON; JOHN DOES 1-3 and JOHN DOE ENTITIES 1-3 DEFENDANTS

---

ORAL DEPOSITION

OF

MIKKI HASTINGS

TAKEN OCTOBER 8, 2025, AT 1:02 A.M.

---

*Arkansas Diamond Court Reporting*

*21043 Natalie Lane*
*Little Rock, Arkansas 72206*
*www.arkansasdiamondcourtreporting.com*
*PHONE: 501.319.4807*

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:

MR. BRYCE BREWER
RAINWATER, HOLT & SEXTON, PA
P.O. BOX 17250
LITTLE ROCK, ARKANSAS 72222
bbrewer@rainfirm.com

ON BEHALF OF THE DEFENDANTS:

MR. JEFFREY PURYEAR
PURYEAR MAYFIELD & MCNEIL, PA
3000 BROWNS LANE
JONESBORO, ARKANSAS 72401
jpuryear@pmmlawfirm.com

MR. LARS KNUTSON
WILSON ELSER
2231 EAST CAMELBACK ROAD, SUITE 200
PHOENIX, ARIZONA 85016
lars.knutson@wilsonelser.com

# I N D E X

STYLE AND NUMBER . . . . . . . . . . . . . . . . . . . . . 1

APPEARANCES . . . . . . . . . . . . . . . . . . . . . . . . 2

STIPULATION PAGE . . . . . . . . . . . . . . . . . . . . . 4

WITNESS: **Mikki Hastings**

Examination by Mr. Puryear . . . . . . . . . . . . . . 5

Examination by Mr. Brewer . . . . . . . . . . . . . . 106

Further Examination by Mr. Puryear . . . . . . . . . 113

Examination Concluded. . . . . . . . . . . . . . . . . 111

COURT REPORTER'S CERTIFICATE . . . . . . . . . . . . . . 113

(NO EXHIBITS WERE IDENTIFIED OR ATTACHED TO THIS TRANSCRIPT)

C A P T I O N

ANSWERS AND ORAL DEPOSITION OF **MIKKI HASTINGS**, a witness produced at the request of the defendants taken in the above-styled and numbered cause on the 8th day of October, 2025, at 1:02 p.m., by Zoom video conferencing, pursuant to the Federal Rules of Civil Procedure.

P R O C E E D I N G S

THEREUPON,

**MIKKI HASTINGS,**

THE WITNESS HEREINBEFORE NAMED,

having been first duly cautioned and sworn by me to testify to the truth, the whole truth, and nothing but the truth, testified on her oath as follows, to-wit:

**EXAMINATION**

BY MR. PURYEAR:

Q Good afternoon, or good morning to you, Ms. Hastings.
A Morning.
Q Can you hear me okay?
A Yes, I can hear you okay. Can you hear me okay?
Q I can.
A Okay.
Q I just introduced myself to you. I'm Jeff Puryear. I'm a lawyer in Jonesboro. I represent, along with my co-counsel, Lars Knutson, who's participating by phone today, represent the defendants in the lawsuit that you have filed against Montana Carriers, Inc. and Jagdeep Dhillon. Do you understand that?
A Yes, I do.
Q We've asked to take your deposition here today. And before we get started, you've got a very good lawyer there,

and I know you've had an opportunity to speak with him, but I wanted to at least provide you the framework for today's proceeding so you have some understanding of my objectives and plans, okay?

A Okay.

Q I'm going to ask you a series of questions about the lawsuit, Mr. Lee, yourself, and other topics, and my goal here is to get information from you. It's important for you to know I'm not here to trick you. I'm not here to confuse you. In fact, I'm here for the exact opposite. I'm here, hopefully, to ask you questions that make sense, and give you an opportunity to give me a truthful response. Do you understand that?

A Yes, I do.

Q If I ask a question, and you answer it, I'm going to assume a couple of things, Ms. Hastings. Number one, I'll assume that you understood my question, and number two, that your response is truthful and I can rely upon that when we go to trial. Is that fair?

A Yes, that's a fair assumption.

Q If I ask you a question that you don't understand, if you will please let me know that and give me the opportunity to restate it or rephrase it in a way that makes sense, I'll do my best to give you an opportunity to give me a truthful answer, okay?

A Okay.
Q All right. We're doing this by Zoom, which is in some ways an unconventional way, but it's necessitated by your location, and that's fine. There's a little bit of a lag, I think, so let me ask you to do this, and it will help our court reporter as well, if you will let me finish my question before you start your answer, that will probably make the proceeding go easier for us, okay?
A Okay. So, I'll give a -- I'll just give a short pause to make sure that everything is completed before I answer.
Q Yeah, and you're doing fine. If you say uh-huh or huh-uh, or if you just simply shake your head or nod, I'm going to ask you to clarify yes or no, okay?
A Okay.
Q And I recognize that that's contrary to how we communicate on a regular basis, but we're making, the court reporter is making a transcript, and I don't want there to be a question about the response that you gave. So I'm going to ask you to clarify, just know I'm not picking at you, okay?
A Okay.
Q And if we need to take a break, you just let me know, okay?
A Okay.
Q Ms. Hastings, have you ever given a deposition before?
A No, I have not.

Q Have you ever testified in court?
A No, I have not.
Q Okay. Have you reviewed any materials or documents to prepare for your deposition?
A No. The only thing that I have looked at is shortly after my uncle passed, my sister sent me a copy of the police report. We looked at it, we discussed it together, but that's the only thing.
Q And give me an estimate in time of how long ago that you looked at that report, Ms. Hastings.
A Maybe eight months ago, nine months ago. I'm not sure.
Q And am I correct that you've not looked at it since that time?
A No, I have not.
Q Okay. All right, back to my question, then, have you reviewed any materials or documents to prepare for your deposition today?
A No, I have not.
Q Okay. I'm certain you've had an opportunity to visit with Mr. Brewer, and my question is not intended to ask anything about your conversations with him or anyone in his firm. Have you talked to anyone else to prepare for your deposition today?
A No, I have not.
Q Okay. Ms. Hastings, I want to try to get something

clear in my mind. The lawsuit that's been filed in your name identifies you as Mikki, M-I-K-K-I. The answers to interrogatories that we received say Mikka, I believe M-I-K-K-A. Can you clarify for me?
A My name is pronounced Mikka, but it is spelled M-I-K-K-I.
MR. BREWER: That was a typo on our part, Jeff.
Q So the lawsuit is correct in the spelling of M-I-K-K-I, as I understand it.
A Yes, that's my correct legal spelling.
Q All right. Okay, let me get some background on you, Ms. Hastings. Where do you live?
A I have -- my home is in Okolona, Arkansas. I have a farm there. I've lived in Okolona almost my entire life.
Q You're not in Okolona, are you?
A No, I'm currently working in Alaska.
Q Where in Alaska.
A I'm in a village. It's called Holy Cross, Alaska.
Q When did you move there?
A I started teaching here in August of last year.
Q All right, so this is 2025, so you began teaching in Alaska in 2024?
A Yes, that's correct.
Q What do you teach?

A I'm a special education teacher for the district.
Q You have a gift, then.
A I feel like I'm blessed to be able to do the job that I do. It's great.
Q My wife was a special ed teacher. I understand. How long have you been a special education teacher, Ms. Hastings?
A I have only been a special ed teacher since 2024. I started my special ed career here at Alaska.
Q And why did you move to Alaska to be a teacher?
A Well, me and my husband are empty nesters. We're both teachers, and we just kind of thought it was an interesting adventure, and that's kind of why we initially did it. We thought it would be a neat thing to do, so we did it.
Q So your husband's a teacher also?
A Yes, he is. He's a -- he's currently the principal and high school/middle school teacher of Holy Cross.
Q How did you get connected with Holy Cross?
A We -- initially, I had just been searching online for interesting teaching jobs. Alaska popped up, and I just kind of did the application just on a, I don't know, on a whim, I guess. The next day, after I applied, a guy who was from Arkansas called me. He actually graduated from Henderson State University, which is the same as me, so there was a recruiter here who was from basically my area. So he called me and he asked me if I would like to come in and teach here.

Initially, we were not all that serious about doing it, but after we talked about it, it really did seem like something we wanted to do. And we had -- we felt like we had a little bit of a connection here because this guy was from our same hometown, so that's why we came here.

I'm actually hired for the district, so there's multiple schools here, so I work out of Holy Cross, but I travel to other schools. They sent us to Holy Cross because they wanted a stable couple here was why we're actually stationed out of this particular village, and he's working out of this particular village.

Q Did you already have your qualifications and education requirements to be a special ed teacher?

A Yes, I do. I was licensed out of the state of Arkansas. I completed my degree, or my certification, in special ed before I came here. But me and him both were science teachers in Arkansas, and so I could have been a special ed teacher there, but we were already in a critical area so --

Q Is Holy Cross a private school?

A No, it's a state school.

Q And so how long have you been licensed as a teacher through the state of Arkansas?

A Since -- I believe I've been licensed since 2018.

Q Okay. You said you were a science teacher at first, and then you're now a special ed teacher.

A Yeah, I had certified as a science teacher, and that's what I taught in Arkansas. I went back to college for special ed certification.
Q Where did you go back to school?
A Henderson State.
Q And you said that's where you went to college originally?
A Yes, it is.
Q When did you graduate and get your degree from Henderson?
A My first degree, I received in 2010. I went to college for math and science education, but I didn't begin teaching after that. I took a job for county government, and so that's why it was a while before I got my teaching license.
Q And then when did you -- you returned to Henderson State to get a -- is it a second degree for special ed?
A Well, I went whenever -- in 2017 or '18, in that area, whenever I decided that I wanted to teach, I actually had to go back for an untraditional teaching license because I did not teach directly out of college, so I went back at that time and got my master's in education. So 2018 to 2020, I received a master's in education, and then in 2023, I did a -- I did a certification endorsement program for special education, and I completed it in 2004 -- 2024, I'm sorry, in the spring of that year.

Q Tell me your husband's name, please.
A My husband is Adam Hastings.
Q And you said you've lived nearly all of your life in Okolona?
A Yes, that's true.
Q And where did you graduate from high school?
A I actually completed a GED program, but I attended most of my high school in Gurdon, Arkansas, which is the school district for that area.
Q Okay. And at what point did your high school education -- did you cease your high school education? What grade were you?
A 12th grade. I did --
Q You completed the GED during your 12th grade year?
A I dropped out of high school in my 12th grade year, and I completed the GED the following year.
Q What year would you have graduated had you completed your 12th grade?
A '95.
Q And what about Mr. Hastings? Where did he grow up?
A He grew up in the -- well, basically, about 10 miles down the road. He lived in a community called Trinity, and he went to school in Gurdon.
Q And did he graduate from Gurdon High School?
A Yes, he did.

Q What year?
A I believe he graduated in '92.
Q Okay. What is the address for your farm in Okolona, please?
A It is 7902 Highway 51 South, Okolona, Arkansas.
Q How long have you -- has that been your home?
A I've owned that place since 2017.
Q What is your address currently?
A I am at 12 Main Street, Holy Cross, Alaska.
Q And other than your husband, does anyone live with you in Alaska?
A No.
Q And when was the last time someone lived with you and your husband at the farm in Okolona?
A Other than the two of us?
Q Yes, ma'am.
A It's been some time. Probably, maybe, 2016 or '17. I'm not certain on those -- well, hang on. It would have been probably 2018 and 2019, because I have had one of our children temporarily living with us since we've been at the new home, but it's been some time.
Q Okay. All right, how many children do you have, Ms. Hastings?
A We have four children.
Q Are they all adults?

A Yes, they are.
Q And where do they live?
A I have --
Q Tell me their names and where they live.
A Okay, I have Heather. Do you need last names as well?
Q Yes, ma'am.
A Okay, Heather Hughes. She lives in Houston, Texas. I have Britney Wright. She lives in Berryville, Arkansas. I have Amy Scobey, and she lives in Hope, Arkansas.
Q Spell Scobey, please.
A S -- give me just one second. I'm sorry, I don't -- I think it's S-C-O-B-E-Y is how it's spelled, but I'm not positive.
Q All right.
A And then I have Elizabeth Rogers, and she lives in Arkadelphia.
Q So you have four daughters?
A Yes.
Q Okay. And is Mr. Hastings the father of all your daughters?
A He's the father of all of them except for my oldest one?
Q Is Heather the oldest?
A Yeah -- yes. I'm sorry. Yes, she is.
Q All right. Were you previously married?
A No.

Q Okay.
A Me and Adam married when she was one years old.
Q Okay. Just so -- at least to provide you some context, I'm curious about any relatives that you have around the Arkadelphia area, particularly Montgomery County, which is Mount Ida, Garland County, Hot Springs, Hot Spring County, which is Malvern, Pike County, Murfreesboro, and then Clark County, Arkadelphia. You've mentioned to me Elizabeth is in Arkadelphia. She's in the circle. Folks in those counties are eligible for jury service in the case, and that's why I'm asking.
A Okay.
Q Is Elizabeth married?
A Yes, she is.
Q What's her husband's name?
A His name is Logan Rogers.
Q Okay. I don't know if Hope -- is that in one -- I don't know if that's -- I'm not familiar with the geography. Is that in one of those counties?
MR. BREWER: Hope is in that district. It will -- it falls in that district. I don't know if it'll pull up to the Hot Springs division or not, but Hope is in Hempstead County.
MR. PURYEAR: Okay.
Q All right, well, I guess just to be safe --

MR. PURYEAR: Thanks, Bryce.
Q -- what is Amy's husband's name? I'm assuming she's married.
A Yes. His name is Madison.
Q Okay. I'm confident that Berryville and Houston are not, so we're fine there. What about -- do you have other relatives, besides your daughters, who live in any of those counties?
A Yes, my sister, Rebecca McElhannon. She lives in Bismarck.
Q Spell her last name, please.
A Oh, that's another one. Give me just one second. Let me see. She's -- I don't know if her name is actually listed in the suit. She may be in paperwork you have.
Q You said she's in Bismarck?
A Yes.
Q Okay. Yes, I found it.
A Okay. Okay.
Q Is Rebecca married?
A Yes, and his name is Daniel. She has a daughter who's over 18, and her name is Katie.
Q Does she still go by McElhannon? Katie?
A Yes.
Q All right. Any other relatives you have in those five counties, Ms. Hastings?

A My mother is inside those counties, and her name is Joan Loy. She is in Bismarck.
Q Please spell her --
A L-O-Y.
Q Okay. We kind of -- we got down this road because I was asking you who had last lived with you and Mr. Hastings, and you had thought maybe 2018 or '19. I'm reminded you seem to be pretty happy about being an empty nester at the start. Sometimes they come back.
A Yeah.
Q So was the last person to live with you and Mr. Hastings, was it one of your daughters?
A Yes, it was.
Q Okay. And other than your children, in the last ten years, has anyone else lived with you and Mr. Hastings?
A No.
Q Okay. You told me that you and Mr. Hastings moved to Alaska in August of last year, and I took it from your testimony that you've lived there continuously since that time.
A We come home -- I have been able to come home about every quarter, but we do come home every Christmas, and we also spend our summers back there.
Q When you say "every quarter," what does that mean?
A Somewhere between August and December, I have managed to

be able to go back home for a short visit. It's a long time to be away from the kids, so --
Q How long is the short visit?
A Total travel and everything, less than a week, or a week.
Q Do you-all drive home?
A No, we fly.
Q Okay.
Q But we are in a bush village, and whenever we leave here, it usually takes us about three days to actually get in the air to Arkansas.
Q Okay. And I'm not sure I understand. Let me go back to -- it's me, not you, I'm certain of that. But when you say "every quarter," is that multiple times during the year? Because you described something between August --
A Yeah, I try to get home -- of course, we are at home up until August. Sometime between August and December, I try to get home.
Q Okay.
A And then in December, we're home again. And then in the spring, usually around spring break, I'm scheduled to be home in April this next year, but somewhere in that time, I go home, and then we're home again at the end of May. So I try to make it no more than just a couple of months at a time that I'm actually gone continuously.

Q It sounds like your school year is similar to Arkansas, generally August to May.
A Yes. Yes, it is.
Q And so you're in your second year of teaching in the district.
A Yes.
Q And do you and Mr. Hastings intend to continue on, and right now, your plans are you'll teach there in the school year '26 and '27?
A We do think so. We -- the pay here is considerably more, so that's what we're working on. Basically, we're doing some retirement things here is what we're looking at. Initially, when we came, it was just going to be for one year, but it's been extremely pleasant working here, and it's been nice.
Q I'm just trying to figure out last fall. Do you recall when you made trips back to Arkansas?
A I came back to Arkansas in September. My daughter, Amy, had a baby, and so I was -- that was my -- basically, that was my excuse to finally come home, so I took some leave, and I was back home for a little over a week in September.
Q Okay. When was the next time that you were home in 2024?
A I had a week off at Christmas -- a week back in Arkansas at Christmas. We actually had two weeks. We had weather

problems, so it took me a little longer. How long were you actually here in Arkansas over that two-week span?
A Probably seven or eight days.
Q And then when was the next time that you were back in Arkansas?
A I didn't get to come back until May this last year.
Q And how long were you home? Was that when you came home for the summer?
A Yeah, I was here for 12 weeks.
Q Okay. I take it, then, that your goal of making it back for spring break in 2025 didn't play out.
A No, it didn't.
Q Okay.
A But it is on the calendar for this year, so --
Q And did Mr. Hastings, did he make any other trips home besides -- well, let me back up. Was Mr. Hastings with you each time that you came home in September and December of '24 and May of '25?
A Only December and May. So our -- basically, our continuing -- our plan is that -- I guess whenever I said that I would go home once a quarter, that wasn't really what our -- our plan is for either me or him to travel back in the spring and in the fall, so it won't be both of us. Our school doesn't really -- there's only three of us that work in the school, so we both really can't be gone together,

except for holidays and when school's closed.
Q Is the door open for you and Mr. Hastings staying in Alaska permanently?
A Well, we could, but we do not -- we can't own a home here.
Q Okay.
A We're living in teacher housing, and except for the spot that the school is actually on, and the teacher housing is on the school property as well, except for that one spot here, everything else here is tribal, and so we can't own property here. And so it would not be a place that we would live permanently.
Q And you said everything else here is -- I did not understand your answer. Please say that again.
A Except for the spot where the school is sitting, and the teacher housing, that is Alaska state land where those things are sitting, but everything else here is tribal land. It's owned by an Athabascan tribe, so we can't have property here. We can't -- basically, we can't live here.
Q Okay. I take it, from your testimony a few moments ago, Mr. Hastings is the only person to whom you've been married, correct?
A Yes, that's correct.
Q All right, I had asked about your other relatives. You identified your sister, Rebecca. Tell me who your other

relatives are, please.
A Actually, I have some aunts and some distant cousins, but aside from the people that I have mentioned to you, I don't actually have any more relatives in the area.
Q Okay. I believe you've listed your sisters in some of the documents you filed in Mr. Lee's estate.
A Yes. So my sisters, Kathy, or Kathryn, she lives in Oklahoma, and she's my sister. And Mary lives in Florida, and she's my other sister. So the three sisters is all that I have as far as that family goes.
Q And what's the order of age with you and your sisters?
A It's Kathy, me, Mary, and Becky.
Q All right, your father, who's your father, please?
A My father is Billy Lee, which was Paul's brother. He died in 2008.
Q I'm sorry for your loss.
A Thank you.
Q And were he and your -- did he live in the area close to you in Okolona?
A Yes, he did. He lived in Okolona.
Q All right, were your mother and your father still married when your father passed away?
A No, they were not.
Q Had your father remarried?
A No, he did not.

Q Okay. And so is Mr. Lee, your father, is he older or younger than Paul Lee?
A He is -- he was older.
Q What was the age difference of your father and your uncle Paul?
A I have no idea. He was 54 whenever he died in 2008, but I can't do that math in my mind, so I --
Q Okay.
A I don't -- I think it was just a few years, but not positive.
Q Here in Arkansas, Ms. Hastings, did you attend church?
A I did.
Q Where did you regularly attend?
A I actually have two churches that I regularly attend. The Trinity Methodist Church, which is -- I guess it'd probably have a Gurdon address, but it's right down the road from my house. And then I also attended Mount Bethel Baptist Church in Arkadelphia.
Q And was the same true for Mr. Hastings? Did he attend both of those churches?
A Yes.
Q Any other churches in the area that either of you attended at any significant period of time?
A Yeah, I attended Third Street Baptist Church for a while in Arkadelphia, but yeah, that's pretty much it.

Q How close is Arkadelphia to your ranch?
A It's about 15 miles, 15, 20 miles.
Q Were you involved in any organizations or civic groups back here in Arkansas?
A Yes.
Q Tell me about those, please.
A I was actually involved in a significant amount. I have been a firefighter for about 25 years, and I was the fire service coordinator for the county, so I volunteered for all the fire departments. In addition to that --
Q Did they --
A I'm sorry.
Q Pardon me for interrupting you. I want to come back to that. What county is Okolona?
A Clark County. I was the emergency manager and fire service coordinator for the county for nine years, eight years. That's what I did between 2010 and 2018, whenever I become a teacher.
Q And where was your office located in that position as the manager?
A My office was located in Arkadelphia. It was above the county sheriff's office.
Q And you last held that position in 2018?
A Yes.
Q And was that --

A I continued --
Q Was that --
A I continued as a volunteer for the departments after I left that position.
Q For how long?
A Until I came to Alaska. I mean, I'm actually still a volunteer on paper for those places, and when I'm home, I definitely will help them, but yeah, until I came here.
Q So as I understand, you were a firefighter for 25 years.
A Uh-huh.
Q And was that at the same time -- were you also the emergency manager for the County?
A Yes, yes.
Q So how long did you serve as a manager?
A So I was the emergency manager for eight years. That is the job that I was paid to do. As a firefighter, now, I did occasionally have times during my job where that was actually part of my job duties, but I also worked as a volunteer for the local departments. As fire service coordinator for the county, I was considered a full-time firefighter, but I did that -- that was only for that eight-year period. I was a volunteer prior to that, and I was a volunteer after that.
Q Is the fire service coordinator and emergency manager position, are those the same, or are those different positions?

A Yeah, they're pushed in together.
Q Okay. And you served in that -- was that a full-time position with the County?
A Yes, it was.
Q And that was for the eight years that you mentioned earlier.
A Yes. Yes, I took that job -- right out of college, I took that job. Now, of course, I went to college as an adult, but, you know, as soon as I graduated, that was the job that I took instead of teaching.
Q And then your volunteer work as a firefighter, 25-year span, would have preceded your employment with the County, and also it was after your employment with the County was complete. Is that correct?
A Yeah, that's correct. I started volunteering as a firefighter somewhere around 2000, 2001, somewhere in that area. And, of course, that -- my volunteer work began in Okolona because that's, you know, that's where I'm from. And then it continued, and it expanded.

In addition to that, I'm also heavily involved in search and rescue. I am the president of the National Association for Search and Rescue. I've been a -- this is my ninth year elected to that board. And I also have my own nonprofit, which is Missing Individual Support Services of Arkansas. We provide funding and stuff to families whose family members

are missing.
Q All right, let me ask you a few questions about that. On your search and rescue position with the organization, when did that -- when did you start as the president?
A As the president, I believe it would have been in -- I believe it was '21. We didn't have a meeting because of COVID, but I don't think it was '20. It was either '20 or '21, but I do not know for sure.
Q And you still hold the position of president of that organization?
A Yeah, I -- I'm term-limited, so in December, I'll be off the board, and I won't have that position anymore because of terms.
Q All right. What about your nonprofit? And I -- missing person, I'll say that. I didn't get the full name. That's okay with --
A We call it MISS, yeah.
Q When did you form that entity?
A We've had it established with actually our, you know, nonprofit status and tax ID and all that. We've had that established for two years now.
Q Okay.
A So January of -- it was probably January of '24. We did it earlier, but then we had some -- our accountant had some problems so we had to reissue it, so --

Q And what role do you, or position, do you hold with the nonprofit?
A I'm the CEO of the company with the nonprofit.
Q When you were employed by Clark County, who was your direct supervisor?
A The county judge, which would have been Ron Daniel for a time, and then later, Troy Tucker.
Q And is Mr. Tucker the current county judge?
A He is.
Q Okay. We headed down this path as I asked about your community and civic involvement. Are there any other organizations in which you're involved, Ms. Hastings, or have been?
A No, not any -- not anything significant, I wouldn't think.
Q Okay. We've talked about your employment in Alaska, and then before you went to Alaska, you were teaching somewhere else. Is that correct?
A Yes, me and Adam both were teaching in Prescott at Prescott High School.
Q And what years did you serve as -- did you teach at Prescott?
A '17 through '24.
Q And was at the -- did your employment as a teacher overlap with your employment with the County as the

coordinator and manager?
A Oh, no, so -- I'm sorry, yeah, it would have been -- it would have been '18, not '17.
Q Okay.
A No, I left the County. I took the job teaching that -- I left the County because I took the teaching job.
Q Right. And what my goal here is to back up in time on your employment. So we covered, now, I believe, from present day back to 2010, when you were employed by the County. What was your employment before you went to work for the County as the coordinator and manager?
A I did work for a period of time for the Red Cross in the -- early in 2000, 2001, and that's kind of how I started down the road with the fire departments. But I also had young kids at the time, so I did not work continuously through that time.
Q Okay.
A I think I worked at the Red Cross maybe from 2000 to 2003, and then I was unemployed for a while.
Q And were you the executive director for the Red Cross office?
A No, I was the assistant executive director, though, but I was not the director.
Q And where is that office located, Ms. Hastings?
A The office was located in Arkadelphia. It was called

the Diamond Valley Chapter, but it is no longer -- it's been closed. It's closed down.

Q So we backed up about 25 years, and my goal here is to identify your various forms and places of employment. Have we covered everything?

A Yeah, pretty much, yes.

Q Do you have any medical education, Ms. Hastings?

A I'm a medical responder. I have been trained as an EMT. I'm not currently certified.

Q When were you trained as an EMT?

A Maybe 2007 through maybe -- well, yeah, maybe 2007 through 2012. I did not keep the certification once I obtained it.

Q Okay. And did you -- we didn't talk about you working as an EMT. So you had no employment history as an emergency medical technician?

A No. The sole purpose for me taking that certification was so I could teach medical responders. You have to -- you have to certify a level higher than what you're training, and I was the training officer for just about every fire department in Clark County. They needed medical responders, so I got my EMT license so that I could train them.

Q And when did you train firefighters? When did that take place?

A I still train firefighters. So I started that -- I

started that whenever I was with the Red Cross, and I'm still an instructor through the Arkansas Fire Academy. I still do that.

Q But it's -- in order to train, as I understand your testimony, Ms. Hastings, in order for you to train a firefighter, it's not necessary for you to be a certified EMT. Is that correct?

A That's correct. It was only necessary for me to certify to teach them specifically to be medical responders, and then they did not require me to continue that certification. But I was allowed to continue to train because I was also doing continuing ed as a medical responder. So I didn't have to keep the -- I had to obtain the EMT license, but I didn't have to continue it, so I didn't. I wasn't working as an EMT and it was, you know, it's a lot of headache to get that license.

Q Do you still provide continuing education for medical responders to this day?

A Yeah, if requested, I do that, yes.

Q When's the last time you provided that continuing education training?

A Not for medical, but for firefighters, I actually taught a class whenever I come home in June, and it's probably been a couple of years since I've done any medical training. Actually, the last time I did a first responder class, that

was during COVID, so it would have been 2021.
Q Let me make sure I understand what you're saying. You've done continuing education as recently as last fall for firefighters, but the last time you did any continuing education for an EMT class was --
A Not EMT. EMT was what I was certified at. That's a higher level. I trained them as medical responders, so they do not have a EMT license. They are not trained at that level. They're trained one level below that. In order to teach, you have to certify one level above, so I have taught a medical responder class. And I think 2001 would have been the last time I taught a medical responder class, but I taught a firefighting class in June, was the last time I taught a class. I have -- I'm requested to teach one in December whenever I come home as well.
Q You said 2021 was the last time you did a medical responder class. Did I hear you correctly?
A Yes, that's correct.
Q All right. What is the -- you've been pretty clear the medical responder is one step below an EMT. Yes, that's correct. It's not licensed. EMT is the first level that's actually licensed in the state.
Q And what is it that a medical responder does?
A It's a 40-hour professional responder training, so it's really focusing on what the firefighters will do whenever

somebody calls 911, and they go into their house and provide them care, or they're providing care on the side of the road. So it's not the same training as what you would have if you were working in an ambulance or in a hospital. It's got some improvision to it. It's for pre-hospital care, is what it is for.

So it will be some medical, and it will be some trauma, and it's designed to be temporary care until the ambulance arrives. Most all firefighters are trained in this because they're called out to provide care until the ambulance gets there, especially in rural fire departments, or rural areas. And the bigger places like Little Rock and things like that, they have their firefighters trained as EMTs.

Q Is it fair for me to say, respectfully, to you, Ms. Hastings, that the course that you're providing is not someone who is providing medical care such as a nurse. Is that true?

A It's true. It's true, yes. Yeah. They're dealing --

Q There's some initial -- excuse me, go ahead.

A They're dealing with bleeding, breathing issues, and, you know, just, they're basically just dealing with sustaining life until the ambulance arrives, is what they're doing. So they're not doing any kind of IVs or prescriptions or anything along that line.

Q But not assessing any type of vital signs, anything of that nature?

A They do, yes. They do vital signs, yes. Yes, that is part of it. They do full assessments on the patients, but they're only -- the main concern is just keeping them alive until the ambulance gets there. So we focus a lot on trauma and then, like I said, breathing issues, shock and heart issues, those types of things, and identifying them. You know, that's part of it, is trying to figure out what's going on with them.
Q Ms. Hastings, do you have social media?
A I do.
Q Tell me which ones and how you're identified, please.
A I mainly use Facebook, and on Facebook, I have my name spelled M-I-K-A, that's because I don't want to confuse my students, Hastings.
Q What else?
A I have the other ones. I mean, I have them all, but I can't even tell you what my username is on them because I don't get on them. I would assume that my username is probably M-I-K-K-I Hastings-something, on all of them. But I do have an Instagram, I do have Snapchat, and I do have TikTok.
Q How about Twitter, or X?
A No, I don't have that.
Q Do you have any military background, ma'am?
A No, I do not.
Q Okay. Does your husband have military background?

A No, he does not.
Q You told me about your husband teaching, and my sense of it was that you-all started teaching at the same time back in 2018.
A No. Adam actually started teaching in 2010. As soon as we graduated from college, he started teaching then. He's been a science teacher continuously until we come up here.
Q And where did he teach from 2010 until you left Arkansas?
A He taught in Bismarck the majority of that time, but he did leave -- I'm sorry, he taught in Prescott the majority of the time, but he did leave for a couple of years in the middle of it and taught in Bismarck. But I don't know for sure what years those were.
Q Those are the only two schools where he taught in Arkansas?
A Yes.
Q And what did he do before? I understand you-all went -- did you-all go to college together at Henderson State and graduate?
A We did, we did. He worked at Georgia Pacific as a -- he was a supervisor there.
Q Where's the Georgia Pacific facility?
A Gurdon.
Q Okay. And did he have any position with the County?
A No, he was a volunteer firefighter for Okolona as well.

And the last ten years, he served as their fire chief, but he did not work for the County.

Q And did he do any of the training of firefighters or medical responders that you've done?

A He is an instructor for the Arkansas Fire Academy, but he did not teach medical. He only taught fire response, specifically.

Q You taught both firefighters in response as well as the medical response component.

A Yes, that's correct.

Q And did you say your husband still is teaching through the Fire Academy in Arkansas?

A Yeah. He hasn't had a class on the books in a couple of years, but he assists me whenever -- me and him teach together whenever we go back. So he's still kind of doing that, but we're not --

Q Have you been -- go ahead. I'm sorry.

A We haven't been taking very many classes. We haven't been doing a whole lot of classes because our time is so limited, you know.

Q Are you-all able to still instruct from Alaska?

A I don't -- I mean, I can still instruct, but I do not teach from here because everything that we're teaching is hands -on. I have to be in Arkansas in order to do their classes.

Q And remind me, where's the Fire Academy?

A Fire Academy is in Camden on the campus of SAU Tech.
Q Have you been involved in any other lawsuit, Ms. Hastings?
A No.
Q What about your husband?
A I think that he had a lawsuit whenever he was much younger, like, maybe when he was 18 or 19, but I don't know the details of that.
Q What makes you think that he had a case?
A Well, I know that he had a lawsuit. I just don't know the details around it. I know that -- the only thing that I know is that they sued the County, and they received a settlement. I don't know any of the details. And that was before we were together.
Q Okay. And when you say "the County," is that Clark County?
A Clark County, yes.
Q And "they" meaning Mr. Hastings and who?
A He had one other person who was with him. It was a friend of his. The two of them had a lawsuit.
Q What's the friend's name?
A Sean Hughes.
Q Okay. Ms. Hastings, I ask this of all witnesses: Do you have a criminal record?
A No, I do not.
Q What about your husband?

A No, he does not.
Q Okay. I have seen the answers to interrogatories. There were actually two sets that were provided in this case in the answers that your counsel provided. Did you participate in gathering information to answer the interrogatories, Ms. Hastings?
A I did receive the forms, and I looked through the forms. The majority of the things that were asked, I didn't know the answers to.
Q Other than the police report that you mentioned earlier, have you reviewed any documents that pertain to the accident involving Paul Lee?
A No, I have not.
Q Have you reviewed any documents that pertain to the defendants we represent, that being Mr. Dhillon or his employer, Montana Carriers?
A No, I have not.
Q Have you, at any time, reviewed any medical records of Mr. Paul Lee?
A No, I have not.
Q Going forward, Ms. Hastings, to try to make it a little bit easier, if I say "Mr. Lee," I'm referring to your uncle Paul --
A Okay.
Q -- as opposed to your father. If I reference your father,

I'll make that clear, okay?
A Okay.
MR. BREWER: Hey, Jeff, we've been going about an hour. You mind if I take a quick break?
MR. PURYEAR: I don't mind at all, Bryce. That'd be fine.
MR. BREWER: Okay.
(WHEREUPON, after a break was taken, the proceedings were resumed as follows, to-wit:)
Q (Mr. Puryear continuing) Ms. Hastings, we're back on the record.
A Okay.
Q You had -- we were talking about what you had or had not reviewed, and you'd mentioned that you and your sister had a chance to look at the police report for the accident with Mr. Lee.
A Yes.
Q And you said that was sometime after your uncle had passed away, sometime, maybe, eight months or so ago.
A Yeah, it was shortly after.
Q Okay. And I think you told me, but I've forgotten, which sister was it that reviewed the report with you?
A That would be Rebecca. And actually, me and all of my sisters reviewed it together.
Q Okay. Where were you-all?

A We were by Zoom. We discussed by video conference.
Q Okay. And you were in Alaska at the time?
A Yes, I was.
Q Okay. And so what was the -- tell me about that. What discussion did you-all have?
Q Well, we were just trying to figure out what had happened. We didn't -- we didn't have a lot of information, and so we were just trying to find out something. So she pulled the -- she found the police report, and she sent it to us, and we looked over it.
Q Did you-all reach any conclusions from the police report?
MR. BREWER: Object to form.
A It was -- the report, to me, was pretty vague. It didn't -- I mean, without being there -- I don't know. We read it, and we just kind of -- just kind of put it to the side because we couldn't make any assumptions based on it.
Q Okay. And it was Rebecca who was able to obtain a copy of the report; is that correct?
A That's correct.
Q All right. Do you recall the officer who prepared the report?
A No, I don't know who it was. I believe it was someone with the state police, but that's all that I know.
Q Okay. My recollection is that the officer who prepared it is a deputy by the name of Steven Holt with Clark County

Sheriff's Department. Do you know him?
A I do not know him.
Q And we've already talked about, you've not reviewed any other documents with respect to the accident, correct?
A That's correct.
Q And have you attempted to speak with anyone other than your sisters, and your counsel, about the accident and what happened with your uncle Paul?
A No, I have not. The only person that I have -- the only person I spoke with was the person who has the truck in his -- in his lot gated off. And it was because I knew the person, and I -- whenever I found out that the truck was there, I messaged him, and I asked him why he didn't tell me that my uncle had had a wreck, because I did not know about the wreck.
Q Okay. Couple things. Number one, who is this person that you're referring to?
A His name is Bill Rogers, and he's the one that currently has the truck in impound.
Q So is he the tow -- did he have the tow truck at the scene?
A Yes.
Q And what is the name of his business, if you know?
A Automobill's.
Q And where is that located, Ms. Hastings?
A In Arkadelphia.

Q Okay. And you said that you called him, and you did not know that your uncle had a wreck.
A Right.
Q When did you first learn of Mr. Lee's accident?
A The night before he passed away.
Q And my recollection is that Mr. Lee passed away on January the 30th of 2025, so it would have been January the 29th, the day before, 2025, when you learned of Mr. Lee's accident.
A Yes, that's correct. And, of course, I've got a time zone difference, so I don't know when it was actually happening, but it was -- here, it was late in the afternoon, and he died overnight, so it was not very long after I found out that he died.
Q And how did you learn that Mr. Lee had an accident?
A Jason Yearby sent me a Facebook message. He told me that my uncle was in the hospital and not doing very well, and that we needed to contact the hospital.
Q Who is Jason? And I'm going to ask you to spell his last name, please.
A I don't know the correct spelling, but I think it's Y-E-A-R-B-Y. I don't know that that's correct. But he is a -- he's a guy that my uncle was spending time with. They had -- they were working on refrigerators, and things like that, appliances, together.
Q Where does Jason -- did you say Yearby?

A Yearby, Yearby, B-Y. He -- I believe he lived in Gurdon.
Q But he, Jason, messaged you on Facebook to advise that your uncle was in the hospital and not doing well.
A Yes.
Q Do you know, Ms. Hastings, when your sisters learned that Mr. Lee had an accident?
A When I messaged them that night. I group-messaged all of them, and I sent them a message, and I told them that -- I was actually in the air flying between villages at the time, so I didn't have really good ability to communicate. I sent them a Facebook message because that was the only way I could get out. And I said, Jason has messaged me and told me that Paul was in the hospital and not doing really well. I said, Can one of you-all contact the hospital? And my older sister, Kathy, said that she could call them, and she contacted the hospital, and then she contacted us back. And when she contacted us back, she said that it was not looking good for him, and that she had -- they had asked what we wanted to do. And she said that she told them to make him comfortable, and he died a few hours later. It was -- and that was when we all knew, when we all found out.
Q And Kathy is your sister who lives in Oklahoma; correct?
A Yes, that's correct.
Q Okay. What is your relationship or connection to Jason Yearby?

A He's just a -- he's a friend of Paul's. We've talked occasionally. You know, I know that -- I know that him and Paul worked together and he's -- you know, he's come by the house a couple of times with Paul. I didn't really have a relationship one way or another with him. You know, I know who he was, and I knew that Paul enjoyed being around him so --
Q When you said that he came by the house with Paul, are you talking about your home in Okolona?
A Yeah, yeah. He would come by with him occasionally whenever Paul visited.
Q And so I take it from your testimony a few moments ago that you learned of your uncle's circumstance from the call -- or I'm sorry, the message on Facebook on January the 29th. You then contacted your sisters, all three of them, and passed on the information, and that was their first knowledge that your uncle had been in an accident; is that correct?
A That's correct.
Q All right. And as I understand, your sister Rebecca was living, I guess, still lives, in Bismarck. She was living there at the time; is that correct?
A Yes, that's correct.
Q Do you know, did she go to the hospital at any time to see your uncle Paul?
A No. But again, this was just a couple of hours, and it was -- it was -- so if it was in the evening here, it would

have been, you know, probably -- it would have been super late there. I mean, I didn't think that whenever he said that he wasn't doing well, I didn't think that it was imminent. We didn't -- you know, I didn't know it was going to be immediate, but no, she did not go.

Q Okay. And I asked about her just because of her close proximity. I'm assuming that your sister in Oklahoma, and certainly your sister in Florida, they had no opportunity to go see him in the hospital.

A No, they did not.

Q Okay. You'd mentioned your conversation that you reached out to Bill Rogers, and you made some comment earlier, you said to him, these are my words, not yours, or something to the effect of, You didn't contact me to notify that my uncle had been in an accident.

A Yeah, this was just a couple of days after Jason -- I had talked with Jason, and Jason had told me that something to the effect that he had gone to look at the truck, and he wanted to get some stuff out of the truck, and the place that he had gone to had told him that he couldn't have any contact with the truck, wouldn't let him. And I said, Well, where is the truck at, you know? And he said -- he told me that it was at Arkadelphia. Well, the person that has the truck was a fire chief at one of the fire departments and is a friend of mine. And so I sent him a text message, and I was, you know, upset

and kind of angry, too. I sent him a text message, and I said, Why didn't you tell me that you had my uncle's truck? Why didn't you tell me that this had happened? And he replied back to me a question mark, and then he called me, and I said, Do you have Paul Lee's truck? And he said -- and then he said, you know, Yeah, I didn't have -- but he didn't know -- he said he didn't put together that that was any of my family or anything. And he told me that he had the truck in the back and that he did tell me that several people, Jason and a couple of other people, had come by asking questions about the truck, but he had it locked up.

And, anyhow, I asked him if he would send me pictures of the truck, and he sent me pictures of the truck. And I did look at the damage on the truck. And, but that -- aside from talking to him, that's the only -- and the only reason I made a contact with him was because I felt like, you know, at that time, I felt like he should have realized whose truck that was, and I should have known back in October that this happened, you know. Anyhow.

Q You said that Mr. Rogers was a fire chief for whom you had some familiarity, but you-all were friends as well.

A Yes, we were also friends. Yes, we're friends.

Q Was Mr. Rogers aware of your relationship, your family connection, to Mr. Lee?

A Yes, he is.

Q Okay. Mr. Rogers sent you some pictures of Mr. Lee's vehicle. You told me that. Did he provide you any additional information about the vehicle?
A No, I didn't ask him anything about it. I just asked him to send me pictures.
Q And my next question, you may have anticipated, but did you talk to him or did he share with you anything else that he knew about Mr. Lee, or the accident, the circumstances, anything of that nature?
A No, he didn't.
Q Was Mr. Rogers at the scene of the accident?
MR. BREWER: Object to form.
A He picked up the vehicle from the accident, but I think it's, like -- I think it's after the fact. I mean, I don't know.
Q And you --
A He wouldn't have been at -- just my knowledge of these wrecks, you know, he would have been there before the cops left, but --
Q No, my question was whether -- and you've hit on it. Did he actually go to the scene, and is he the one who retrieved your uncle's vehicle? You testified he did.
A Yes, he picked up the vehicle.
Q Okay. I'm going to ask you a broad question. It's intended to be broad, Ms. Hastings, because I want to try and

make sure I catch everything while I've got this time to talk with you, but did you talk to anybody else other than Mr. Rogers? And then you talked about Mr. Yearby. He called you about your uncle. But did you talk to anybody else about what happened at the scene of the accident or the circumstances for your uncle's accident?
A No, I have not.
Q And then other than your conversation with Mr. Yearby about your uncle's condition in the hospital, have you spoken to anyone else, outside of your counsel, about any injuries that he sustained or any medical treatment that he received?
A No, I have not.
Q Okay. My question was, have you talked to anybody? Let me expand that in one way. Have you messaged anyone, texted anyone, emailed anyone, any sort of electronic communication on those topics, the accident, the injuries, or the medical treatment?
A No, I have not.
Q Okay. And so the sum total of information that you have received outside of your counsel would be through communications with Bill Rogers and Jason Yearby, and then the conversations that you and your sisters had relative to the automobile accident report. Is that true?
A Yes, that's correct.
Q Have you, at any time, prepared any notes about anything

with respect to your uncle's accident, or his injuries, the circumstances?
A No, I did attempt to, you know, try to remember times that he's been ill in the past, and I've talked to my counsel about that, but that's basically all. I didn't have any information, so I didn't -- you know, I don't really have any way I, you know --
Q Let me try it this way, and I'll caution you, please, your conversations with Mr. Brewer, you can keep those to yourself, please.
A Okay.
Q But did you prepare any notes about anything about his medical history? Do you have anything that you've written down or typed out?
A No.
Q Okay. How about your sisters? Do you know if they prepared any notes or written down anything about what happened with your uncle, his injuries, his medical care?
A I don't know. I don't think so, because, you know, they're not -- they're not talking with you-all right now, so I don't think so, but I don't know.
Q Let's try it this way: you've not reviewed the notes that anyone else has prepared about your uncle's accident or his injuries or medical care; is that true?
A That's true.

Q Okay. Have you posted anything on social media with respect to your uncle's automobile accident?
A The only thing that I posted on social media would be his funeral announcement.
Q Okay.
A Whenever he died, me and my sisters made a collective post about losing him, and then we posted his obituary.
Q Was that posted through your Facebook page?
A I believe it was posted through Mary's Facebook page, but it would have had all of us tagged in it, so it would show up on my page as well.
Q And did you say, Ms. Hastings, that was a post that you-all made about your uncle leading up to his funeral?
A Yes.
Q Okay. But that's the sum total of any social media activity you had with respect to your uncle's accident, his injuries, his death, anything; is that correct?
A That's correct.
Q Okay. And what about your sisters? Have they posted anything other than that?
A I do not think that they have. I have not seen anything. And it would be out of character for them to do that.
Q Okay. So let's visit about Mr. Lee for a little while. Does he have any living relatives other than you and your sisters?

A Just some cousins and uncles.
Q Okay. Can you tell me who they are and where they live?
A I know a uncle, one uncle. That would be George Lee, and he lives in Hot Springs, I believe. He has a --
Q Is --
A I'm sorry?
Q Go ahead. I'm sorry to interrupt you.
A He has a cousin, David Miller, who lives in Hot Springs. And he has another cousin named Ramona, and I cannot remember what her last name is.
Q Where does Ramona live?
A I think she lives in Hot Springs as well.
Q Okay.
A I know that there's other distant cousins and things, but I don't know them. I don't know who they are.
Q Well, and so you understand the purpose of my question, it goes back to jury selection for the case, and so when you have time, we don't need to do this now, but if you can identify the names of those other family members and provide those to Mr. Brewer. He can get that to us, and we can handle it that way. Is that fair for you.
A For me? Yes, that's fine for me.
Q Okay, great. Where did Mr. Lee live? What was his address?
A I don't have his last address. It was a Chidester

address. I know I have it on his paperwork, but I don't have it here with me.

Q Where is Chidester?

A It's approximately 25, 30 miles from Okolona.

Q And did anyone live with Mr. Lee?

A No, he lived by himself. He lived alone there. He was living on Jason Yearby's -- a farm owned by Jason Yearby.

Q And you said he lived alone, so was that -- was it -- I'm just trying to understand the residence there. What type of -- was it a home? Was it an outbuilding? Was it --

A I do not know. I never went to where he actually stayed. He came to my house.

Q And how long had Mr. Lee lived on Mr. Yearby's farm?

A Maybe a year. Before that, he had a rent house in Gurdon, and the house caught on fire, it burned, so --

Q How long did he live in the house in Gurdon?

A A couple of years. He lived in a couple of different rent houses in Gurdon, and also in Delight while he was back here.

Q Are you saying there were two rent houses in Gurdon, and there were two rent houses in Delight?

A Yeah, yeah. He lived a couple of different places in both of those cities.

Q And that was for, you estimated, a couple of years?

A Yeah.

Q And I just --

A I can't get any better than that. I don't remember the -- I mean, I remember that he was at these places, but I can't tell you, you know, what time frame or anything. I know -- I just know that he lived in two different places in Gurdon. I know that he lived in two different places in Delight, and I don't know what year it was that he moved back here, so I can't -- I can't figure out what time -- what that timing was, so --
Q Did you visit any of the rent houses in Gurdon or Delight where your uncle Paul lived?
A I did. I visited both of the ones in Bismarck and one of them in Gurdon.
Q Okay.
A I'm sorry, I said Bismarck. Both of them in Delight and one of them in Gurdon.
Q And how many times did you visit him at those three residences?
A I didn't visit him there often because he didn't really want company. He didn't like people at his house.
Q Why not?
A I don't know. He was a bachelor. I don't think he -- I don't think he kept it clean. I don't -- I think he wanted to come to my house instead, and so I let him.
Q And you said that you were having trouble on the number of years between the four rent houses. And you made a comment, you're not sure when he came back, or moved back, something

along those lines. Where had he been?
A He lived in Gurdon during my teen years, and then him and his ex-wife, Stephanie, they got married, and I don't know what year they got married, but whenever they got married, they lived some time in Florida. They lived some time in Arizona. And the last place that -- well, then he moved to Memphis for a good little bit, and he was in Memphis -- I think he was in Memphis 2012, 2014, through that kind of -- those types of years, that period.
And then he moved to Phoenix just very briefly, and whenever he moved to Phoenix, him and Stephanie separated, and he moved back to Arkansas, he moved back to Gurdon. And so I don't really know exactly when all those things happen. I think it was probably 2014 or '15, you know, in that time frame, you know, somewhere in there, but I don't know for sure.
So during -- between -- so I guess you can say the last ten years, I can remember four places that he lived, but I can't tell you when he lived there. Actually, I can remember five places he lived, because he did move to Chidester, was the last place.
Q So the five places would be the two rent houses in Gurdon, the two rent houses in Delight, and Mr. Yearby's farm --
A Yes.
Q -- where you recall your uncle living in Arkansas.
A Yes.

Q All right. But you're unable to say when he moved back to Arkansas; is that correct?
A Right. I don't know. I don't know for sure when that was.
Q Did he live with anybody else in the rent houses that you mentioned?
A Not -- no, not that I'm aware of.
Q Do you know where his ex-wife Stephanie is?
A I think she's still in Phoenix, but I do not know for sure.
Q Did she take his last name? Was she Stephanie Lee?
A Yes, she was.
Q Do you -- have you spoken with her or had any communication with her since she and your uncle separated?
A No, I have not. Mary did. She -- I don't know for sure. I think she made contact with her, but she tried to make contact with her. I know she at least tried to when Paul died, we, you know, we wanted to notify her, but I can't -- either she couldn't get her, or Stephanie didn't reply to her, or something. I don't -- I don't know.
Q And so when's the last time you had any communication with Stephanie Lee?
A Probably 2014 or so when they were living in Memphis.
Q And was -- I assume they were divorced?
A Yes, they divorced.

Q Do you know where that divorce case was filed?
A I do not -- I do not know.
Q Was he married to anyone other than Stephanie?
A No.
Q Did he have children?
A No.
Q Can you estimate for me, Ms. Hastings, when your uncle Paul left Arkansas? I think you said he first went to Florida.
A Uh-huh. I think -- so I know that he was here in '99, but I don't really -- I don't know after that, so it would have been sometime after '99. I don't know when they got married, but I would assume -- if you-all could find that, then that would be the timeline, because they basically got married and moved together.
Q Did they get married in Arkansas?
A I don't know. I assume that they did, but I don't know.
Q Is it -- am I correct in -- you didn't attend the wedding?
A No, I don't believe that they had -- I think that they just went and got married at the courthouse or something.
Q Other than his ex-wife Stephanie, did Mr. Lee live with anybody else in the last 20 years?
A No.
Q Your grandparents on your dad's side, can you tell me their names, please?
A Her name was Betty Jo Blakely, and he was Willis Paul Lee,

Sr.
Q And they both already passed away; is that correct?
A Yes, that's correct.
Q And how long ago did your grandmother die?
A She died in the early '80s, '81 or '82.
Q And then what about your grandfather?
A I believe it was 2024 -- I'm sorry, 2014.
Q Okay. And where did -- where was your grandfather living when he passed away?
A He was in a nursing home in Memphis.
Q When did your grandfather last live in the area when -- I'm talking about the counties that we --
A Right. He was last there in 2012, 2013, somewhere in there. He wasn't in the nursing home all that long, but he suffered a stroke and had to have continuous care.
Q And as I understand, your uncle was living in Memphis at that time.
A Yeah. That's why he went to the nursing home in Memphis. He went to be near Paul.
Q Okay.
A Paul put him in a nursing home near him, yeah.
Q I understand. Where did your grandfather -- where was he living, what town, when the stroke occurred?
A Okolona.
Q So he was pretty close to your ranch?

A Yes. Yes. And at that time, I actually lived a lot closer to him because it was before I had bought this farm, and I lived in Okolona, so me and my grandpa lived about two miles apart.
Q Now, when your uncle Paul lived in Arkansas, where did he live?
A Gurdon.
Q I'm sorry, I've -- let me back this up. I know about the rent houses. You've described those for me when he came back.
A Yeah, he's always lived --
Q Before he moved.
A He lived in Gurdon then, too, yeah. I mean, I think just about all the memories that I have of where he lived, he lived in Gurdon, with the exception of a little bit of time that he lived over in Delight, that I told you about, so --
Q Where did he go to high school?
A Prescott.
Q Did he go to college?
A Yeah, he went to SAU.
Q Southern Arkansas University?
A Yes.
Q Is that Monticello?
A I --
MR. BREWER: Magnolia.
THE WITNESS: Okay.

MR. BREWER: SAU is Magnolia.
THE WITNESS: Okay.
MR. BREWER: UAM is Monticello.
THE WITNESS: Yeah, I think it was -- I don't know for certain, but I think it would be Magnolia.
MR. PURYEAR: Okay. Obviously, I don't know.
Q (By Mr. Puryear) Did Mr. Lee serve in the military?
A No, he did not.
Q Tell me about his employment, his work history, and let's just go from the time -- let's work from what you know most recently and work backwards.
A Okay, most recent for employment, I know that he worked for Sub-Zero. He did contract work repairing refrigerators for them. Before that, I don't really know a whole lot. Whenever he was in Gurdon, whenever I was younger, he owned a furniture store and a video store, and so he was self-employed a good part of that time. And then whenever I was a lot younger, he did real estate. He worked for Century 21 in Arkadelphia. The Sub-Zero contract work that you mentioned, when did he start doing that?
A I don't know when he -- well, I don't know for certain, but I think that that's the work that he started doing when him and Stephanie got married. Whenever he was living in Florida, he was doing that type of work. It may not have been for Sub-Zero. It could have been for other companies. I don't know.

But the one that I know for certain he worked for was Sub-Zero. And the last time I know he worked for them was when he was in Memphis.

Q All right. So it sounds like we've covered your knowledge of his work history before he returned to Arkansas.

A Uh-huh.

Q So what work was he doing in Arkansas after he divorced from Stephanie?

A Whenever he came back from Arkansas, he was doing just general appliance repair, like, out of his house. He would -- refrigerators, washers and dryers, and that type of thing. And then he was also selling produce in the summertime, just on-the-side-of-the-road kind of thing.

Q Where was he getting the produce he was selling?

A Initially, he was buying it from grocery suppliers, but then later on, a good portion of them, he was actually getting from me because we were growing vegetables on our farm.

Q Did he continue to sell the produce on the side of the road until the point where you moved to Alaska?

A Yeah. Whenever he went down to the farm at --

THE WITNESS: I'm sorry, I turned off my phone, but it's coming on my computer.

A Whenever he went down to live on Jason's farm, him and Jason were going to grow produce down there. That was what they were going to do, so he had stopped basically getting

produce from me a few years before. And I don't know how much they grew, or what they grew, or anything, but they were working on that. That was one of the reasons why he wanted to go down there, because he wanted to farm more.
Q Okay. So when you say it was a few years before that he got produce from your farm, meaning a few years before you had moved to Alaska; is that correct?
A Yeah, yeah. Because I have not -- so he probably hasn't gotten from me since maybe 2022 or so, you know, but I also -- I had a -- I had a year that I was down. I got blight really bad in my greenhouse, and I didn't even -- all my crop died one year. So anyway, he was getting his stuff from someone else during that time.
Q Was it the tomatoes that got the blight?
A Yeah. Yeah. It was a very, very sad, very sad moment for us.
Q I'm sorry. Did you have those big green worms, too?
A No, I didn't get that, but I had plants that was taller than me, and they were fully loaded down, and they -- 100 percent of it died, and then I couldn't plant back in -- you know, I have -- my greenhouses, you plant in the ground, and I couldn't plant back in the greenhouse for two years, so I had to shut down my greenhouse.
Q Back to Mr. Lee, so it had been a few years before you moved to Alaska. You estimate in '22 would have been the last

time he may have gotten vegetables or produce from you to sell, correct?

A Yeah, we were -- so the first year or two, we were buying them. I'm trying to remember. It may have been 2020 through maybe 2022, we were -- and it wasn't exclusive, because I did not have everything that he wanted, you know. But as far as tomatoes and stuff, he would get his tomatoes from me during that time.

Q And what he did, if he did anything in that period, you just don't know, for obtaining produce, whether he was actually selling it during that period; is that fair to say?

A Yeah, I think that he probably was selling it. He was probably buying stuff from Warren was probably what he was doing, because that was where he was getting his stuff prior to that.

Q All right. And then during that same period where he was no longer getting produce from you, do you know for a fact that he was continuing to do any appliance repair work?

A Yeah, I'm pretty -- yes, because that's what him and Jason were doing together. That was the, kind of, the basis for the two of their relationship. They were working on appliances together.

Q And forgive me if you've already said this, I'm just trying to keep it straight, but at what point did he start doing the appliance work after --

A He was doing both of those things. You know, whenever he came back to Arkansas, he was -- that was what he was doing for money whenever he came back here. And then he was also --
Q The appliance work?
A Uh-huh. Yeah. And then he was -- you know, of course, the produce is just seasonal, so, you know, he would get a few things to go sit on the side of the road. And he used to tell me he just wanted to make enough money he could buy him a hamburger, so that was what he was going to go do.
Q Okay.
A But he wasn't trying to -- he wasn't trying to do a lot of stuff.
Q And, to your knowledge, Ms. Hastings, Mr. Lee did not, at any time, have an employer, if you will, a formal employment circumstance, where he was working for someone receiving a paycheck in the years after he came back to Arkansas; is that true?
A I don't think so.
Q And I saw in your answers to interrogatories, No. 11, we had asked about his employment, and you said there, He was not working at the time of his accident, correct?
A Well, all that I know is that he was doing these things on the side, but he was not working for somebody who was providing him a paycheck.
Q Yeah, and I'm just looking at the answer here. There's an

objection that's been raised in response to Interrogatory No. 11, Without waiving objections, Plaintiff states her uncle was not working at the time of the collision. Was that true?
A He would not have had a regular job at the time.
Q Okay.
A I do not know what he was doing on the side --
Q Okay.
A -- at that time. I don't know.
Q In that interrogatory, it asked about his retirement status, if any. The response is that, again, Without waiving objections, Plaintiff states she has no knowledge regarding decedent's retirement status, employer retirement benefits, at the time of the incident. Is that still true?
A That's true. I don't know.
Q Okay. All right, I want to have some understanding of how much interaction you had with your uncle, so let's take the period from when -- the point where you moved to Alaska, and let's back up five years, which I understand that would be about 2019 to 2024, correct?
A Yes, correct.
Q And so how -- I know you didn't -- he didn't like for you to come to his house, so you didn't go to see him. He lived at Jason Yearby's place, and you said you never went out there to see him.
A That's right.

Q So, but he -- you made some mention about him coming to your house.
A Yeah, he visited me regularly, and whenever I say regularly, he came over to the house probably once or twice a month kind of thing. He -- well, I mean, I know -- he moved back -- he moved back here. He told me he moved back here to be closer to us, as in me and Adam, and we were close. I mean, he was really independent, so, I mean, I tried to respect that. And he -- you know, he wouldn't have wanted me coming to his house. He wouldn't have wanted me, you know --
Q What was the reason -- why did he come to your house?
A To visit. He would just come to visit. He spent his holidays and stuff there. He had Christmas with me, the -- you know, all of those years that you mentioned, we had Christmas together, and then, you know, any other holidays that we were doing, he came.
He -- I mean, you know, the farm that I have, he helped me to find it. He talked to everybody, and somehow or another, he started talking to the bank president over in Prescott, and they told him that they had this place that had been foreclosed and that they were selling cheap. And anyway, that's how I ended up with it. He told me about it, and we checked on it, and we were able to get it. And then the -- you know, we did sell produce together. That was a project that we did. I mean, we were pretty close.

Q When did you and your husband purchase the farm?
A I think it was 2017.
Q Did he -- again, just trying to understand, when you say he came regularly, did he -- did you-all have a set day he was always there, or --
A No, no, no. He just -- you know, he would just -- he would come whenever he wanted to come, and he would -- you know, he would just, kind of, like, swoop in and visit, and then swoop back out just as fast as he had swooped in.
Q Okay.
A But yeah, I mean, there was not any -- there was not any regular schedule. He came whenever he wanted, and he was welcome anytime he wanted.
Q Okay. And for -- I think you said earlier that for a brief period, maybe a child or a couple of your children were living at the farm with you and your husband, but, otherwise, it was just you and Adam there?
A Yeah. Yeah.
Q Did he -- what role, if any, did he play in growing the produce on your farm?
A He didn't do anything as far as actually growing the produce. He just -- like, whenever I first -- I have two greenhouses on my property, and he was selling produce, and he was telling me, you know, how to sell produce and stuff, and he was really into it. And someone had told him about grants that

you could get for these greenhouses through the Department of Agriculture, and so I checked on it, and I was able to get grants on them. So we got the greenhouses, and then what we did at our place was we had basically a roadside produce stand in our yard, but you can't grow all the variety that people want. You just you can't put that much crop out there. You can't support it.

And so me and him were, you know, buying stuff from the same places, and I had produce at my place, and then he had produce at his roadside that he was -- he was mainly doing that in Delight, so down the road. We were doing that project together. And then after that, after I was able to get the greenhouses, then I could -- then I could grow tomatoes, so I didn't -- we didn't buy tomatoes together anymore. I sold my tomatoes, and he would come over and get some from me, and he would sell them, too. So that's kind of how -- that's kind of how that worked. I mean, he gave me, you know, input and told me how to do some things, but he didn't ever actually work the greenhouses.

Q Okay. And when did you put the greenhouses in?

A Probably '18 or '19. It would have been -- the first year we actually had just a garden. It would have been the year after that, probably, the second or third year that I was there.

Q Did you -- we've been talking about the point where Mr.

Lee moved back to Arkansas, and let's go back to before that. He was in Florida, Arizona, Memphis, Phoenix. You described all that. Did you go to visit him at any of those places?
A Only whenever he was in Memphis. Whenever he was in those other locations, I wasn't, you know, really financially able to travel, so --
Q How many times did you go to Memphis to see him?
A Often. I probably went to Memphis, you know, maybe ten times or so. I'm not sure.
Q How long did he live there?
A I don't know. I don't know. But my grandpa, you know, whenever he was there, I was also going to, you know, see my grandpa in the nursing home as well, so --
Q And how long did -- how long was your grandfather in the nursing home in Memphis?
A I think he was only there for maybe two years before he died.
Q How many visits did you have with your grandfather in Memphis?
A Five or six.
Q Okay. Was Mr. Lee, was he a smoker?
A No.
Q Did he drink alcohol?
A No.
Q Did he use any type of illegal drugs or substances?

A No.
Q Did he have any hobbies other than the things that you've already told me?
A No, not that I'm aware of.
Q Did he have any type of a criminal record?
A No, not that I'm aware of.
Q I had asked earlier whether you'd looked at any medical records for your uncle, and you had told me no. I want to go back to that for just a moment. I think my question at that point was in the context of what happened with the accident, but let me broaden that. Have you ever looked at any medical records of any type for your uncle Paul?
A I have not looked at any medical records of any type.
Q Okay.

MR. PURYEAR: We've been going about an hour. You want to take a break for just a minute? Is that good for everybody?

THE WITNESS: Sure.

MR. PURYEAR: Okay.

(WHEREUPON, after a break was taken, the proceedings were resumed as follows, to-wit:)

Q (Mr. Puryear continuing) We are back on the record. When Mr. Lee was getting the produce from you, did you-all have any sort of an arrangement about what he was getting, or how he was selling them, or what he was doing? Was there anything you-all

did with that?
A No. I mean, I'd just tell him he could have a -- you know, he'd say, How much do you want for these boxes of tomatoes? And I'd give him a, you know, some kind of price, and he'd take them. I mean, I wasn't charging him much for them because I wasn't trying to make money off of it, and we wasn't -- and then whatever he sold them for was his money.
Q That was my next question. Did he, then, bring anything back to you of the profits?
A No, no. Whatever he sold it for was his money.
Q Yeah. Okay. And I take it from what your testimony is, is that you would charge him some small amount, just that he would just pay you a little something and then hopefully he'd go make more with it.
A Yeah.
Q Okay. All right. And I take it he was never providing you any sort of financial support when he was back in Arkansas; is that true?
A That's true. I was, you know, barely financially stable by the time he came back into Arkansas.
Q Okay. Let's continue our discussions about your uncle Paul, but on a different topic. Let's talk about his health. What can you tell me about his health after he came back to Arkansas?
A Well, I know that he was a diabetic. Most people in our

family are, so that was something that I knew quite a bit about. And he also had some heart issues. He had open heart surgery. I think that that was in 2021. He was feeling pretty rough up until then, but after he had the surgery, you know, he said that he really got back some energy and stuff, so he didn't ever complain to me about those types of medical issues after the surgery.
Q And as far as his diabetes, how did you know he was diabetic?
A He told me.
Q Okay. Did he take -- do you know if he had to take any medication for his diabetes?
A I know he did, but I don't know specifically what he was taking, and I -- I don't know what he was taking. I think he was taking shots, but I don't know that for certain.
Q And what about for his heart condition leading up to his surgery? Do you know if he had to take medication?
A I don't -- I assume, but I do not know.
Q And do you know what type of heart condition he had that led to the surgery?
A I think he had blockage, and he had to have stents put in, but I'm not positive. I'm pretty certain, but I'm not positive.
Q Okay. And you estimated his surgery, his heart surgery, was in 2021?

A Yes.
Q And where was that procedure?
A Hot Springs.
Q What facility?
A It was St. Joe's at the time. It's CHI now? Is that what it's called?
MR. BREWER: St. Vincent's now, Jeff. It used to be St. Joe's.
THE WITNESS: Okay. Okay. St. Vincent.
Q And I think you're saying CHI, for the Catholic Hospital Initiatives.
A Okay. Yeah. But I think that that's what it's called, but I don't know for certain, yeah. I haven't been in that hospital in a while, and I know they have changed names a few times.
Q All right, and -- say that again.
A I just said, I haven't been there in a while, in that hospital in a while, and I know that they have changed names a few times, so not certain.
Q Okay. All right. And did you go see him when he was in the hospital for his heart surgery?
A Yes, I did.
Q Okay. How long was he admitted?
A I do not know. I think he was there -- I think he was there for maybe close to two weeks, but I'm not positive.

Q And how many times were you able to visit him during that estimated two weeks?
A I would say I probably went up there five or six times.
Q Okay. Did any of your sisters visit him when he was in the hospital for his heart surgery?
A No, my sisters did not.
Q Other than the hospitalization that we've discussed about his heart, are you aware of Mr. Lee having any other heart surgeries?
A No, I'm not.
Q Do you know how long he had been treating with a physician because of his heart?
A Whenever he had that surgery, just trying to remember, he had a -- before that, he had another stay in the hospital in Little Rock that was because of it, and I believe that they were delaying treatment because, again, that was, you know, 2000, 2001, in that period where we, you know, had COVID, and they had trouble getting him scheduled and stuff. So he was -- I know at least from 2000 to 2001, he was having a lot of trouble with it. Can you ask me the question again?
A Yes, ma'am. My question was, other than the procedure that you -- heart surgery you described in 2021 at St. Joseph's, now St. Vincent's, in Hot Springs, did he have any other heart surgeries?
A I do not know of any other surgeries.

Q I'll come back to that in just a minute.
A Okay.
Q You were saying a while ago that there was trouble scheduling it, and you mentioned COVID, and then you said 2000, 2001.
A I'm sorry, 2020 and 2021. Yeah, sorry.
Q I understood what you meant. I just want to make the record clear.
A Yeah.
Q So is it your recollection, then, Ms. Hastings, that in the 2020 and 2021 period there were efforts to schedule the heart surgery that he ultimately had and you estimate in 2021?
A Yeah, yeah. I think that they -- initially, I don't know when it was that he went to the hospital in Little Rock, but I think, initially, the plan was to do something at that time, but they couldn't.
Q Okay.
A And I don't remember for sure if it was because it was a scheduling problem or if they were just concerned about doing operations during such an influx of COVID. It would have been one of those reasons or maybe even both of those reasons.
Q And what hospital in Little Rock was he going to?
A I'm pretty sure he was at Baptist Health.
Q Do you know the name of his doctor?
A I do not.

Q So as I understand your testimony, you're not aware of any other heart surgeries other than the one we've talked about that you estimate in 2021; is that correct?
A Correct.
Q Okay. In Interrogatory No. 8, we'd asked for you to identify every injury, symptom, or complaint that Mr. Lee suffered from at any time before his collision, his automobile accident, in October 31st, 2024. And you said that you did not know of your uncle's medical issues, but can state he suffered heart issues to such extent that he had undergone multiple surgeries. But as I understand it today, you're only aware of the one surgery in 2021; is that correct?
A Yes, that's correct.
Q Okay.
MR. BREWER: And Jeff, I may have answered that that way because I knew he went to Baptist and to St. Vincent, so I may have gotten it confused as two procedures, but it's really one procedure.
Q Ms. Hastings, let's step back away from just the heart issues. Are you aware of Mr. Lee having any other type of surgery at any time?
A Not -- no, not that I can remember. I can't remember any surgeries.
Q And do you recall, other than the hospitalization in, you've estimated, 2021 for the heart surgery, do you recall Mr.

Lee being admitted to the hospital on any other occasion?
A He was admitted to the hospital before that, before 2021. Probably in 2020, but I'm not certain on dates, but he was admitted to Nashville Hospital, and he was there for wound care. He was having trouble with a foot.
Q Which foot?
A I don't remember.
Q How long was he admitted to the hospital in Nashville?
A He was in the hospital for about a week.
Q And did you visit him while he was in the hospital during that week?
A Yes, I did.
Q Did your sisters visit him?
A No, they did not.
Q When did -- let me back up. The hospitalization that you estimate in 2020 for wound care of his foot, that would have been -- was that in the COVID year at the time?
A I do not remember COVID being an issue, but I do want to say, I have no idea if I'm right on these dates. I really do not.
Q Okay.
A I mean, I know that it was before his heart surgery, but I cannot tell you when. But I do not remember COVID being an issue there. Yeah, I don't know.
Q Okay. And that's why I wanted to go back to it to

understand. We all have lots of memories, unfortunately, of COVID, and so that's what I wanted to figure out. But let's try to zero in on this. So you specifically recall he was admitted to the hospital in Nashville for approximately one week in connection with wound care of one of his feet.

A Yes.

Q And who was his doctor?

A I don't know who his doctor was.

Q I take it, then, you never spoke to any of his doctors or about what was going on with him?

A No, they -- and that -- during that time, the -- I did speak with -- I did speak with a nurse. He wasn't wanting to -- he wasn't wanting to stay in the hospital, and so we were arranging some aftercare for him back at his house. And he was living in Delight at the time, so that -- I do know that. So we were arranging care for him to be released, but I don't recall ever actually speaking to the doctor, just a nurse.

Q How long had Mr. Lee been having trouble with his foot?

A I don't know. He was not real good about telling me he had a problem. He wasn't going to tell me until he had to, and the only reason -- I mean, the only reason why he told me then was because I felt like he needed me at the hospital. I had to go so that he had a plan.

Q What was the problem with his foot, Ms. Hastings?

A He had an infection of some sort.

Q Okay. And do you --
A I was told that -- what they told me was that Nashville is supposed to have, like, a good wound care facility there, so he went there specifically for that wound care because they had those capabilities there.
Q Do you know what caused the infection?
A I do not.
Q Okay. Did that wound care issue resolve, or did it continue after he got out of the hospital?
MR. BREWER: Object to form.
A Over time, that issue resolved, I think. I did not see him -- well, he didn't go back into the hospital about it. And he had somebody who was coming into his home for a while taking care of the wound care, so I'm assuming that the issue resolved.
Q Your testimony a few minutes ago was he didn't like to tell you things.
A No, he did not like to tell me things.
Q And so your assumption is it cleared up, but, I guess --
A I don't know.
Q Don't know. Okay.
A Yeah.
Q Are you aware of Mr. Lee being admitted to a hospital for wound care on any other occasion?
A No, not that I'm aware of.

Q Are you aware of Mr. Lee having ongoing problems with wounds in either of his feet after that hospital admission?
A No, other than that, that's the only thing that I actually have knowledge about. I don't know.
Q Okay. Are you aware of Mr. Lee seeing any other doctors for wound care?
A Not that I know of.
Q Okay.
A Well, actually, there may have been -- he may have had a doctor's visit down in Camden at their facility, but I can't really remember the details on that. It could have been around the same time as well, but I don't really remember the details on that. I did go to the hospital at Camden, but I think that his stay was very brief there because I just don't remember too much about it.
Q Can you provide me any context at all, Ms. Hastings, of why he was in the hospital in Camden?
A No. No. I would have to ask somebody else to help me remember, because I do not remember. All I really remember is going down there in the -- it was late whenever we went to the hospital, and I think he was only there for a day or two, but that's all I remember. I'm not even certain he was there for more than one day.
Q And as best you can recall, Ms. Hastings, would the hospitalization in Camden have been prior to or after the

admission in Nashville for the wound care?
A I feel like it would be prior to that, but I don't know for certain.
Q Do you recall any other hospital admissions for Mr. Lee?
A I do know that he went to the hospital somewhere around May or -- the end of May, or the beginning of June of 2024. I was actually in Alaska at that time. We had come up here for a month to get ready to come, and then he had sent Adam a message, and he just said, Well, I've been in the hospital, everything's fine. And that was kind of -- that was it.
Q Which hospital?
A I don't know. That was literally all that I know is that he did go to the hospital, but I don't know what it was for, and he didn't tell -- he didn't tell anybody until he was out.
Q So when he messages your husband Adam, am I understanding your testimony, he was already out of the hospital --
A Yeah.
Q -- or he was in the hospital?
A No, he had said he had been in the hospital. He was out.
Q Okay. All right. But you never spoke to him about that admission; is that correct?
A No, I did not.
Q Okay. Any other hospitalizations that we haven't discussed?
A Not that I'm aware of or that I remember.

Q All right. And we've been talking about from the time he, obviously, when he was in Arkansas, after he came back from Phoenix and divorced Stephanie. What about in the years when he lived away? Do you know if he had any hospital admissions then?
A I do not know of any. I actually -- I mean, I kind of feel like he probably didn't. I feel like things were okay. I don't know. I never heard about any, and he was working -- I know he was working and making a pretty good living with Sub-Zero, so I don't think that there was any problems.
Q Back to the period when he was in Arkansas -- let me go back to my question. Are you aware of him seeing any other doctors? We've been talking about hospital admissions, but what about doctor visits, health conditions, or problems that he had?
A Yeah, I don't know. I don't know about any.
Q Is it fair to say, Ms. Hastings, that everything you've told me about these admissions for his heart surgery, wound care, Nashville, this other text, that would be the sum total of your knowledge of his health conditions or problems from the point where he moved back from Arkansas until he passed away?
A Yes, that's correct.
Q Is the hospital in Nashville, is that the Howard County Memorial Hospital?
A Yes, that's correct.

Q You spoke about wound care in his foot. Are you aware of Mr. Lee having any other type of bed sores or any pressure ulcers or anything like that?
A No, I'm not aware.
Q At any time.
A No.
Q Okay.
A The foot has been the only thing that he's ever mentioned.
Q Did he have a family doctor?
A I do not know.
Q I'd asked about medications, and you thought he might have been taking some for his diabetes. You didn't know. You assumed he's taking medication for his heart, but any idea where he -- what pharmacy he used or how he filled his prescriptions?
A I do not know.
Q Any reason to believe he took any other type of medication, Ms. Hastings?
A Those would be the only two things that I would expect to see medication for.
Q Was Mr. Lee ever admitted to any type of a long-term care facility or a nursing home?
A No, he was not.
Q Do you know if Mr. Lee received any type of governmental benefits?

A I know he received disability.
Q When did he first receive disability benefits?
A It was sometime after he came back to Arkansas, but I do not know when it was.
Q How did you learn that he received Social Security Disability. I'm assuming it's Social Security Disability.
A He told my husband that he was receiving disability.
Q When did he mention that to Adam?
A I don't know. I mean, I don't know when it was. I would -- probably whenever he was trying to get them, and whenever he got them. The two of the two of them talked as well, so they had that conversations that I wasn't necessarily in on. That would have been one of them.
Q And can you estimate for me, Ms. Hastings, when Mr. Lee told your husband that he was receiving disability?
A Maybe three or four years ago, maybe. I don't know. I wouldn't think it would have been any longer than that.
Q Did you have a conversation with Mr. Lee at any time about his receipt of disability benefits?
A I did not.
Q And did you ever talk to him about what his conditions were for his application to receive disability benefits?
A I did not, but I did talk to my husband about that because I didn't know. And what he had told Adam was that whenever he was -- when he was younger, he was -- my family owned a logging

company, and he was working in the skidder, and a log had come in on the skidder and had crushed his ankle, and so his disability had something to do with his ankle.

Q Do you recall -- well, other than Mr. Lee telling Adam about that, did you know that Mr. Lee had any sort of a disability with respect to his ankle?

A No, I did not. Now, he, you know -- I mean, looking back, he walked kind of funny. I always thought he just walked on the side of his shoe. I didn't put it together, but that could be. I don't know. But no, I did not know.

Q And never had a chance -- never talked to him about that?

A No, I literally asked Adam this question recently.

Q Okay. Did he receive any other governmental assistance?

A Not that I'm aware of.

Q Do you know if he had any form of health insurance or coverage?

MR. BREWER: Object to form.

A I think he just had Medicaid or Medicare. Medicaid? Whichever one it is.

Q Have you seen any type of insurance card that Mr. Lee had for his health insurance or coverage?

A No, I have not.

Q Did Mr. Lee have a driver's license?

A Yes, he did.

Q Do you know where it is?

A Yeah, my sister Becky, she picked up the wallet from Jason Yearby, so she has it.
Q Okay. We made a request for a copy of his driver's license with our discovery. Can you obtain that and provide that to us, please?
A Yes, I can.
Q Okay. Was his driver's license -- was it still valid at the time of the accident?
A Yes, it was.
Q Okay. Did he have any type of restriction on his driver's license?
A I didn't look, so I don't know.
Q When was the last time that you actually saw Mr. Lee prior -- well, when's the last time you saw him?
A I probably last seen him somewhere around January of '24.
Q And you had not yet moved to Alaska.
A Yes, correct.
Q And what were the circumstances when you last saw him?
A He -- well, actually, let me back up. I think that I last seen him in March of '24, and he had come to my house.
Q What for?
A To visit.
Q Okay. After that visit in approximately March of 2024, did you speak to him again?
A I did not.

Q Okay. All right. And was this visit one of his regular visits, or was there anything in particular for him coming by?
A It was just a regular visit.
Q And how was he doing at that time?
A Everything appeared to be okay. I only visited with him for just a couple of minutes, and then he visited with Adam for the rest of the time.
Q And were you still there at the house while they were visiting, or had you left and had something else going on?
A I was still at the house.
Q Okay. But all seemed okay with him at that time?
A Medically-wise, yeah, there wasn't anything out of the ordinary.
Q Where was he living at that time?
A He was living down on Jason's property.
Q In Chidester?
A Yes.
Q Was he -- was Mr. Lee, was he a good communicator?
A Well, I'm -- depends on what you mean by communicating. I mean, he was a pretty good talker, but, you know -- is that what you're -- what are you meaning?
Q Yeah, was -- first of all, was he able to communicate with you well?
A Yeah, he would talk to everybody. He could talk to everybody, and it was fine.

Q Okay. And I guess the flip of that, was he -- did he ever get to a point where he couldn't communicate with you very well, and he couldn't express himself or say things, tell you what was going on?
A No, no.
Q Okay. After that last time that you saw him at your house in approximately March of 2024, did he ever come back to your house?
A No.
Q Okay. I know you didn't talk to him again after then, but what about Adam? Did he talk to Mr. Lee after that last time you saw him?
A Yeah, Adam had talked to him a few times, and they may have just texted, but they did communicate some after that.
Q Did you have any text messages with Mr. Lee after that last visit of March of 2024?
A No, I did not.
Q Do you know of the last time that your sisters saw Mr. Lee?
A My older sister that lives in Oklahoma told me that she hasn't seen or talked to him in 15 years.
Q Okay.
A My other two sisters, I'm not real certain on. You know, Mary lived in Florida, lives in Florida, and they seen each other, you know, quite a bit whenever they were both living

there, but I don't know about anything afterwards. And I don't think that Becky has seen him or talked to him much.

Q Okay. It is -- this is just my perspective, and I'm going to make a statement, and ask you a question. It appears to me that of the four sisters, you would have had the most contact with your uncle Paul. Am I correct in my assessment?

A Yes, that's correct.

Q Okay. Did Mr. Lee, at any time, ever place any sort of a monetary value on his own life?

MR. BREWER: Object to form.

A He didn't discuss that with me.

Q Okay. I have seen the court paperwork where you had opened -- you had filed the petition to be the administrator for his estate, and I want to ask you a few questions about that, Ms. Hastings.

A Okay.

Q How was it that you were selected to file the petition as the representative?

A Because I had the closest relationship with him.

Q Was there any discussion among you and your -- anyone else about whether you should do it or someone else would?

A The only discussion that we had on should it be somebody else was that Becky, you know, is there in Bismarck, and we did have a discussion if, you know, it might be easier for her to do it because of that. But in the end, I did have, you know, a

continuous relationship with him and, you know, a pretty close relationship, so I think I was just the obvious person to do it.

Q And when you said -- you made reference to a discussion, who participated in that discussion?

A Me and my sisters.

Q Okay. Was that at the same time when you-all discussed the police report?

A It would have been in the neighborhood of the same time.

Q Have you served as the representative of any other estate in any court matter?

A No, I have not.

Q Okay. Setting aside conversations with your counsel, whose decision was it, or idea was it, to pursue any type of a claim in connection with Mr. Lee's accident?

MR. BREWER: Object to form.

A Well, I felt like it was Paul's decision. He had already discussed the situation, and we -- so me and my sisters discussed it, and we decided to continue it.

Q When you say that Paul had discussed it, I don't understand. Who did he talk to about this?

A Paul had checked on counsel about doing a suit. I don't know where he was at on it, but he was already working on it whenever he died.

Q Okay. How did you learn that?

A Whenever -- the first conversation that Kathy had, she called the hospital to find out information, you know, when we were told that he was in the hospital. She talked with Jason that night, and Jason had told her.
Q And what did Jason tell your sister?
A That Paul had filed a lawsuit and that somebody needed to do something with the lawsuit. That was what he said to her. And, so anyway, we took some time to discuss it, you know. We did discuss it, me and my sisters, and we felt like -- our feeling was that he had initiated it, and we should pursue it.
Q Did you talk to Jason about that circumstance?
MR. BREWER: Object to form.
A Whenever I talked to Jason a few days later, Jason wanted to have discussions with me about it, but I did not discuss it with him. He brought it up a couple of times, you know, trying to ask me what I was going to do, and that kind of thing, and I just -- I avoided it, and I did not discuss it with him because I -- frankly, I felt like it was none of his business.
Q And I'm sorry, Ms. Hastings, but please -- I don't remember, which one of your sisters did Jason tell about this conversation or statement of your uncle Paul?
A He told Kathy. When Kathy called the hospital, he told her.
Q Okay. Did anyone other than Kathy talk to Jason about that issue?

A No.
Q And as I understand, the statement of Mr. Yearby to your sister was that your uncle Paul had taken some steps to initiate a suit.
A Uh-huh. Yes, that was what he had told her. And the only information that came to me was that I needed to contact Rainwater and find out something, and that was pretty much where it was at.
Q Okay. And the first time that that was mentioned by Jason to your sister was just -- would have been a few hours before your uncle had passed away; is that correct?
A That's correct.
Q Okay. When Kathy had shared -- I assume she shared that information with you and your sisters. And you're nodding your head yes.
A Oh, I'm sorry. Yes, she shared that information with me.
Q Okay. And then did the four of you-all, you and your sisters, did you-all get together and discuss, Hey, what do we do with this --
A We did.
Q -- information?
A We did.
Q Was there any disagreement or naysayers among the four of you about pursuing a lawsuit for your uncle Paul?
MR. BREWER: Object to form.

A No, there was not.
Q Okay. Ms. Hastings, have you conducted any research into anything that's pertinent to the case here --
A No, I have not.
Q -- on your own?
A No, I have not.
Q Do you know if your sisters have done any such research?
A I do not know, but I don't feel like they have, but I do not know.
Q Do you have any pictures of Mr. Lee in the last five years?
A No, I do not.
Q Do you have any videos of Mr. Lee in the last five years?
A No, I do not.
THE WITNESS: My computer is about to go dead. I need to move positions real quick so I can plug it.
MR. PURYEAR: Sure, let's just take a break and give you a few minutes to --
THE WITNESS: Okay.
(WHEREUPON, after a break was taken, the proceedings were resumed as follows, to-wit:)
Q (Mr. Puryear continuing) I think we covered this, let me just clear it for sure. The only person you talked to who was at the scene of the accident was Mr. Yearby; is that correct?
MR. BREWER: Object to form.

A No, Mr. Rogers, Bill Rogers.
Q Thank you. Mr. Rogers. I apologize.
A Yes, that's correct.
Q Ms. Hastings, do you know where Mr. Lee had been at the time of the accident or where he was going?
A I was told that he was going to a doctor's appointment, but honestly, I don't know who told me that. It was maybe Jason, but I do not know where he was -- where he was at.
Q Is it true that you have no personal information about any injuries that Mr. Lee sustained in the accident? Is that correct?
MR. BREWER: Object to form.
A That's correct.
Q Ms. Hastings, through the discovery responses, there's been a list of eight medical care providers who provided some level of care for Mr. Lee from the time of the accident until the time that he had passed away. Did you compile this list?
A No, I did not.
Q Okay. Then my next question, do you have any idea of any medical care provider, the name, any facility, where Mr. Lee was from the point of the accident until he passed away?
A The only place that I know is when he was at Saline, which was the last place he was at. Saline County.
Q Okay.
A Was that right?

MR. BREWER: No, it's Baptist in Conway. You --
A Okay, I'm sorry. Yeah, I'm sorry. That's the only information that I had was just that one facility.
Q Okay. And who told you that Mr. Lee was at the Baptist facility?
A That was in the message that Jason Yearby sent me.
Q Okay. You will agree with me that you have no personal knowledge of any treatment that he received during that period; is that correct?
MR. BREWER: Object to form.
A That's correct.
Q You have no information as to any medical conditions or problems that he had during that period of time; is that correct?
MR. BREWER: Object to form.
A That's correct.
Q Did Mr. Lee ever get COVID?
A I don't remember him having COVID.
Q Okay. In that dreaded COVID time, did he stay away? Did he continue to come visit your house?
A He continued to visit. I mean, you know, that was -- it was during that time when he had his surgery, so we were seeing each other very often during that time.
Q But you don't remember him ever getting COVID?
A No, I don't.

Q He would have been one of the lucky ones, then.
A Yeah, I had it four times, so -- public school teacher.
Q Did Mr. Lee, at any time, have a power of attorney designated to make decisions for him or to make health care decisions?
MR. BREWER: Object to form.
A I had thought that he had done that with me during his heart surgery, because I had to go in, and I do not remember the doctor's name or anything, but I had to go in, and I had to meet with the doctor, and we discussed all those things, so I thought that I had had power of attorney at that time. But that's the only time, because, you know, like I said, I don't really -- I don't know of any other situation, so I don't know if he did. He didn't tell me he did any other -- any other way or any other time.
Q Okay. And, generally speaking, Ms. Hastings, when someone designates a power of attorney, they'll have a written document that makes that clear. Did you ever receive any such document from Mr. Lee?
A No, not that -- no.
Q And other than that one time when you spoke to the doctor relative to his heart procedure, were you ever involved in any of his decisions for medical care?
A No, not for medical care, no.
Q Okay. Were you ever involved in decisions that he had

made for other issues?
A Well, he had discussed with me, you know, what he wanted to do as far as, you know, whenever he died, and for funeral arrangements, and things like that, so we had discussed those types of things. But I did not have any -- I never seen anything in writing, just what he told me he wanted.
Q And that would have been as far as what? When you say what he wanted, what do you mean?
A Well, he had told me on a couple of different occasions that he was working on a life insurance policy, and that he was going to designate me as the beneficiary, and this was what he wanted me to do with that money. So he had a particular funeral home, which was Welch's Funeral Home, where he wanted to go, and then he wanted to be cremated, and he wanted to be buried out near his mother.
And so he would -- but he never -- but I didn't think that he ever went through with the policies because he never came back and asked me for, like, my social security number and things like that. And so then a period of time would pass, and then he would come back, and he would say, Okay, I'm working on this again, you know, and here's what I -- here's what I want again. So I heard about his plans a lot, but he was always planning to do it, and, you know, essentially, he didn't ever put any plans in writing.
Q Okay. And so I take, then, to your knowledge, he never

purchased any life insurance policy.
A I don't -- no, I don't think so.
Q Okay. Is it true that you've never had any communication with anyone at Montana Carriers?
A No, I have not.
Q Or Mr. Jagdeep Dhillon, the driver of the vehicle?
A I have not had any communications with him, either.
MR. PURYEAR: Why don't we take a break for just a minute, okay?
THE WITNESS: Okay.
MR. PURYEAR. About five minutes. Thank you.
(WHEREUPON, after a break was taken, the proceedings were resumed as follows, to-wit:)
Q (Mr. Puryear continuing) Ms. Hastings, we're back on the record. Was there a funeral for Mr. Lee?
A Yes, there was.
Q Where was the funeral? Where did it take place?
A His church, which is the -- I think that they're the First Assembly of God Church in Gurdon, I think is what the name of the church is. But his preacher contacted me within a day or two, and he said that the church was really wanting to do a service, and so I just, I worked with them in order to provide a service for him and the church family. My sister, Rebecca, and my daughters attended the service.
Q And was that --

A Two of my daughters attended the service, not all four of them.
Q And the First Assembly of God Church in Gurdon, is that where Mr. Lee went to church?
A Yes, he went to church there.
Q Do you know how long he had been in that church?
A I know that he had been in that church at least before his heart surgery, because I had contact with his preacher during that time as well, so at least 2001 on -- 2021 and on, that 20's getting me, and maybe longer, but I know at least that long.
Q Do you know, Ms. Hastings, if Mr. Lee attended church anywhere else --
A No.
Q -- while he was back in Arkansas?
A No. That's the only place that I know of.
Q And was he -- do you know if he was a regular churchgoer?
A Yes, the preacher told me that he was, that he was very regular.
Q Was Mr. Lee involved in any community activities, civic organizations, anything like that?
A Not that I know of.
Q Did he have social media accounts?
A He had a Facebook account, but he didn't have very many people on it. He wasn't just great at using it, so -- but he

did have one.
Q And you said that your sister, Becky, who lived in Bismarck, she came to the funeral.
A Yes.
Q But your sister, Kathy, and your sister, Mary, did not.
A No, both of them -- so Kathy discussed driving in, but she had some real financial problems, and Mary couldn't get a flight out, and that was kind of the same situation with me. I couldn't fly out of Alaska.
Q And perhaps I misunderstood. Did you attend the funeral or no?
A No, I did not attend the funeral at the church. I worked with the preacher and helped to organize it, but I was not able to leave Alaska. It was in the bad wintertime. We couldn't. I had a --
Q Well, I --
A I'm sorry.
Q No, I misunderstood you a while ago, but now you've clarified. It was your sister Rebecca and two of your daughters. Those are the family members who attended your uncle Paul's funeral.
A Yes.
Q Okay.
A I had a private burial whenever I came back in June. He was cremated, and so my daughter picked up his ashes and

brought them back to my house in Okolona, and then whenever I got here in June, me and my husband went out and buried him beside his mother.
Q And where's that cemetery located?
A In Okolona. The cemetary is called Weir Cemetery, W-E-I-R Cemetery.
Q And did any of your sisters attend the private burial in Oklahoma -- excuse me, Okolona?
A They did not, but I specifically requested that they not. They all were willing to come in and make plans, but I asked them if they would allow me to do it to let me have some time, and they did.
Q And have you been back to the cemetery since you and your husband buried your uncle's ashes?
A Well, we also put a memorial stone out there, but that was within a few days. We did both of those things in June.
Q All right. Other than returning to place the stone --
A So I did not go back in July or August, no, I did not.
Q Okay.
A I do know that my sister Kathy has. Since then, she has driven to Okolona, and she has visited his grave. I don't know about the other two. Well, I know that Mary has not. Mary has not been in, but I don't know about Becky.
Q I take it from your testimony earlier, so I want to confirm with you, Mr. Lee did not provide any financial support

to you; is that correct?
A The only support that I have had from him was whenever I was a teenager. I lived on my own, and he helped me out some then, but not as an adult, no.
Q How old are you, Ms. Hastings?
A I'm 48.
Q So we're talking over 30 years ago when he would have provided some help to you.
A Yes, that's correct.
Q Have you received any medical treatment in connection with the passing of your uncle?
A No, I have not.
Q Have you taken any type of prescription medication in connection with the passing of your uncle?
A No, I haven't.
Q Okay. To make sure I've covered everything, have you obtained services from any type of counselor, psychologist, anything in connection with the loss of your uncle?
A No, I have not.
Q Did you miss any time from your employment in connection with the passing of your uncle Paul?
A I took off a couple of days, just a couple of grieving days.
Q Those were provided to you as part of your benefits with the school district?

A Yes, they were.
Q Okay. What is it, from your individual perspective, Ms. Hastings, what is it that you are seeking out of this lawsuit?
MR. BREWER: Object to form.
A I don't really know the answer to that. I mean, I feel -- I mean, I wish that I still had him in my life, but, I mean, you-all can't give me that, so I don't -- I don't know the answer.
Q Did you -- I'm going to back up in time with you for just a minute, Ms. Hastings. Did Mr. Lee, at any time, need the assistance of a walker?
A No. He did wear a, like, a foot boot for a little bit, but he wasn't -- he didn't use any walker or canes or anything.
Q Okay. All right, help me out with this, the boot that you're describing. What does that look like?
A Like, the black padding that goes down the bottom, and then the top that comes up the sides, and it has, like, the Velcro straps on it.
Q I'm familiar with a walking boot.
A Okay, yeah, yeah. It was, yeah, something like that. And he was -- I think he was using that during the time that he had his wound care, was when he was using that.
Q And I know that's somewhat of a moving target for you on the date. That's okay. You've estimated somewhere --
A 2000 --

Q Okay.
A Maybe -- I mean, 2020.
Q Yeah.
A I don't know why I keep doing that. Maybe 2019. I don't know.
Q Did he -- was that something that he used for a time or two, or did he have it for an extended period, or do you recall?
A He had it an extended period of time that he was using that. Maybe three or four months. I don't -- you know, but it was an extended period of time that he had that that he was using it to walk.
Q And, Ms. Hastings, do you know, was that device, was that part of the wound care issue he had with this foot, or was it some other problem? Or do you know?
A I don't know. I don't know. I mean, I feel like it was during the wound care, but I don't -- I have no idea what it was for, so I don't know for sure.
Q You had said earlier that perhaps Mr. Lee has either Medicaid or Medicare. You seemed a little bit uncertain about those.
A Yes, I don't --
MR. BREWER: It was Medicare, Jeff. It wasn't Medicaid. He wasn't --
Q Then as to the Medicare part, Ms. Hastings, have you seen

any communication or letters from the Medicare about the benefits that they provided to Mr. Lee?

MR. BREWER: Object to the form.

A No, I have not. Jason gave -- whenever he gave Becky the wallet, he gave Becky a pile of some letters and stuff, but there wasn't anything in there from Medicaid -- or Medicare, whichever one it is. We have not gotten any other mail or communications from him since then, so no.

Q Did Mr. Lee's wallet have a copy of any type of health insurance card?

A It may have, but I don't know. I can find out that information, but I don't know.

Q Would you please do that and provide that to your counsel? Because we made a request for a copy of that as well. Would you provide that for us?

A Yes.

THE WITNESS: Are you making a note of the things that I need to provide, because I'm --

MR. BREWER: I've got them, Mikki. I've got the list.

THE WITNESS: Okay. Okay, thank you.

Q (By Mr. Puryear) I don't think I asked this, so let me just make sure with you, Ms. Hastings, did Mr. Lee, was he ever involved in any kind of litigation?

MR. BREWER: You did ask it, but yeah, you can

go ahead and ask again.
A Not that I know of.
Q Did he ever make any type of claim for any injuries, workers' compensation, anything like that?
A Not that -- the only thing that I know about is the disability, and I just know about that secondhand, so I don't know.
Q Yes, ma'am, we talked about that. Okay. Ms. Hastings, that wraps up all the questions that I have. I appreciate your time today. Have all of your answers to my questions been truthful?
A Yes, they have.
Q And if there was a question that I asked that was confusing or didn't make sense, did we have a chance to clear that up to give you an opportunity to give me a truthful response?
A Yes, we did.
Q Okay.

MR. PURYEAR: That's all the questions that I have, ma'am. I thank you for your time. It's nice to meet you. I'm sorry for it to be under these circumstances.

THE WITNESS: Thank you very much.

**EXAMINATION**

BY MR. BREWER:

Q Mikki, I've just got a couple of questions. Did Paul -- you talked about how he kind of, I call it a truck patch farm, and roadside sell, and stuff like that, did he enjoy his life?

A He did.

Q Tell them a little bit about his personality and stuff of that nature.

A Well, Paul was very kind of flamboyant kind of personality. He was loud and -- but he talked to everybody. He knew everybody. You know, he would tell you stories that you couldn't believe, and then you'd find out they were true. He was a lot of fun, and, you know, whenever he came back to Arkansas, you know, I think he was just coming back to just relax and enjoy life. I think that was kind of what he was doing.

So, you know, he tinkered, was what he called what he was doing. He just called what he was doing tinkering. So he'd tinker with some appliances, and tinker with some, you know, produce and stuff. And those were just -- those were things that he enjoyed. I mean --

Q There were times that, you know -- let me ask this -- you know, I think Jeff asked you if you'd ever supplied assistance to Paul, and vice versa to you. Were there times you tried to buy stuff for Paul, and would he let you, or things of that nature?

A Oh, no. I mean, Paul was very, very proud. If -- I

didn't know what he needed. He wouldn't tell -- he would have never told me if he needed something anyway, because he just wasn't that kind of person. Me and him went out to eat occasionally, and he always bought when we went out to eat, and, I mean, he -- if he had needed anything, and I had known that he needed something, I would have, you know, absolutely provided it to him.

Now, he -- you know, he bought -- he worked with Adam some. He borrowed trailers and things like that from Adam, and they did -- they, you know -- they went out and moved things together and stuff like that, so as far as that kind of thing, you know, we did, but he didn't --

Q What was Paul and Adam's relationship kind of like? I mean, you know, I think it seems -- seems like, from listening to you today, Paul and Adam may have, you know, had a --

A They had a close --

Q -- a better one --

A They had a close relationship. I mean, he -- you know, there was things that he would talk to Adam about that he wouldn't talk to me about just because Adam's a man, and he kind of has that man's man kind of personality, so there was things that they talked about. I mean, whenever he came back, it was literally just me and Adam. He didn't have any other family around here. He came back to spend time with us, and so --

Q Why do you think he helped you get the farm?
MR. PURYEAR: Object to form.
MR. KNUTSON: Counsel is testifying.
A Because he loved me, and he cared about me. He wanted to see me succeed. I owned a double-wide trailer. I owned that double-wide -- well, I paid on that double-wide trailer for 30 years. I'd never owned it. And this was finally a place that was, you know, that I could own, that I could retire, and he just wanted to see me -- see me succeed.
Q Okay. Was Paul over at -- you said something about you-all saw each other every holiday. What holidays and how did family -- how did all that interact?
A He come to Christmas, so at Christmas -- my sisters do not attend Christmas with me because they're so spread out. Me and Becky do things occasionally, but she has young kids, and so they do their stuff at their house. So at my house, it would be me and my kids, my in-laws, and Paul is usually who we would have for holidays, so he'd come by for Christmas.
We'd do something at the lake every 4th of July, and we'd camp at Greeson, and we'd do the -- we'd watch the fireworks up there. And he came up there, you know, several times and did 4th of July with us. And he -- my birthday, I share a birthday with his mother, and so he'd always call me, and he'd always tell me that he always remembered my birthday because when it was, but we always talked on my birthday and on his birthday,

and, you know, he was just always welcome at the house.
Q You said he used to own a furniture store and a what kind of shop?
A Video store. He did video rentals.
Q Video rentals in Gurdon? Okay. Did people, in your opinion, did they like Paul and stuff of that nature?
A Yeah, yeah. He was very personable, and, you know, I wasn't really around people that he was communicating with, you know, the last several years, but after he died, I received a lot of messages from people, you know. His obituary was Willis, because that's actually his first name, but nobody knew him by Willis, so I had a lot of people messaging me, you know, asking me, for sure, if this was who it was. And then they would say, you know, some kind of way that he had helped them. And most of the time, he had done an enormous amount of free washer and refrigerator repairs for people. He'd fixed all of their stuff whenever they were in trouble, so that was what I heard the most.
Q Okay.

MR. BREWER: I may have some more questions later on in the case, but not today. I'm going to pass you back over to Mr. Puryear.

THE WITNESS: Okay.

**FURTHER EXAMINATION**

BY MR. PURYEAR:

Q Ms. Hastings, I just have one follow-up question that I intended to ask you earlier. What was Mr. Lee's weight? Was he tall? His height and weight. Tall? Short? Heavy? Thin?
A He was tall and hefty, but he wasn't fat, you know. He was a big guy. I can't tell you what his weight was, but he was a big guy.
Q And tall is relative, so --
A I'm 5 foot, so yeah, he's taller than me.
Q So he might have been 5'2". No, I'm just kidding.
A I think he was probably close to 6 foot tall, but I wouldn't have an estimate on weight. Maybe -- I don't know. Maybe -- I don't know. I would be bad if I tried to guess it. He was -- he wasn't fat, but he was -- he was hefty. He was a big guy.
Q Okay.

MR. PURYEAR: That's the only question that I have in follow- up. Thank you, ma'am, for your time.

THE WITNESS: Thank you.

(WHEREUPON, the proceedings were concluded in the matter at 4:44 p.m. on October 8, 2025.)

(WITNESS EXCUSED)

C E R T I F I C A T E

STATE OF ARKANSAS )
)ss
COUNTY OF CLEBURNE )

I, MARCY MCKENZIE, Certified Court Reporter #891 and Notary Public, do hereby certify that the facts stated by me in the caption on the foregoing proceedings are true; and that the foregoing proceedings were reported verbatim through the use of the voice-writing method and thereafter transcribed by me or under my direct supervision to the best of my ability, taken at the time and place set out on the caption hereto.

I FURTHER CERTIFY, that I am not a relative or employee of any attorney or employed by the parties hereto, nor financially interested or otherwise, in the outcome of this action, and that I have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect impartiality, that requires me to relinquish control of an original deposition transcript or copies of the transcript before it is certified and delivered to the custodial attorney, or that requires me to provide any service not made available to all parties to the action.

C E R T I F I C A T E

(Continued)

I FURTHER CERTIFY that I am not knowingly identified on a preferred provider list, whether written or oral, for any litigant, insurance company, or third-party administrator involved in this matter. This transcript is prepared at request of Counsel for defendants; and all fees are billed directly to Counsel for defendants in compliance with Arkansas Board of Court Reporter Examiners Regulations Section 19.

WITNESS MY HAND AND SEAL this 20th day of October, 2025.

Arkansas Supreme Court Certified Court Reporter
Marcy McKenzie
CCR No. 891

________________________________________

MARCY MCKENZIE, CCR

Certified Court Reporter #891

My Commission Expires: 2/12/2035

MARCY MCKENZIE
COM. EXPIRES 2-12-35
NOTARY PUBLIC
COM. # 12694004
CLEBURNE COUNTY, ARKANSAS