Bryce Brewer, Esquire
Rainwater, Holt & Sexton
P.O. Box 17250
Little Rock, AR 72222

RE: Hastings v. Montana Carriers, Inc.

Dear Mr. Brewer,

I am in receipt of your correspondence regarding the above matter. I have reviewed documentation which was provided.

I am board certified with the American Board of Internal Medicine since 2013. I am the Medical Director and attending physician at Cornerstone Specialty Hospital, CHI St. Vincent Rehabilitation Hospital and Midtown Subacute Rehabilitation. I have provided testimony in forensic settings as an expert.

Background facts

Mr. Willis Lee is a (at the time) 67 year old man with coronary artery disease status post bypass surgery, congestive heart failure, diabetes mellitus on insulin and complicated by peripheral neuropathy, hypertension, hyperlipidemia, atrial fibrillation on anticoagulation, chronic kidney disease stage III, benign prostatic hypertrophy, and several prior right ankle surgeries related to Charcot foot and osteomyelitis who was reportedly on his way to a doctor's appointment when he was in a motor vehicle accident.

Below is a diagram from the police report and a photo of the damages to the vehicle Mr. Lee was driving at the time of the crash. I reviewed these for informational purposes and to assist me in assessing the injuries arising from the crash. The photograph demonstrates extensive crush damage which is consistent with a collision.






He arrived to CHI HS as a level 2 trauma via LifeNet EMS who reported patient had lost consciousness at the scene, initial BP 60/34, was placed in cervical collar, given a bolus of IV fluids and tranexamic acid en route to the hospital (to support blood pressure and as reversal agent for his blood thinner, Eliquis). He was "A&Ox4" on arrival (alert and oriented to person, place, time, and situation) to ER [CHI HS ED Notes, p44]. Trauma workup revealed extensive rib fractures (right 5, 6, 10 and left 5, 6, 9, 12), extensive spine fractures (TS-6, T11, T12) with the T12 injury described by the radiologist as "highly unstable," laceration of left abdominal wall subcutaneous tissues, and enlarged external iliac and inguinal lymph nodes [CT C/A/P dated 10/31/24, p 531]. Subsequent MRI confirmed the severe unstable T11 and T12 fractures, additionally noting severe spinal canal stenosis at this level due to displacement of the fracture fragments, and a significant epidural

hematoma extending the length of the thoracic canal causing moderate mass effect on the thecal sac [p543]. Also of note, ethanol level was undetectable, kidney function was at his baseline (Cr 1.03), lactic acid was normal (indicating good perfusion of organs), and WBC elevated to 18k (a marker of inflammation). Skin survey 10/31/24 by wound care team revealed moisture associated skin damage to coccyx, and a stage 3 pressure ulcer to right lateral ankle [p1025, p1302, p1307]

He was initially planned for surgical intervention of the thoracic spine fractures 11/1, but prior to planned procedure he became hemodynamically unstable with hypotension and atrial fibrillation with rapid ventricular response (low blood pressure and high heart rate) requiring transfer to ICU and postponing of this procedure. He was seen by pulmonary critical care and cardiology 11/1, started on vasopressors (continuous infusion of medications to keep his blood pressure up). Cardiology noted a prior ejection fraction of 40-45% in March of 2024, but on most recent transesophageal echocardiogram from 9/20/2024 had an ejection fraction of 16% [10/31/24 cardiology consult note, p 149). He started on broad spectrum antibiotics (vancomycin and zosyn), and right ankle x-ray performed which showed varus angulation without definite acute fracture, but also commented on recent MRI (prior to accident) that showed extensive osteomyelitis and probable pes planus deformity [p538]. Repeat echocardiogram done shortly after admission to the hospital showed ejection fraction slightly improved to 20% [p560].

His pressors were changed from epinephrine to norepinephrine, then to phenylephrine and vasopressin when he went into rapid atrial fibrillation. He was also loaded with digoxin then started on an amiodarone drip which eventually was able to control this unstable heart rhythm. His circulatory shock was felt likely related to hypovolemia vs neurologic injury, though the antibiotics he was given would also cover septic shock had that been the source.

Following medical stabilization, he underwent surgical intervention of his T11 and T12 unstable fractures on 11/3/24 with Dr. Dowdy, including evacuation of epidural hematoma that was causing spinal cord compression. Of note, these injuries were described in the neurosurgery consult note "ank spondy noted on CT" and the operative report as "anklylosing spondylitis associated fractures" [11/3/25 Op Note, p 112). Although there was no previous mention of this diagnosis in the patient's chart, it could explain the

disproportionally extensive spine injuries this man sustained as a result of his motor vehicle collision.

His post-operative course was complicated by rapid atrial fibrillation (again) and volume overload requiring IV diuretics, but able to extubate from the ventilator the following day (11/4). Cardiology signed off 11/6 when his cardiac condition deemed stable enough for outpatient workup of his worsened congestive heart failure (presumably by repeat cardiac catheterization). His confusion gradually improved, his vasopressors weaned off, and his diet advanced, but unfortunately despite good cooperation with the various therapy modalities (PT/OT/SLP) he showed little to no improvement in his lower extremity paraplegia [11/6/24 PT Note, p395] [11/9/24 Discharge Summary, p1617]. He was then felt medically stable for transition to Longterm Acute Care unit (LTAC) 11/8/24, where he remained until 12/19/24 when discharged directly to South Arkansas Regional Hospital (inpatient rehab) for "aggressive physical therapy, occupational therapy, nutrition, medical management, and nursing care" [12/19/24 H&P, p2].

On arrival at Inpatient Rehab, he was noted to have extremely weak upper extremities, poor to no trunk control with flaccid lower extremities lacking both sensation and movement.
He was also noted to have pressure injury of his sacral region/ buttocks and diabetic foot ulcer and seen by wound care services in addition to Physical, Occupational, and Speech/Swallow therapies. On initial interview with Case Management, he reported that he hadn't been out of bed in 40+ days and that his plan was to return home once his mobility improved (where he lives alone) and that he "WOULD NOT GO TO A NURSING HOME." He also noted that he was awaiting some braces for his feet ordered 6 months ago which she passed on to Hanger for assisance, and Case Manager updated the AR Spinal Commission about his move to their facility (12/19/24 CM Note, p8].

For his right ankle wound, he underwent fairly extensive workup starting with X-ray obtained 12/21/24 which showed soft tissue swelling, no fracture, and recommended MRI (p13] and then arterial duplex ultrasound 12/23/24 which was consistent with peripheral arterial disase (p21]. Cultures were sent (eventually polymicrobial growth, p120) and he was started on antibiotics (vancomycin and cefepime), surgery consulted. MRI of the ankle 12/25/24 revealed a fluid collection extending from wound to joint space worrisome for septic arthritis, and findings consistent with osteomyelitis of multiple bones of the ankle joint [p28].

While he initially participated in therapy at approximately 3 hours per day, he was noted to have significant interference from pain in addition to his profound weakness. He was beginning to make progress with wheelchair training, using upper extremities to propel himself 20 then 50 feet, and then sitting on edge of mat for 22 minutes [12/26/24 PT Note, p30]. After it was discovered that patient was not aware of his prognosis related to spinal cord injury, he was made more aware evening of 12/26/24 by his attending, Dr. Smart [p33]. He also developed ulceration of his urethral meatus from his Foley catheter (necessary because his spinal cord injury) [12/27/24 Progress Note, p44], but as of 12/29 "still very motivated but most likely will need long-term supervised care" with patient having "unrealistic expectations for himself" [12/29/24 Progress Note, p46]. Staff and case management continued to discuss prognosis with him, and on 12/31/24 Dr. Kennedy had a "frank discussion" with him regarding necessity for foot and possibly leg amputation, and that he likely will never regain the ability to ambulate [Progress Note, p53] and by 1/2/25 he had "lost his motivation," stopped participating in therapy, appetite poor [Progress Note, p57]. Dr. Kennedy formally recommended amputation by 1/4/25, but patient refused. He returned with Dr. Kidney and they together discussed with patient the need for amputation (and also debridement of the eschar on his sacrum), but again patient refused both, also patient requested to see another spine specialist, presumably in hopes of receiving a better prognosis for his paraplegia [1/4/25 Progress Note, p60]. He continued to refuse therapy and interventions to his wounds, but on 1/6/25 requested to see Dr. Gauldin in Hot Springs (who had previously operated five times on this right ankle). Case Manager and Dr. Smart spoke with this surgeon that day, and medical records with disk of images sent via overnight mail to Dr. Gauldin's office [CM Note, p68]. Patient was then recommended for skilled nursing facility placement (SNF) to follow-up with Dr. Gauldin as outpatient for what would likely be extensive intervention and suspected amputation of the right lower extremity [1/10/25 Progress Note, p92]. He requested a SNF near Hot Springs for this reason, and eventually accepted to Twin Rivers in Arkadelphia to which he was discharged 1/15/25. He continued to refuse all therapy and surgical interventions following the frank discussion 12/31/24, with no significant documented refusals previous to this.

In summary, he was "initially very motivated to get well," participating "very well" with therapy and engaged in his care. After being informed that he likely would never regain use of his legs, and "when he came to the realization he stopped working well with therapy," and indeed had no documented participation from then onward [1/15/25 Discharge Summary, p116]. Of note he was continued on vancomycin and cefepime for the duration

of his Acute Rehab Stay and discharged to the Twin Rivers SNF on same [Discharge Med Rec, p159].

He returned from the SNF to the ER on 1/25/25 with weakness and shortness of breath that started 3 days prior, tested positive for COVID-19 at a local ER, started on levophed then transferred from local ER to BHMC-C ER for further care. He was found to be altered and unable to provide any history, hypotensive, and went back into atrial fibrillation with rapid ventricular response. He reported being continued on vancomycin at SNF, and cefepime added back on arrival to BHMC-C, in addition to remdesivir and dexamethasone for his COVID-19 [1/25/25 H&P, p5]. He was admitted to the ICU in critical condition, started on BiPAP and then intubated to be placed on ventilator. His WBC count was 60k, Creatinine up to 2.5, bicarbonate less than 5, Ph 7.17 consistent with severe shock and possibly superimposed diabetic ketoacidosis (lactic acid 2.0, serum ketones 6.19) [1/28/25 Renal Note, p 48]. General Surgery was consulted for his wounds but felt he was too medically unstable for any surgical interventions [1/28/25 GS Consult, p55]. He had attempted dialysis catheter placement 1/28/25 to initiate continuous renal replacement therapy (CRRT) but procedure was unsuccessful after several attempts and aborted. Given his overall prognosis, ethics team was consulted while next of kin (NOK) contacted. With no available contact information, CHI HS was contacted who provided the information for patient's friend, Jason, whom Mr. Lee had appointed his decision maker while there. A cousin, Brenda Hammond, and niece, Catherine Dreamer, were also found and together they made the unanimous decision that the patient would not want to be kept alive with this prognosis, and decision made to transition to comfort care only. He was removed from the life support (ventilator) and kept comfortable, then expired a short time later at 9:46am on 1/30/2025.

Overall, this chronically ill but independently functioning man who lived alone and appeared by all accounts to be fully adherent and engaged in his medical care (he was even on his way to a doctor's appointment when he had the collision), had a devastating spinal cord injury with his motor vehicle collision. For the first ~2 months of his hospitalization he remained engaged, working with therapists, motivated, and taking all prescribed medications and treatments. As is typical of these types of injuries, his course was complicated by a progressive cascade of events that started with his traumatic injuries, but then leading to worsening wounds, severe deconditioning (even of his upper extremities), and eventually took him to inpatient rehab. While there it was finally addressed with him that he was not likely to walk ever again because of his spinal injury, and that he would need an amputation of his right lower extremity due to progression of his ankle wound and underlying

osteomyelitis. It was when he accepted this prognosis, that he immediately began refusing all therapy and treatments, including the amputation. As a specialist in the care of these types of patients, this loss of motivation to recover can be one of the most challenging complications of this cascade, in particular for relatively young, previously independent patients who now must rather suddenly accept a substantially worse quality of life.

While it is clear that Mr. Lee died from sepsis and its complications of respiratory failure and renal failure, also it is more likely than not that one of his wounds, either the sacral wound he acquired because of his spinal cord injury or the chronic ankle wound with previously treated osteomyelitis, were the source of his sepsis. It is more likely than not that the spinal cord injury led to the sacral wound. It is also more likely than not he became a paraplegic and began refusing all therapies and surgical interventions because of the injuries he received as a result of the crash. He had 5 previous ankle surgeries which he accepted and only declined treatment after he became paraplegic because of this crash.

Opinions:

My opinions are given within a reasonable degree of medical certainty and are more likely than not. It is my opinion that the injuries Mr. Lee received as described in his medical records including paraplegia and the cascading events emanated from the crash, were probable results of the trauma. The timing between the collision and his injuries and subsequent treatments were appropriate. The treatments were medically necessary and reasonable.

In reaching my conclusions, I considered the probability of alternative explanations and weighed them relative to the injury risk of this traumatic crash. Barring this crash, the likelihood of the conditions occurring spontaneously leading up to Mr. Lee's death, given what is known about Mr. Lee's past history and treatment, is not likely.

For these reasons, it is my opinion as a physician board certified in Internal Medicine and specializing in the care of Longterm Acute Care (LTAC) that but for the traumatic crash on 10/31/24, Mr. Lee would not have needed any of the subsequent hospitalizations at CHI HS, South Arkansas Regional, and BHMC-C. Moreover, but for the subsequent spinal cord injury he suffered in the crash and the permanent disability caused by the crash, he would have accepted further treatment of his medical problems. When he accepted he was very unlikely to ever regain use of his legs, he began refusing physical therapies and surgical interventions and eventually died from complications of sepsis which he declined to treat further. But for this

accident, he would have almost certainly remained engaged in his medical care, not needed any of the hospital, rehab, or nursing home facilities that he stayed at for the continuous period from his accident 10/31/24 until his death, 1/30/25.

Sincerely,



David Rainosek MD