**IN THE UNITED STATES DISTRICT COURT WESTERN DISTRICT OF ARKANSAS**
**HOT SPRINGS DIVISION**

**MIKKI HASTINGS as Personal Representative**
**And SPECIAL ADMINISTRATRIX of the Estate**
**of WILLIS PAUL LEE, JR., DECEASED,**
**on behalf of the individual and survival heirs and**
**Wrongful Death Beneficiaries of**
**WILLIS PAUL LEE, JR., deceased,** **PLAINTIFF**

**V.** **CASE NO.: 6:25-CV-06053-SOH**

**MONTANA CARRIERS, INC. et al.** **DEFENDANTS**

**<u>PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENTAND STATEMENT OF ADDITIONAL MATERIAL FACTS</u>**

Plaintiff Mikki Hastings, as Personal Representative and Special Administratrix of the Estate of Willis Paul Lee, Jr., deceased, on behalf of the individual and survival heirs and wrongful-death beneficiaries of Willis Paul Lee, Jr. deceased, offers this response to Defendants' State of Undisputed Material Facts and statement of additional material facts:

1. Plaintiff Mikki Hastings ("Ms. Hastings") is the niece of Willis Paul Lee, Jr. ("Mr. Lee"). ***See* D.E. 21, ¶ 9.**

Response: Undisputed.

2. On or around October 31, 2024, Mr. Lee was driving his 1996 Dodge Ram eastbound on Interstate 30 near Arkadelphia, Arkansas. ***See* D.E. 21, ¶4.**

Response: Undisputed.

3. On or around October 31, 2024, at approximately 8:45 a.m., Defendant Dhillon was driving a 2025 Freightliner pulling a trailer traveling eastbound on Interstate 30 in the right lane. ***See* D.E. 21, ¶ 42.**

Response: Undisputed.

4. Mr. Lee was traveling in the right lane of eastbound Interstate 30 at the same time, in front of Defendant Dhillon. ***See* D.E. 21, ¶ 45.**

Response: Undisputed.

5. At the same time, there was intermittent rain. ***See* D.E. 21, ¶ 46.**

Response: Undisputed.

6. Mr. Lee then slowed his vehicle. ***See* D.E. 21, ¶ 47.**

Response: Undisputed.

7. Defendant Dhillon struck the rear of Mr. Lee's Dodge Ram (the "collision"). ***See* D.E. 21, ¶ 49.**

Response: Undisputed.

8. The collision injured Mr. Lee. ***See* D.E. 21, ¶ 55.**

Response: Disputed as incomplete. The collision killed Mr. Lee. Ex. 4 report of Dr. David Rainosek.

9. Mr. Lee died on January 30, 2025. ***See* Ex. F, 43:6-7.**

Response: Undisputed.

10. Deputy Steven Holt, of the Clark County Sheriffs Department, responded to the collision. ***See* Ex. C, 14:14-16.**

Response: Undisputed.

11. Deputy Holt called for a tow truck for Mr. Lee's vehicle. ***See* Ex. C, 38:14-17.**

Response: Undisputed.

12. Deputy Holt's crash report identifies Automobill's as the wrecker, lists the tow destination as 211 High School Road in Arkadelphia, and characterizes the pickup as "towed due to

disabling damage." ***See* Ex. B, 3.**

Response: Undisputed.

13. The damage estimate on Deputy Holt's crash report is $5,000. ***See* Ex. B, 3.**

Response: Undisputed.

14. Mr. Lee's Dodge Ram was towed from the scene to Automobill's. ***See* Ex. F, 42:19-21.**

Response: Undisputed.

15. Automobill's is owned by Bill Rogers. ***See* Ex. F, 42:17-23.**

Response: Undisputed.

16. Mr. Lee's Dodge Ram was impounded at Automobill's following the collision. ***See* Ex. F, 42:17-18.**

Response: Undisputed.

17. Plaintiff did not retrieve Mr. Lee's vehicle from Automobill's after learning that the truck was there. ***See* Ex. F, 46:16-48:2.**

Response: Undisputed.

18. Mr. Lee lived in Chidester, Arkansas at the time of the collision. ***See* D.E. 21, ¶1.**

Response: Undisputed.

19. At the time of the collision, Defendant Dhillon was an employee of Defendant Montana Carriers, Inc. ***See* D.E. 24, ¶14.**

Response: Undisputed.

20. At the time of the collision, Defendant Dhillon was acting as an employee of Defendant Montana Carriers, Inc. ***See* D.E. 24, 1 81.** Defendant Montana Carriers, Inc. has admitted that it is vicariously liable for any negligence of Defendant Jagdeep Dhillon while in the

course and scope of his employment. ***See* D.E. 24, 178.**

Response: Undisputed.

21. Defendant Montana Carriers Inc. leased the tractor/trailer unit operated by Defendant Dhillon at the time of the collision on October 31, 2024. ***See* D.E. 24, 137.**

Response: Undisputed.

22. Plaintiff did not learn of the collision until January 29, 2025. ***See* Ex. F, 43:4-9.**

Response: Undisputed.

23. Bill Rogers was a friend of Plaintiff. ***See* Ex. F, 46:23-24.**

Response: Undisputed.

24. Bill Rogers did not know that Mr. Lee was family to Plaintiff. ***See* Ex. F, 47:6-8.**

Response: Undisputed.

25. Mr. Lee helped out Plaintiff when she was a teenager living on her own. ***See* Ex. F, 102:2-4.**

Response: Disputed as incomplete. See Plaintiff's statement of additional material facts set forth below for a full description of Lee's assistance to Hastings. See also, Ex. 1, Affidavit of Mikki Hastings.

26. Mr. Lee did not provide any other support to Plaintiff. ***See* Ex. F, 102:2-4.**

Response: Disputed. See Plaintiff's statement of additional material facts set forth below for a full description of Lee's assistance to Hastings. See also, Ex. 1, Affidavit of Mikki Hastings as well as deposition of Mikki Hastings and deposition of Adam Hastings, attached as exhibits 2 and 3 respectively.

27. Mr. Lee got married to his ex-wife, Stephanie, and lived some time in Florida, Arizona, and Memphis. Plaintiff did not know when they married. ***See* Ex. F, 55:2-6.**

Response: Undisputed as clarified. Hasting said he did not remember when they were married. She did not say that she did not know at the time that they married.

28. Plaintiff did not attend Mr. Lee's wedding to his ex-wife Stephanie. ***See* Ex. F, 57:17-18.**

Response: Undisputed but misleading. Hastings testified that no one attended as was the couple's wish as stated in the cited testimony.

29. Plaintiff visited Mr. Lee when he was living in Memphis. ***See* Ex. F, 69:4-6.**

Response: Undisputed.

30. Plaintiff did not visit Mr. Lee when he lived in Florida or Arizona. ***See* Ex. F, 69:4-6.**

Response: Undisputed.

31. Mr. Lee and his ex-wife separated before Mr. Lee moved back to Arkansas. ***See* Ex. F, 55:11-12.**

Response: Undisputed.

32. Plaintiff does not know for sure when Mr. Lee moved back to Arkansas. ***See* Ex. F, 56:1-3.**

Response: Undisputed.

33. After moving back to Arkansas, Mr. Lee would visit Plaintiff once or twice a month. ***See* Ex. F, 66:3-6.**

Response: Undisputed.

34. In addition to regular visits, Plaintiff and her husband, Adam Hastings, would text with and call Mr. Lee. ***See* Ex. G, 33:16-19.**

Response: Undisputed.

35. The last time that Plaintiff saw Mr. Lee was in June 2024, before Plaintiff left for

Alaska. ***See* Ex. G, 34:10-12.**

Response: Undisputed.

36. Plaintiff and Mr. Lee had a family squabble the last time they saw one another and the two did not speak after that. ***See* Ex. G, 34:10-12.**

Response: Undisputed.

37. Plaintiff did not interact with Mr. Lee when she returned to Arkansas in September 2024 for the birth of her grandchild. **Ex. F, 20:16-21; Ex. G, 34:10-12.**

Response: Undisputed.

38. Plaintiff did not have any interactions with Mr. Lee over Christmas in 2024. Mr. Lee was hospitalized at that time. ***See* Ex. G, 36:14-23.**

Response: Undisputed.

39. Mr. Lee attended First Assembly of God Church in Gurdon, Arkansas. After Mr. Lee passed away, the preacher from Mr. Lee's church informed Plaintiff that the church wanted to have a service for Mr. Lee. ***See* Ex. F, 98:18-24.**

Response: Undisputed.

40. Plaintiff learned from Mr. Lee’s preacher that Mr. Lee was a regular churchgoer. ***See* Ex. F, 99:17-19.**

Response: Undisputed.

41. Dr. Anthony Lamkin, a wound-care expert for Defendants, testified that Mr. Lee had a chronic, infected wound on his right lower extremity dating to 2017, eight years before the collision, that had caused sepsis and bacteremia on multiple occasions and had put his life at risk repeatedly before the collision. ***See* Ex. E, 21:13-24; 22:13-21.**

Response: Undisputed.

42. Plaintiff's expert, Dr. Tanya Rutherford Owen, provided a life care report for Mr. Lee. ***See* Ex. A.**

Response: Undisputed.

43. Dr. Owen's life care plan projects $687,262 in first-year costs and $91,042 each year thereafter across five (5) year period. ***See* Ex. A, 2.**

Response: Undisputed.

44. Dr. Thomas Ireland, an economist retained by Defendants, testified that an economist's standard role is to put a present value on a life care plan. ***See* Ex. D, 44:1-12.**

Response: Undisputed.

45. Dr. Owen's report relied on aggregate population statistics maintained by the National Spinal Cord Injury Statistical Center. ***See* Ex. A, 1-2.**

Response: Undisputed.

46. Dr. Owen's projections were applied to patients with paraplegia, at a generic injury level, and without individualized assessment regarding Mr. Lee's pre-existing cardiac disease, cardiac arrest, diabetes, chronic right-lower-extremity infection, acute kidney injury or any of his other comorbidities. ***See* Ex. A, 2.**

Response: Undisputed.

47. Plaintiff disclosed Dr. Owen's report on February 24, 2026, after the Scheduling Order's expert-disclosure deadline had run. ***See* Ex. A; D.E. 9, at 1-2.**

Response: Undisputed.

**STATEMENT OF ADDITIONAL MATERIAL FACTS**

1. Hastings and her father did not have a sound relationship. Ex. 1 Affidavit of Mikki Hastings ¶¶ 4,5.

2. Hastings was abused by her birth father, so much so that she moved out of the family home by the time she was 17 along with her infant daughter. Ex. 1 ¶ 5.

3. Paul Lee seemed always to be aware of the strain in the relationship, and he rose to the occasion by giving Hastings financial help in those early years of estrangement from her father, providing groceries, and, more importantly, being around to provide advice, guidance, and emotional support. Ex. 1 ¶¶ 7-11.

4. As time passed, Hastings became financially stable, married, and life moved on. Paul did not provide financial assistance to her because she did not need it. Ex. 1 ¶ 11. He did help with used appliances for her budding family as that was a trade of his, Ex. 2, depo. of Adam Hastings at 20, and was able to get Hastings' husband a job when he badly needed one. Ex. 1 ¶ 9; Ex. 2 at 20.

5. For the most part, Paul Lee's "support" for Hastings was of the less concrete sort; advising, nurturing, caring, and undergirding. Ex. 1 ¶¶ 7-11, 13-21.

6. In recent years, Paul would regularly visit Hastings' home to see her and her husband. Ex. 3, depo. of Mikki Hastings at 66; Ex. 1 ¶ 22. He spent the holidays like Christmas and Thanksgiving with Hastings as part of the family. Ex. 3 at 66.

7. When Hastings' birth father was taken very ill and on life support, Hastings was looked to as the person who would decide whether extraordinary life support would be continued. She was exceedingly uncomfortable serving in that position given the estrangement of their relationship and the history of abuse. Ex. 1 ¶ 12.

8. Paul Lee counseled her and helped her find peace with the decision to terminate life support. Ex. 1 ¶ 13. Then he stood by her at the funeral and actually helped with the expenses of it. Ex. 1 ¶ 15.

9. This lawsuit was filed to recover for the injuries Paul suffered and for the injuries Hastings suffered because of his death as a wrongful-death beneficiary. Doc. 21, Amended Complaint. Negligence was alleged against Dhillon, the driver, and his employer, Montana Carriers, which admits that Dhillon was in the course and scope of his employment at the time of the collision so it is vicariously liable for any negligence Dhillon committed. The complaint also alleges direct liability against Montana Carriers for negligent hiring, training, and supervision as well as for negligent policies and procedures regarding drivers keeping a lookout for others on the highways, proper speeds, distracted driving, and driving in traffic. Doc. 21 ¶¶ 71, 72.

10. Paul suffered a T12 spinal fracture, among other things, and was paralyzed below the waist. Ex. 4 report of Dr. David Rainosek.

11. Defendants offer an expert, Dr. B. Mark Landrum, who they want to testify that Lee would have lived only about three to five years anyway due to his underlying health conditions. Ex. 5, report of Dr. Mark Landrum.

12. Dr Tanya Owen describes how Paul Lee was facing a life of expensive rehabilitation, unable to walk and care for himself. Dr. Rutherford finishes the story by detailing what that three to five years would have been like because of Defendants' negligence Ex. 6, Owen's report.

Respectfully submitted,

Attorney for Plaintiff

BY: *Bryce Brewer*

Bryce Brewer (ABN 2002013)
RAINWATER, HOLT & SEXTON, P.A.
P.O. Box 17250
Little Rock, AR 72222
(501) 868-2928
(501) 868-2990 (Fax)
bbrewer@rainfirm.com