IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

MIKKI HASTINGS as Personal Representative
And SPECIAL ADMINISTRATRIX of the Estate
Of WILLIS PAUL LEE, JR., DECEASED, on behalf of the
Individual and survival heirs and Wrongful Death
Beneficiaries of WILLIS PAUL LEE, JR., deceased PLAINTIFFS

VS. CASE NO.: 6:25-cv-06053

MONTANA CARRIERS, INC.;
JAGDEEP DHILLON; JOHN DOES 1-3
And JOHN DOE ENTITIES 1-3 DEFENDANTS

---

ORAL DEPOSITION

OF

ADAM HASTINGS

TAKEN MARCH 25, 2026, AT 3:04 P.M.

---

*Arkansas Diamond Court Reporting*

*21043 Natalie Lane*

*Little Rock, Arkansas 72206*

*www.arkansasdiamondcourtreporting.com*

*PHONE: 501.319.4807*

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:

MR. BRYCE BREWER [VIA VIDEO CONFERENCE]
RAINWATER, HOLT & SEXTON, P.A.
P.O. BOX 17250
LITTLE ROCK, AR 72222

ON BEHALF OF THE DEFENDANT:

MR. JEFFREY PURYEAR [VIA VIDEO CONFERENCE]
PURYEAR MAYFIELD & MCNEIL, P.A.
3000 BROWNS LANE
JONESBORO, AR 72401

I N D E X

STYLE AND NUMBER .......................................... 1

APPEARANCES .............................................. 2

STIPULATION PAGE ......................................... 4

WITNESS: **Adam Hastings**

Examination by Mr. Puryear ............................. 5

Examination by Mr. Brewer .............................. 48

Further Examination by Mr. Puryear ..................... 50

Examination Concluded .................................. 52

COURT REPORTER'S CERTIFICATE ............................ 53

ERRATA SHEET/SIGNATURE PAGE

EXHIBITS

(NO EXHIBITS WERE IDENTIFIED OR ATTACHED TO THIS TRANSCRIPT)

C A P T I O N

ANSWERS AND ORAL DEPOSITION OF **ADAM HASTINGS**, a witness produced at the request of the Defendant taken in the above-styled and numbered cause on the 25th day of March, 2026, at 3:00 p.m. via Zoom video conference, pursuant to the Federal Rules of Civil Procedure.

**P R O C E E D I N G S**

THEREUPON,

**ADAM FRANKLIN HASTINGS,**

THE WITNESS HEREINBEFORE NAMED, having been first duly cautioned and sworn by me to testify to the truth, the whole truth, and nothing but the truth, testified on his oath as follows, to-wit:

**EXAMINATION**

BY MR. PURYEAR:

Q Good afternoon, sir.

A Good afternoon.

Q Please state your full name for the records, please.

A It is Adam Franklin Hastings.

Q Mr. Hastings, my name is Jeff Puryear. I'm a lawyer in Jonesboro. And I'm involved in this lawsuit filed by your wife, and I assume you're aware of the lawsuit?

A I am.

Q Okay. And you probably know that she went through a similar proceeding with us, oh, about six months ago, and she gave her deposition by Zoom.

A Yes, sir.

Q Okay. Well, I've asked to take your deposition because Mr. Brewer tells me that you're going to be called as a witness when this case goes to trial in August. Is that your

understanding?
A Yes.
Q Okay. Have you ever given a deposition before?
A I have, but it's been a long time ago.
Q What was the nature of that proceeding?
A It was when I was a very young teenager. We had a lawsuit against the Clark County Sheriff's Office.
Q What was the nature of that case?
A So it was me and a friend of mine were driving a truck. It was late at night. The cop got after another truck, is my understanding. The cop got after another truck, and he didn't catch said truck. And so then he seen us, and he run our truck, and we went home. Me and him lived together. And when we got in the house, this cop never turned on his blue lights because he thought we'd already run from him. And he broke out the window, crawled in the window, and had a gun on us for no reason. And this was, I'm -- I was 18 at the -- 19 at the time. So this would have been in '93 or so. '93, '94, somewhere around there.
Q And did you and your friend, did you all file a lawsuit against the sheriff's office?
A So the friend did. And I was just kind of caught up in it. So we didn't go out to do so. His stepmother worked for a lawyer in town, and she just happened to mention what happened, and the lawyer kind of perked up. So that's the way that it

went. We didn't -- we didn't go out to get the sheriff's office or nothing, but it just kind of happened. And I was just a part of it, so --
Q Is it -- do I understand your testimony to be, Mr. Hastings, that you, yourself, did not join in to chase the lawsuit?
A I did. My name was in it. I did get some money from it. Yes.
Q That was my next question. Were you paid -- were you paid a settlement out of that.
A Yes, I was. I was -- it was like a percentage out of -- my friend, he actually went to jail. I did not go to jail, and so his was was the biggest part of it, and I was just kind of a percentage of it, as well. Ended up working out.
Q What was your percentage, your cut?
A I don't even remember. I think the -- I think the settlement total was 40,000, and I got like 8,700, so --
Q Okay. Have you been involved in any other lawsuits, Mr. Hastings?
A No, no.
Q And did you give a deposition in that case with the Sheriff's Department?
A Yes.
Q All right. Well, how old are you today, sir?
A I am 52.

Q So since it's been 30 plus years, I would -- or I guess I would guess about 30 years out --
A Yes.
Q -- I'll go down the purpose of the deposition here today, so you have an understanding. I'm going to --
A Okay.
Q I'm here to ask you questions to get information from you. Mr. Hastings, I'm not here to trick you. I'm not here to confuse you. In fact, I -- if I ask you a question that doesn't make any sense or sounds confusing, I want you to tell me that; okay?
A Okay.
Q Because what I want you to be able to do is understand what I'm asking, so you can give me a clear response.
A Okay.
Q Is that understood?
A Yes, sir.
Q You've taken an oath, so you're under oath here today. So I want you to do your best to give me your truthful answers because I want to rely on what you tell me when this case goes to trial. Is that fair?
A Yes.
Q You answer my question, Mr. Hastings, I'm going to assume you understood it and that your response is truthful. Is that fair?

A Yes.
Q Okay. Just a couple of things. We're on the Zoom camera, and the court reporter's taking down what you and I say back and forth, but it'll really help her out if you and I don't talk over each other; okay?
A Okay.
Q And sometimes that's hard to do because in normal conversations that's just the way we talk. But I would ask for you, if you will, please, do your best. Let me finish my question before you start answering. And I'm going to do my best to wait until you finish your answer before I ask my next question; okay?
A Okay.
Q If you say uh-huh or huh-uh, I'm going to ask you to clarify yes or no. That way, there's no -- there's no guessing about what the transcript says; okay?
A Okay.
Q I'm not picking at you. I say uh-huh and huh-uh all the time, but I just want the record to be clear from our proceeding today; okay?
A Okay.
Q Have you -- have you reviewed anything to prepare for your deposition today, Mr. Hastings?
A No. I really have nothing --
Q Have you --

A -- to review. I'm sorry.
Q I got jumpy. I'll try to wait. Have you -- have you been provided the information in connection with this lawsuit?
A No. Aside from -- aside from what my -- me and my wife talk about. And she just, you know, gives me, you know, what's talked about, it's just -- so no actual information, no.
Q Has she shared information with you about the case?
A Well, yeah. Yes.
Q So what all has she shared with you?
A Just -- well, I knew she'd done a deposition. I know that -- I know the -- I know about the accident. No real particulars, I don't -- I don't believe.
Q What do you know about the accident, sir?
A I know that it happened on October 31st. I know that he went to the hospital. They had trouble finding him a bed. He ended up going further away on a -- to the hospital. I know it was storming, and that's about -- I know he was hit from behind and pushed in the ditch. That's about -- that's it.
Q How did you get that information about the accident, Mr. Hastings?
A We learned that when -- okay. So we learned he was in the hospital by someone else calling us and saying that he was in bad shape in the hospital. Because we were up here in Alaska at the time.
Q Who called you?

A It was Jason Yirby that called us.
Q And did -- when did he call?
A Oh, shoot. I don't even -- probably around January. It was about a week before he passed.
Q And so we're -- so we know what we're talking about, but we're talking about before Mr. Willis Paul Lee had passed away?
A Yeah. Yes, yes.
Q That -- and I understand that that is your wife's uncle?
A Yes.
Q Okay. So about a week before Mr. Lee died, you all got a telephone call from Jason Yirby?
A Yes.
Q Okay. And up to that point, did you know anything about Mr. Lee's accident?
A No.
Q Okay. So then it was Jason's phone call was the first time you knew if anything had happened to Mr. Lee; is that correct?
A That is correct.
Q And you said his accident was on October the 31st of 2024?
A That's what I was told, yes.
Q All right. So about three months after the accident was when you first learned that anything had happened to Mr. Lee; is that correct?
A Yes.

Q Other than -- and I hope I'm saying your wife's name, is it -- she goes by the name of Mikki; is that correct?
A That is correct.
Q All right. And I know she spells it, it looks like Mikki, but her name is Mikki.
A Yes.
Q Okay. Other than talking to Mikki, talking to Jason Yirby, have you talked to anybody else about this accident, or what happened to Mr. Lee?
A No, I have not.
Q Have you talked to the lawyers who are representing Mikki in the case?
A No, I have not.
Q At any time, you've had no communications with the attorneys?
A No.
Q Okay.
A I'll leave that to Mikki, so --
Q Okay. Am I correct, Mr. Hastings, just to make sure that Mr. Yirby and your wife -- I'm sorry -- Mr. Yirby's the only person who's provided information to you about the accident; is that correct?
A Yes.
Q All right. Did Mikki talk to Mr. Yirby also when he called in January of 2025?

A He called -- he called my phone, and then from there, she may have called him back. But I -- I don't -- I'm not -- I don't know that for sure. I don't know if she -- I don't know if she called him or called the hospital, or I don't know.

Q I'm going to back up a little bit, get some background information on you, sir. And I had a chance when I took Mikki's deposition to learn some information, and I'll try not to re-ply old ground that I had with her.

A Okay.

Q I know she told me where you all live. It's Okolona; right? That's your house in Arkansas?

A Yes, we own a home in Okolona. Yes.

Q All right. Where did you grow up, Mr. Hastings?

A I grew up about two miles from where my house is at. So right there.

Q All right. And did you go to school at Gurdon; is that right?

A Yes. Most --

Q What --

A -- of the time.

Q All right. Where else did you go to school?

A I went to school in Arkadelphia, which is in the same general area for -- well, you're from Arkansas. I went there for two years in the fourth and fifth grade. And then whenever we moved to my house, that was -- that's where I grew up, I

went to school in Okolona for a year before that small school closed. And that was in the seventh grade.
Q What year did you graduate high school, sir?
A '92.
Q And was that from Gurdon High School?
A Yes.
Q And then where did you go to college?
A At Henderson in Arkadelphia.
Q And when did you graduate from Henderson State?
A Oh, a bachelor's in 2010, master's in 2014, and a education specialist in 2021.
Q And Mikki explained in her deposition, make sure I'm -- my memory's good. Correct me if I've -- if I got it wrong, but that you and she moved up to Alaska in 2024 to be teachers up there in a village?
A Yes.
Q And I don't remember asking her, when did you all actually move up there?
A So move full time, it would have been in the end of July of 2024. We come up here and spent a month, the end of May until about the 20th of June before that, but it -- we went back home for a month in between.
Q Okay. And when you all went there for approximately one month, what was the purpose of that first trip or stay?
A So we had -- we had been hired by the school district, and

they had a conference in Anchorage that was for educational leaders. I'm a principal up here, and they wanted me to go to that conference. So they paid for me to come up and go to that conference in Anchorage. And then while we were here, they asked if we would like to go and stay in the village for a month and kind of get our bearings, see how it was. And so that's what we did.

Q I see. And you returned to Arkansas for approximately one month until you made your permanent move in July?

A Yes. Okay, the very end of July -- July to August, somewhere in between.

Q And I know from her testimony, y'all had some trips back to Arkansas, but y'all been living there in Alaska since that July, August of 2024 to present day; is that correct?

A Yes, we go home for Christmas. We go home for summers because we got kids and grandkids in Arkansas. So we go home and spend those times with them.

Q And so the -- let me follow you up on that, so -- you've been home for Christmas in 2024 and 2025?

A Yes.

Q And you've been home the summers of '25 and '26.

A For '25, and we will be going home for '26, yes.

Q I'm -- thank you. I'm ahead of myself here. You're planning to be here this summer?

A Yes.

Q And have you made any other trips back to Arkansas other than what you've just told me?
A I have not.
Q Seem to recall in Mikki's deposition that she said you all would leave there in May to come home for the summer?
A Yes.
Q All right. And how long are you -- did y'all stay here last year?
A Last year we come back up here, it was July around the 27th or so. We come up here and done some halibut fishing before we had to go back to our village. And we went to Denali to a class on Denali Mountain. And so we come back a little earlier before school started this past summer, but it was at the end of July.
Q I had asked your wife about this, so I ask you the same thing. I'll explain why I'm asking about your family, not be nosy, but so when we pick the jury in our case, we don't have any relatives in -- on the jury; okay?
A Okay.
Q Do you have relatives -- adult relatives in Clark County? And I've already covered your children and their spouses with Mikki, but do you have separate family who live in Clark County?
A Not in Clark County, I don't.
Q Okay. I mean, going --

A Wait, wait.
Q -- down the list here --
A Wait, wait, wait. Let me back up on that. My grandmother lives in Clark County, and I have an aunt that lives in Clark County.
Q Could you tell me their names, please?
A My grandmother is Patsy Brooks, and my aunt and my uncle are Carla and Cheryl Jester.
Q And where do they live?
A They live in a community called Beirne. It's south of Gurdon.
Q Both your grandmother and your aunt and uncle?
A Yes.
Q All right. I'm glad to hear that you still have your grandmother. That's great.
A Yes, it is.
Q She's probably getting up there.
A She's up there. I like -- I think --
Q Let me --
A -- she's 91.
Q Wow. What about in Montgomery County? Do you have any adult relatives there, Mr. Hastings?
A No.
Q How about Hot Spring County, Malvern?
A Hot Spring County, I have a -- you know, Mikki's sister

lives in Hot Spring County, and her husband. But I don't have any relatives there.
Q How about Pike County?
A No.
Q And then, finally, Garland County?
A No.
Q Okay. Have you served in the military, sir?
A No.
Q And were you involved in any civic clubs or groups when you were living there in Arkansas?
A Can you define civic clubs?
Q Well, you know, you got Kiwanis and Jaycees and Optimists and things like that. I don't know if y'all had anything like that down there that you were involved in.
A No, I was not involved in anything like that. No.
Q Okay. And I asked Mikki about your church is -- where y'all attended. We covered that.
A Yeah.
Q Did you volunteer at work that you did down here?
A Yes, a lot.
Q Tell me about that. Tell me about your volunteer work.
A Working for fire department. I've done that for -- I started in 2001, and I retired it when I come up here. So about 23 years I was volunteer for the fire department. I was volunteer for the county search and rescue team, and I was a

volunteer for the Office of Emergency Management.
Q Okay. Which fire department, sir?
A Okolona, and had had some ties to Hollywood, as well.
Q And then what about the -- which search and rescue department?
A It was Clark County Search and Rescue, which is now disbanded, but that's what it was then.
Q And in the OEM, which office?
A It was Clark County.
Q Okay. All right. Any other volunteer work, Mr. Hastings?
A No.
Q Mikki told me about your teaching -- that when you were here. I got that. As I recall, before you were a teacher, you worked at a facility, a factory or something?
A It's a saw mill that's in Gurdon. It was originally International Paper when I started, and it was Georgia Pacific whenever I left it.
Q Did it smell as good as the one in -- at Pine Bluff?
A It actually did not smell bad. It was -- it smelled like cutting trees because we was a lumber mill. We wasn't paper.
Q I got you. I didn't know with International Paper, so -- sir, do you have a criminal history?
A None.
Q And never arrested at any time?
A None, no.

Q Tell me about your relationship with Mr. Lee, please?
A We -- so I knew Paul before Mikki and I were married. He owned the local video store in the small town we all grew up in, back whenever you'd go and rent VHS tapes. He also --
Q I remember.
A So he also sold used appliances. He was always peddling something. So I actually knew him before Mikki and I were together. Once we got married, he helped us out quite a lot with -- especially with appliances, you know, young and broke, and you know, trying to buy a washing machine or a refrigerator or something like that. He helped us out on that a lot. He would come and repair things like that for us. So just a family relationship.

About 2000 -- 2002 or so, I got laid off from work at the sawmill. And at that time, Paul was doing some cleanup, storm cleanup, you know, cutting trees and stuff out of the ditches and hauling the debris. And he called me and asked me if I wanted to get a trailer, and come up and work with him. And so I worked with him for a couple of months doing, you know, contract work, that type of stuff. And it was on that job whenever Paul met his ex-wife that he was married to.

And so it wasn't long after that that they got married, and they moved away. They lived in Florida and Tennessee and Arizona and things like that. We'd see him a few times a year, up until the point where his dad, which is my wife's grandpa,

had a stroke. And that would have been somewhere around 2009, 2010. And then we'd see him quite a bit more often after that, while he was still married and living elsewhere.

He was living around Memphis at that time. We went out and spent a weekend a few times because he took his dad up there and put him into a assisted living home. And so we'd go up there to see my wife's grandfather, and we would visit with Paul and his wife at that time. And it was probably around 2017, '18 that he moved back to Arkansas after he had split with his wife of that time. And then we would -- we'd see him quite a bit more often after that. He and I would -- so as a teacher, he would come by and visit us and we bought a -- he was the first one that told us about our place we bought before the sign even went up. How he'd do all that stuff, I don't know.

So we bought that place, and it was a small farm. And we -- and since I was a teacher and off in the summertime, I would grow stuff and sell vegetables, produce. And he'd done the same thing, except he would -- he'd have it on a trailer, and he'd peddle it different places. And so he and I would take turns driving down to southeast Arkansas around Warren, picking up produce and bringing it back, so we'd have extra stuff to sell. And we'd done that for several years, up until I moved back up here in the summertime.

Q Okay. So was he -- you mentioned that you had your farm

and Mikki told me about that, said y'all had some greenhouses and mentioned one summer when the blight got all your tomatoes.
A Yes.
Q And then y'all -- I think y'all shut it down after that; right?
A Well, we actually tried another year past that, but it was -- so whenever the blight got all the tomatoes from the greenhouse, that's -- we really got serious about going down and picking up tomatoes at Warren, you know, which is a tomato growing capital in Arkansas. And that's whenever we got serious about -- because we'd already told people we were going to be selling tomatoes, and so we decided we would take the expense and buy some to resell.
But yeah, after that -- after that next year, and it had done it again, we decided that, or we would send a soil sample to the University of Arkansas. And they told us that blight was in the ground, and so we give up on tomatoes after that.
Q Okay. So was it -- so how many years -- how many seasons did you go to Warren and actually -- to get the tomatoes because you couldn't grow them yourself?
A Well, we always kind of supplemented. So it was probably four, maybe five years that we would do that.
Q I was thinking that she had said that it was just a year or two that y'all, before you went to Alaska, that you got the blight and shut down the tomatoes.

A No. See, we'd done this before we actually got the greenhouse. The greenhouses were bought on a grant. And so we had our farm, and it would sell like peas and stuff like that. And it was after the greenhouses that we figured out we couldn't do tomatoes. You know, tomatoes are picky.

So it was after the greenhouses that we actually decided that we couldn't grow them ourselves. But we had been selling there at the house for ever since we bought the place. And we bought it in '17. So it had been '18 since we started.

Q So was Mr. Lee, was he growing his own produce?

A No, he didn't have the space to. He didn't have a place to grow them.

Q Okay. So he was buying, and then peddling them on his own?

A Yes.

Q Okay. Okay. Remind me of -- where were the towns where Mr. Lee lived? I've forgotten.

A So he lived at -- most of the time he lived in Delight, which is Pike County. He moved from there; he moved down to Gurdon. And then from Gurdon, he went to Bluff City.

Q And did he live alone at each of those places?

A Yes. Well, let me --

Q Did you ever go --

A Let me back up --

Q Okay.

A -- for a minute. He had a -- he had a girlfriend that lived with him for a short while. But other than that, he lived alone.
Q Did you go visit him where he lived down in Delight?
A Yes.
Q Okay. And was that -- did he have a -- did he buy a house? Was he renting a place, an apartment? What was it?
A So he actually, whenever he moved back from Arizona, he had a camper trailer, and he lived in the camper trailer. Now this particular camper trailer, it was tied up in divorce stuff, and he wasn't going to pay for it. And so it actually got repoed because of divorce. And then he moved into another camper trailer there in Delight. And whenever he -- when he left Delight, he went to -- he went to Gurdon, and he rented a house in Gurdon, and then another house in Gurdon. And then the Bluff City was a camp house.
Q What do you mean a camp house?
A It's like a small shack. It was a -- so he had this -- the deal with Jason Yirby that he was going to teach him how to work on appliances and help him, you know, make a little money on the side. And it -- the place belonged to Jason Yirby's family. And they were also going to start growing vegetables there.
Q All right. Help me out a little bit here. So he -- when he was at Delight was in -- was when he was living in camper

trailers, is what you said?
A Yes.
Q And how long did he live there at Delight?
A About three years. Two to three years.
Q Okay. And then did he move from there to Gurdon?
A So in between there is whenever he -- he spent a lot of time in the hospital. So yeah, whenever he left there, he went to went to -- went to Gurdon.
Q And which hospital was he in?
A St. Joe's in Hot Springs.
Q And what -- why was he in the hospital?
A So he ended up having a foot infection, and he also -- they figured out he had some heart issues at that time, and it was during COVID. He actually called me, and whenever he's living in Delight, he called me and he said, I can't even get out of bed. And I went up, picked him up, and I took him to St. Joe's that night. And, you know, because of it being COVID, it was -- it was kind of delayed, the actual heart surgery he had. But it -- he was -- you know, he struggled with infections in his feet, being a diabetic.
Q What was the reason he couldn't get out of bed, Mr. Hastings?
A I don't really know. I don't know if it was weakness. I don't really know because I went over there, and we actually ended up getting him an ambulance at that time. And then, like

I said, I took him to St. Joe's. And I don't know if that was tied to the heart. I don't know if that was the infection. I don't know.

Q Okay. But that was, as I understand, just trying to keep it all straight here, that was when he was at Delight --

A Yes.

Q -- before he had moved -- before he had moved to Gurdon?

A Yes.

Q And he was having heart issues, and he was having trouble with his feet because of his diabetes?

A Yes.

Q Okay. He went to the hospital in Hot Springs, and you said -- you said some -- made some comment a while ago, he was -- maybe he was there for a little while?

A So they figured out that he needed heart surgery. They figured out he had some severe blockages or something. I didn't get the particulars. But they figured out he needed heart surgery, and this was about the beginning of COVID. So there was a lot of delay on scheduling said surgery and getting him in the hospital and all that.

Q Okay. But I take it at some point he did have the heart surgery?

A He did have the heart surgery, yes.

Q Okay. And did he have that at Hot Springs, as well?

A Yes. Well, no. I take that back. That was in Little

Rock that he actually had the surgery.
Q When he got through all that, did he have any other medical problems besides the heart and the foot that time?
A Well, you know, he was on disability, though. He had a -- he had a deformed ankle, which is where the disability come from, in the beginning. He was a logger, and a tree come through the cab of the skidder and broke his ankle, and they didn't -- it wasn't fixed correctly. And so his ankle was kind of turned sideways, and that's where his original disability come from.
Q Mr. Hastings, do you remember, was it his right foot or his left foot that was deformed?
A I believe it was his left. I don't know that, I can't remember that for sure, but --
Q How long ago did that happen to him?
A Oh, that was before -- that was way back whenever he was younger.
Q So long before he left Arkansas and got married?
A Oh, yeah, yeah. It was way back there whenever he worked in the log -- his whole family were loggers. And he'd done it for a while when he was younger, and it was during that time that it -- that that accident happened.
Q How did that affect him, that disability?
A Well, it didn't until he was older. So his -- how to explain it -- so his foot would kind of roll to the outside,

and it didn't really affect him at all, you know, he worked. He was an appliance repairman, worked for big appliance companies for years after he'd gotten married. And until he just couldn't stand to walk on it no more after he got older and fatter, heavier.

Q So how did -- was he able to get around when he was older?

A Oh, sure. Sure.

Q Okay. I guess I'm trying to understand. You said you -- something about your comment that when he was -- he could no longer walk on it while he was doing his appliance work when he was older and heavier and all that.

A That's -- but --

Q What do you mean?

A Okay. So he could walk on it. It was being on it extended amounts of time, walking distances, things like that is what -- is what caused him the problem. I mean, he --

Q I take it the problem --

A -- could walk. I'm sorry.

Q No, I'm -- you're doing okay. So he was able to walk, but he couldn't walk long distances?

A Right, right.

Q Okay. Did he have to wear any special shoes or equipment or anything like that?

A Once in a while, he'd have like a -- like a boot on, you know, like a straightening boot. You know, while they -- while

they tried to fix the problem or see if they could straighten his foot up. He went to the doctors and tried to get something done with it, but they never did, you know, get it to a point where it was straight by any means.

Q How long did he have to wear that walking boot?

A It would be different times, and it -- he would usually, you know, a couple of months here and there.

Q So would he wear it some, and then he didn't, and he would go back to wear it again?

A Yes.

Q And was that over a period of several months, over a couple of years, what?

A That was probably over a period of a year that they had done it -- done this. And whether it was -- whether it was his doctor saying, Okay, you can take it off, see what happens, or whether it was just him deciding he was sick of wearing it, that I don't know for sure.

Q I understand. Did he ever have to use a cane?

A No.

Q Did he ever have to use a walker?

A No.

Q And so I'm clear, Mr. Hastings, the difficulty that he had walking on it, that was something -- he'd had that difficulty from when he was a young man; right?

A The accident was from when he was a young man, but it

didn't really cause him an issue until he was older. May -- you know, I don't know. I can't speculate. I was going to say maybe arthritis from swelling or some -- I don't know. But it did cause him an issue when he got older.

Q And was that period when he was older, was that when he had moved back to Arkansas, you estimated '17 or '18?

A Yes. Yes, because he had done all of his disability stuff before he actually come back to Arkansas. He'd done that while he was out -- one of them -- like in Arizona or something. When he come back to Arkansas, he was on disability at that time.

Q Did he have any sort of, I'll say, a deformity of his foot?

A Like just that ankle that didn't -- it didn't hold his foot straight. If --

Q And you said it looked --

A -- so if you was to look at his foot, and he's walking, it's like his foot was here, but his ankle would be -- you know, it would be poked out that -- to the outside.

Q Okay. And did it make him walk with a limp or something?

A Very slightly.

Q So did you know he had this problem with his foot because you could see it when he was doing stuff or because he told you or what?

A Well, he told me about it. We -- so in my younger years,

I actually worked for my wife's father in the logging woods. And Paul was in between jobs somewhere along in there. And he come out and drove the skidder for us. And he actually told me all about it then. So I knew what all had happened because he said, Yeah, I was doing -- riding one of these things before and this happened. And he had told me about it. But yeah, after -- I mean, I could see it whenever he walked with just tennis shoes on. You could kind of see that his foot rolled to the outside.

Q Got you. All right. Look, let's go back. I was asking about where he lived, and you mentioned Delight. He was in the campers. And then he went from there, he was in the hospital, and then he went to Gurdon, as I understood?

A Yes.

Q And you said he rented a couple of houses there?

A Yes.

Q And did you go to those places where he had lived? Did you see them?

A Yes.

Q Okay. And then after, I don't know how long, do you remember how long he lived at Gurdon?

A A couple of years, maybe.

Q And then next he was, you said, Bluff City in the camp house, which was a small shack?

A Well, yeah. You know, like a deer camp or, you know, like

a cabin.
Q How long did he live there in that cabin or deer camp structure?
A He was -- he moved there probably about seven months, eight months, maybe. That's where he was living whenever he had the accident so --
Q Just putting it -- not to hold you to some specific time period, but if his accident was on October 31, he'd been there seven or eight months, then sounds like he would have moved in that place at Bluff City sometime in 2024. That sound about right?
A Yeah, end of '23, beginning of 20 -- somewhere along in there.
Q Okay.
A I could actually look back at my text because he actually asked me about a trailer that I have at my house to move his stuff. And it belonged to my mother-in-law, and so he wanted me to ask my mother-in-law if it's okay if he used said trailer. So just somewhere around the end of '23, beginning '24, somewhere through there.
Q And did you go visit him there at that deer camp?
A No, I never went there.
Q And when you went to visit him at Delight or Gurdon, how often did you go out there to see him?
A I mean, it wasn't real often. He would usually come to

our house. He would -- there was a particular place he liked to get a burger in the afternoons, which is five miles from our house. So he would swing by our house before or after that. So we didn't go there very often, but, you know, a few times.

Q Okay. And how often did he come to visit you and Mikki at your house?

A Usually around once a week, maybe twice.

Q Okay. You've been telling me about stuff and your interactions with him. What -- anything else that you all -- that you would do with Mr. Lee that we hadn't already talked about?

A No.

Q Okay. And other than -- other than when he would stop by to see you or maybe the few visits you had to his place, did you talk to him any more than that or communicate with him?

A We would -- we would text now and then, or he would call. He would come up with some good idea of something to grow, and he would call and give us stuff like that. Just, you know, phone calls and texts and things, but yeah.

Q Okay. When -- Mr. Hastings, when was the last time that you saw Mr. Lee?

A Probably somewhere in between when we come up here and went home June of '20 -- June 2021, 20th, 21st, somewhere along in there before we left. Somewhere in between there was the last time we actually saw him.

Q Let me make sure I got my days straight. So you were -- you told me that y'all went to Alaska for the one month end of May until June the 20th?
A Yes.
Q Of 2024?
A That would have been 2024, yes.
Q And did you see him when you came back to Arkansas in --
A Yeah, he --
Q -- the month of June?
A -- he had come by the house. And there was a little bit of a family squabble issue in between there. And that's why we didn't really talk to him after that.
Q And when you saw him, and I'm -- again, this June, July period that you all -- before you moved permanently to Alaska --
A Uh-huh.
Q -- you saw him where, Mr. Hastings?
A At our house. He'd come by our house.
Q For anything in particular?
A No, he was going to get him a burger, and he just swung by.
Q And then you said there was some family issue and that y'all didn't talk to him after that.
A Right.
Q All right, so when was the family circumstance that you're

talking about?
A Well, it had been building up until that point, but it kind of -- kind of culminated at that time. He would always be talking about how the young nurse that was -- that he went and seen wanted him or something like that. And my wife really didn't like him talking like that to her. And so she told him, Yeah, I don't like to hear that, so keep that to yourself. And it just kept going. And finally, she told him, said, I don't want to hear that. If you can't not say that, then don't come over here. And he said, Well, what am I supposed to do; go get me an invalid? And then he left. And that was the last time we actually saw him.
Q And give me your best estimate of when that was, Mr. Hastings.
A That was probably the end of June, if I was guessing, of '24.
Q Was that -- I know you said that's the last time you saw him. Is that also the last time that you talked to him?
A Yes.
Q All right. Any other text messages with him after that?
A So he had -- so he texted me about something after that, but I said, I didn't want to get my wife stirred up, so I didn't really reply.
Q All right. So your last real communication with him was the end of June of 2020 -- the end of June in 2024; correct?

A Correct.
Q All right. And is the same true for Mikki?
A As far as I know, yes.
Q All right.
A Now, she may have -- she may have not even talked to him at that time.
Q And then you and Ms. -- you and Mikki then y'all moved at the end of July, first of August to Alaska? We've already covered all that.
A Yes.
Q Okay. So you had mentioned to me that you all made it home for Christmas in 2024; correct?
A Correct.
Q And based on what you told me, you had no communication or interaction with Mr. Lee when y'all were home at Christmas that year; is that correct?
A That's correct.
Q Okay. And as we now know, he was -- he was in the hospital somewhere during that time period, wasn't he?
A Yes.
Q Okay. And so did you all -- anybody reach out to try and check on him or anything?
A No.
Q Did -- you didn't know anything about his accident; isn't that true?

A That is true.
Q Okay. When you learned from Mr. Yirby about the accident, you told me sometime in January, about a week before Mr. Lee died. I take it you had no communication with Mr. Lee at that time?
A No.
Q No meaning, that is correct, you had no communication with him?
A That is correct, no communication.
Q Okay. Who is Jason Yirby? I know we've talked about him, but who is that?
A So he was -- I actually knew him because I worked with him at Georgia Pacific. But his mother owned a little restaurant there in Gurdon, and that's where -- that's where Paul met him, I'm sure, is through his mother. He's probably a couple years younger than I am, but the particulars I don't really know how they -- how they met. I'm just making an assumption that he met him at this restaurant.
Q Fair enough. I appreciate that. And do you know how long, if I can use the phrase, did he pal around with Mr. Yirby?
A It was probably around the time that he had moved back to Gurdon. So I wouldn't know exactly how long.
Q You thought he lived at Gurdon maybe a couple of years?
A Yeah. Yes.

Q But you're not sure when they started -- when they became friends or had an acquaintance?
A No, I couldn't give it a timeframe. The first time I knew that they were, kind of, working together, the two of them had come by my house one day. They had borrowed one of my trailers. Paul had some stuff in a storage building in Delight, and they'd come by my house and borrowed my trailer to get the stuff out of the storage building and take it to the Gurdon. That's the first I knew that they were, they were kind of working together on stuff at that time.
Q Okay. And do you know anything else about what Mr. Yirby and Mr. Lee did or any activities that they had together?
A I thought -- all I understand is that he was kind of teaching him how to -- how to work on appliances, make a little extra money. And I think Jason Yirby, you know, put some money into the deal to get broken appliances, things like that, and they kind of worked together and moved them.
Q Okay. It sounds like, and if I'm -- if I'm misunderstanding you, Mr. Hastings, then please correct me, but it sounds like your interaction with Jason Yirby as it pertained to Mr. Lee was pretty limited?
A Yes, because I was already -- I wasn't working with him anymore at that time. Yeah, and they come by my house one day, and like I said, I knew him. I knew who he was, and that's whenever I learned that they were kind of working together.

But that was -- that was about it.
Q But when you say when you were no longer working with Mr. Lee, are you talking about as far as picking up produce?
A Oh, no, no. I'm sorry. Working with Jason Yirby. Actually, I worked with him at GP before, so I knew he -- and --
Q Okay.
A -- but I wasn't -- I was already teaching at that time before the -- him and Paul, kind of, started working something together, and so I don't know.
Q The particulars of which you don't know?
A I don't know, no.
Q Okay. And to make sure I've understood you, other than this -- there was a female companion who Mr. Lee lived with for some short period of time. Other than that, you're not aware of him living with anybody when he came back to Arkansas; is that correct?
A Correct.
Q Even when he was living at this deer camp, which I think you said was -- you thought was on the Yirby property. He was living by himself in that, whatever that shack was?
A Yes.
Q And was there a point in time where -- let me back up. You talked about Mr. Lee selling produce, peddling, buying and peddling. Was there a point in time when he stopped doing

that?
A Whenever he moved to Gurdon, I think he was more focused on the appliance part of it. So he didn't do it anymore at that time, that I'm aware of. Me and him did not do it together. So I'm assuming that he did not.
Q And when you say focused on the appliance, that goes back to when he was -- what he was trying to show that work to Jason Yirby?
A Well, he -- but he always dealt with appliances. He would buy broken used appliances, and he would repair them, and he would resell them. He'd done that for the whole time I've known him. Whenever we first got married, he supplied us our first washing machine he worked on. He got my kids washing machines whenever they moved out. So he'd always done that. I think whenever he moved to Gurdon, though, he more focused on that part of it versus the produce.
Q Got you. Mr. Hastings, do you have any specific information about, I mean, how much of that stuff, if he was doing repair work and reselling? Do you have any way to give me any more particulars on that?
A No. What -- the statement he always made is he wanted to make enough to buy him a burger. You know, because he was on disability, and he was not 65 yet. And he was looking forward to being 65, so he wouldn't have to worry about how much money he made aside from disability.

Q Okay. And was he -- did he have a -- if he went and bought some used appliance, and he fixed it up to resell it, did he have a place that -- I mean, where was he doing all that or reselling those items? Do you know?

A So he would usually just do that out of his yard whenever he was in Delight stuff. Now, whenever he moved to Gurdon, where he actually lived in Gurdon was -- it was an old store that had like an apartment in the back of it. And he lived in the said apartment, and he sold the stuff out of this old store.

Q Okay. When you say he was selling them out of his yard, was that when he was at the -- at the deer camp?

A See, the deer camp, I don't know much about. I never --

Q Uh-huh.

A -- I never went down there. This was in Delight when he lived in the camper.

Q Uh-huh.

A He had like a -- like a little awning thing. It was an old house where his camper sat. Whenever he first moved back, he lived in his aunt's yard, in his camper. And they kind of -- I think it was the appliances that they had a falling out about because she felt like he was junking up her yard. And then he moved to this old house with a canopy deal on it. And he worked on the appliances there in that yard in the -- under that canopy in Delight.

Q Was he a smoker?
A No.
Q Was he a drinker?
A No.
Q Any type of illegal drug use?
A No. Not that I'm aware of, but no.
Q Any criminal history for Mr. Lee?
A None.
Q Did he -- any other activities or hobbies that you hadn't already told me about?
A Not that I knew anything about, no.
Q Been going for a little bit over an hour. You doing okay? You want to take a break?
A I'm good.

MR. PURYEAR: Madam Court Reporter, are you okay?

COURT REPORTER: Sorry, I was looking for -- I was looking for my button. But yes, I'm fine.

MR. PURYEAR: Okay. All right, we'll continue on, then.

COURT REPORTER: Okay.

Q (Mr. Puryear continuing) Mr. Hastings, we've talked about what you knew about his heart, his surgery. We talked about his feet, you mentioned his diabetes. What other health conditions did he have?

A That was all I know of.
Q And you said that on the one occasion, he said he couldn't get out of the bed, and you went and picked him up. I think you said he was at Delight, and you took him to the hospital at Conway?
A No. I took him to the hospital at Hot Springs.
Q Thank you. I'm sorry, at Hot Springs. You said St. Joe's. Okay.
A Yes.
Q Did you -- do you know about him having to go to a hospital on any other occasion?
A No.
Q So other than taking him to St. Joe's in Hot Springs, you never saw him, went to visit him, at any other time in a hospital; is that correct?
A Not inpatient, no.
Q All right. What about outpatient?
A So I -- he had a, like I said, he had trouble with infections in his feet, you know, diabetic nerve stuff. And he'd -- he would, you'll step on something, and he wouldn't even know he'd injured his foot, and he'd get an infection.
So he had a -- he had a wound doctor in Nashville, and I took him to that wound doctor several times. But I would stay in the waiting room. I wouldn't really go back with him, but I would -- I would carry him to his wound doctor at times. But

that's the only time he actually spent time in a hospital was for his heart surgery.

Q Do you remember the name of the doctor, Mr. Hastings?

A Not at all.

Q Or the facility in Nashville where you took him?

A It's the only -- it's the hospital in Nashville. It's the only one there, so --

MR. BREWER: Howard Memorial, Adam?

A It just probably is Howard Memorial. Like I said, it's the only one in Nashville. And the doctor was inside the hospital, so --

Q And give me your best estimate, Mr. Hastings. How many times did you take him to see the foot doctor?

A I actually took him probably five times. Now, he would go on his own whenever they would tell him that you can come on your own. But if he needed -- if they told him he needed somebody else to bring him, then he would -- he would usually ask me if I'd bring him. There's somebody else he called Preacher, I never actually met. But this Preacher took him to the hospital or took him to this wound doctor a couple of times that I couldn't.

Q What was the -- why did you need to take him?

A I don't -- I don't really know. He would call --

Q When you saw --

A Oh, go ahead. I'm sorry.

Q You continue on. I didn't mean to interrupt you.
A He would -- he would just call me and say that I need -- they told me I need somebody to take me over there. I don't know if they was giving him something to deaden -- maybe take the feeling out of said foot or something like that. He would just call me and say, Hey, can you take me over here on this date? And I would go yes or no. But he would go on his own whenever, at times, because he would tell me, I went over there to wound care, and they said it's looking good. And so I don't -- I don't know for sure why he would need me to take him at times, and other times not. But --
Q On -- and I know it was your estimate of about five times that you took him to the doctor in Nashville. But did you -- did you have to help him walk or anything like that?
A No. No, he just needed a driver.
Q All right. So I want to make sure I've covered everything with you. We've talked about any other inpatient admissions, and the only one that you know of and that you went to was in Hot Springs. You got him out of the bed. We've talked about an outpatient at the hospital in Nashville about five times that you took him.
A Uh-huh.
Q Any other -- any other times when you would have visited with him or been with him when he was receiving some kind of medical attention?

A No.
Q And are you aware of any other hospital admissions that we hadn't already talked about for Mr. Lee?
A No, I'm not.
Q Not aware of any other health conditions or health problems that he had besides what we've already talked about today?
A No.
Q What -- how would you describe Mr. Lee's health the last time you saw him, which I understood would have been June of 2024?
A He drove himself to the house, and he walked in. I've got steps that come into my house. He walked up the steps. He come in. He sat down. We sat there and talked. He seemed pretty good. And after, you know, going back to when he had the open-heart surgery, my youngest daughter picked him up from the surgical hospital in Little Rock after this and brought him back to our house for a couple of days. And he'd made the statement he felt like a new man, so --
Q That was after his heart surgery, Mr. Hastings?
A Yes, that was after heart surgery.
Q Did he -- are you aware of him having any, what I would say are like bed sores or pressure ulcers, anything like that?
A No.
Q Okay. Did he have -- do you know if he had any wounds on

his -- on his ankle, the one you've been talking about?
A No.
Q Okay. And other than what you've described for me, this -- the way his ankle stuck out, and you're not aware of him having any other problems with either one of his feet; is that correct?
A No, other than -- like I said, other than the infections he would get from not being able to feel his -- step on a screw or something. The only infections, other than -- other than that, that was the only problem I knew of.
Q Did Mr. Lee ever contract COVID?
A Not that he told me about, no.
Q Did Mr. Lee ever place a value on his life and tell you about that?
MR. BREWER: Object to form.
A No.
Q Did he ever ask you to make decisions about his health care for him?
A No.
Q Do you know if he had someone designated to make health care decisions for him?
A Not that I'm aware of, but probably not. He was -- he was just that kind of a person. He felt like he was going to be here forever, I guess. He didn't think that far in the future.
Q Mr. Hastings, that's all the questions that I have. Have

you understood my questions, sir?
A I believe so.
Q And if we had any confusion, did we get it cleared up so you could -- you could give me a truthful answer?
A Best I know, yes.
Q And have your answers been truthful here today, sir?
A Yes.
Q Can I rely on what you told me to prepare this case for our trial in August?
A Yes.

MR. PURYEAR: Well, I appreciate your time today. I understand you had cut away from the school responsibilities. So thank you for visiting with me. It was nice to meet you.

THE WITNESS: Good to meet you.

**EXAMINATION**

BY MR. BREWER:
Q Adam, I just got a couple that you didn't cover with Jeff --
A Okay.
Q -- just to be honest, because this is the only time Jeff's going to get to talk to you before trial; okay?
A Okay.
Q Can you -- he asked you about Paul and you talked about Paul and a lot of things about Paul. Can you -- and you -- you

told him about the bad incident between Mikki and Paul, but can you tell Jeff about the relationship, if any, between Paul and Mikki?

A Like I said, whenever we first got together, he helped us out. You know, since he did work on appliances, and you know, we was young and broke. And he supplied us our first washer and dryer. We could call him at any time. He would come over and fix appliances for us. You know, he didn't -- he didn't have a whole lot of money, so he couldn't really help us out monetarily, but he would definitely do what he could.

Q I know at some point in time Paul's brother, Mikki's dad, got sick, and the relationship was tough like that. How did Paul and Mikki and all that navigate, and what happened there, if anything?

A So I don't know if it's relevant. Mikki's dad was an alcoholic. And they had this whole thing, and he was drunk one night. It was after Mikki's mom had left him, and she was at our house, and he found out she was at our house, and he come to our house and pulled a gun on us, basically, because we was telling him he had to leave. And Paul was one of the first, at that time, to call and you know, kind of, you know, see how everything was, and you know, let us know that what her dad was doing was not him or her papaw. So now after he had died, we kept a relationship with Paul after that. You know, it was about time that Paul was living off. And so we kind of took

care of Papaw, because he lived in the town we lived in, in Okolona. And we were in -- we were in school. I think Paul was living in Florida. And he called Mikki's phone. And we were in the same class, and -- of course, we was in class. She didn't answer. And then he called back again immediately. And he called back again. She finally said, I got to go answer this. And he couldn't get a hold of Papaw at that time. So that was whenever his dad, Mikki's papaw, had a stroke. And we'd found him in his house.

Q Would you describe Mikki and Paul as being pretty close with each other?

A Yes. Up until, like I said, whenever they kind of clashed over the talk about the young nurse. Up until then, yes.

MR. BREWER: I've got nothing further, Jeff. I'll reserve all the rest of my questions for trial.

**FURTHER EXAMINATION**

BY MR. PURYEAR:

Q I was trying to understand the story, Mr. Hastings. And just so I'm clear -- you mentioned that your father-in-law was an alcoholic.

A Yes.

Q And that Mikki's mother left her father?

A Yes. And that was after we were together -- it was well after we were together, in fact. And it was somewhere around 2002 that they got divorced. 2001, 2002.

Q And then there was an incident you were describing, was it Mikki's father had pulled a gun on you and Mikki?
A Yes.
Q And approximately when did that happen?
A That -- about 2001, 2002 because Mikki's mom was at our house.
Q Okay. I was trying to understand the sequence of events. All right. But at that time, Mr. Lee, Paul Lee, he was living off somewhere else; right?
A Yes.
Q You had mentioned in Florida or something to that effect.
A Well, he was in Florida whenever his dad had the stroke. I'm not for sure where they was at that very time.
Q But the incident with her parents was approximately 2001, 2002. And at that time, Mr. Lee, he was living somewhere; he wasn't in Arkansas?
A Yes.
Q And the reason I asked, you talked about Mr. Lee checking on you guys. I'm assuming that was by telephone.
A Yes. Well, he come in for -- no, yeah, it was by telephone that he had called us.

MR. PURYEAR: Okay. All right. That's all I got, Mr. Hastings. Thank you for clarifying the story for me. Appreciate it.

THE WITNESS: Okay.

MR. BREWER: Adam, I thank you, buddy. You can go back to work.

THE WITNESS: Yay. Thank y'all. Y'all have a good day.

MR. BREWER: Thank you.

MR. PURYEAR: Nice to meet you. Thank you for your time, sir.

THE WITNESS: You're welcome.

**(WHEREUPON, the proceedings were concluded in the matter at 4:28 p.m. on March 25, 2026.)**

**(WITNESS EXCUSED)**

C E R T I F I C A T E

STATE OF ARKANSAS )
)ss
COUNTY OF FAULKNER )

I, NATOSHA WILLINGHAM, Certified Court Reporter #894 and Notary Public, do hereby certify that the facts stated by me in the caption on the foregoing proceedings are true; and that the foregoing proceedings were reported verbatim through the use of the voice-writing method and thereafter transcribed by me or under my direct supervision to the best of my ability, taken at the time and place set out on the caption hereto.

I FURTHER CERTIFY, that I am not a relative or employee of any attorney or employed by the parties hereto, nor financially interested or otherwise, in the outcome of this action, and that I have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect impartiality, that requires me to relinquish control of an original deposition transcript or copies of the transcript before it is certified and delivered to the custodial attorney, or that requires me to provide any service not made available to all parties to the action.

C E R T I F I C A T E

(Continued)

I FURTHER CERTIFY that I am not knowingly identified on a preferred provider list, whether written or oral, for any litigant, insurance company, or third-party administrator involved in this matter. This transcript is prepared at request of Counsel for Defendants and all fees are billed directly to Counsel for Defendants in compliance with Arkansas Board of Court Reporter Examiners Regulations Section 19.

WITNESS MY HAND AND SEAL this 6th day of April, 2026.

Natosha Willingham

_____________________________________

NATOSHA WILLINGHAM, CCR

Certified Court Reporter #894

My Commission Expires: 01/09/2033

NATOSHA WILLINGHAM ARKANSAS SUPREME COURT No. 894 CERTIFIED COURT REPORTER

NATOSHA WILLINGHAM COMM. EXPIRES 01/09/2033 NOTARY PUBLIC COMM # 12721815 JEFFERSON COUNTY ARKANSAS

ERRATA SHEET

Page _____ Line ______Change: _________________________________

To: _________________________________

Reason:_________________________________

Page _____ Line ______Change: _________________________________

To: _________________________________

Reason:_________________________________

Page _____ Line ______Change: _________________________________

To: _________________________________

Reason:_________________________________

Page _____ Line ______Change: _________________________________

To: _________________________________

Reason:_________________________________

Page _____ Line ______Change: _________________________________

To: _________________________________

Reason:_________________________________

Page _____ Line ______Change: _________________________________

To: _________________________________

Reason:_________________________________

Page _____ Line ______Change: _________________________________

To: _________________________________

Reason:_________________________________

_________________________ ______________ Page ____ of ____

ADAM HASTINGS DATE

SIGNATURE PAGE

I, Adam Hastings, do hereby certify that I have read the foregoing 52 pages of typewritten transcript of my testimony, after necessary translation, given under oath on the 25th day of March, 2026, and that the said transcript and corrections, if any, that appear on the attached errata sheet(s), are true and correct to the best of my memory and belief. Further, that I have signed my name to this signature page and authorize that the same be attached to the original transcript.

_____________________ ______________________________

DATE ADAM HASTINGS

*************************************************************

STATE OF ARKANSAS)

COUNTY OF _______________)

SUBSCRIBED AND SWORN to before me, a Notary Public in and for the aforesaid county and state, on this the _________ day of __________________, 2026.

__________________________

NOTARY PUBLIC

MY COMMISSION EXPIRES:

_______________________