IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

MIKKI HASTINGS as Personal Representative and SPECIAL ADMINISTRATRIX of the Estate of WILLIS PAUL LEE, JR., DECEASED, on behalf of the individual and survival heirs and Wrongful Death Beneficiaries of WILLIS PAUL LEE, JR., deceased. PLAINTIFF

VS. NO. 6:25-cv-06053

MONTANA CARRIERS, INC.; JAGDEEP DHILLON; JOHN DOES 1-3 and JOHN DOE ENTITIES 1-3 DEFENDANTS

---

ORAL DEPOSITION

OF

MIKKI HASTINGS

TAKEN OCTOBER 8, 2025, AT 1:02 A.M.

---

*Arkansas Diamond Court Reporting*

*21043 Natalie Lane*

*Little Rock, Arkansas 72206*

*www.arkansasdiamondcourtreporting.com*

*PHONE: 501.319.4807*

---

**EXHIBIT 1**

C A P T I O N

ANSWERS AND ORAL DEPOSITION OF **MIKKI HASTINGS**, a witness produced at the request of the defendants taken in the above-styled and numbered cause on the 8th day of October, 2025, at 1:02 p.m., by Zoom video conferencing, pursuant to the Federal Rules of Civil Procedure.

and I know you've had an opportunity to speak with him, but I wanted to at least provide you the framework for today's proceeding so you have some understanding of my objectives and plans, okay?

A Okay.

Q I'm going to ask you a series of questions about the lawsuit, Mr. Lee, yourself, and other topics, and my goal here is to get information from you. It's important for you to know I'm not here to trick you. I'm not here to confuse you. In fact, I'm here for the exact opposite. I'm here, hopefully, to ask you questions that make sense, and give you an opportunity to give me a truthful response. Do you understand that?

A Yes, I do.

Q If I ask a question, and you answer it, I'm going to assume a couple of things, Ms. Hastings. Number one, I'll assume that you understood my question, and number two, that your response is truthful and I can rely upon that when we go to trial. Is that fair?

A Yes, that's a fair assumption.

Q If I ask you a question that you don't understand, if you will please let me know that and give me the opportunity to restate it or rephrase it in a way that makes sense, I'll do my best to give you an opportunity to give me a truthful answer, okay?

A Okay.
Q All right. We're doing this by Zoom, which is in some ways an unconventional way, but it's necessitated by your location, and that's fine. There's a little bit of a lag, I think, so let me ask you to do this, and it will help our court reporter as well, if you will let me finish my question before you start your answer, that will probably make the proceeding go easier for us, okay?
A Okay. So, I'll give a -- I'll just give a short pause to make sure that everything is completed before I answer.
Q Yeah, and you're doing fine. If you say uh-huh or huh-uh, or if you just simply shake your head or nod, I'm going to ask you to clarify yes or no, okay?
A Okay.
Q And I recognize that that's contrary to how we communicate on a regular basis, but we're making, the court reporter is making a transcript, and I don't want there to be a question about the response that you gave. So I'm going to ask you to clarify, just know I'm not picking at you, okay?
A Okay.
Q And if we need to take a break, you just let me know, okay?
A Okay.
Q Ms. Hastings, have you ever given a deposition before?
A No, I have not.

relatives are, please.
A Actually, I have some aunts and some distant cousins, but aside from the people that I have mentioned to you, I don't actually have any more relatives in the area.
Q Okay. I believe you've listed your sisters in some of the documents you filed in Mr. Lee's estate.
A Yes. So my sisters, Kathy, or Kathryn, she lives in Oklahoma, and she's my sister. And Mary lives in Florida, and she's my other sister. So the three sisters is all that I have as far as that family goes.
Q And what's the order of age with you and your sisters?
A It's Kathy, me, Mary, and Becky.
Q All right, your father, who's your father, please?
A My father is Billy Lee, which was Paul's brother. He died in 2008.
Q I'm sorry for your loss.
A Thank you.
Q And were he and your -- did he live in the area close to you in Okolona?
A Yes, he did. He lived in Okolona.
Q All right, were your mother and your father still married when your father passed away?
A No, they were not.
Q Had your father remarried?
A No, he did not.

Q Okay. And you said that you called him, and you did not know that your uncle had a wreck.
A Right.
Q When did you first learn of Mr. Lee's accident?
A The night before he passed away.
Q And my recollection is that Mr. Lee passed away on January the 30th of 2025, so it would have been January the 29th, the day before, 2025, when you learned of Mr. Lee's accident.
A Yes, that's correct. And, of course, I've got a time zone difference, so I don't know when it was actually happening, but it was -- here, it was late in the afternoon, and he died overnight, so it was not very long after I found out that he died.
Q And how did you learn that Mr. Lee had an accident?
A Jason Yearby sent me a Facebook message. He told me that my uncle was in the hospital and not doing very well, and that we needed to contact the hospital.
Q Who is Jason? And I'm going to ask you to spell his last name, please.
A I don't know the correct spelling, but I think it's Y-E-A-R-B-Y. I don't know that that's correct. But he is a -- he's a guy that my uncle was spending time with. They had -- they were working on refrigerators, and things like that, appliances, together.
Q Where does Jason -- did you say Yearby?

brought them back to my house in Okolona, and then whenever I got here in June, me and my husband went out and buried him beside his mother.

Q And where's that cemetery located?

A In Okolona. The cemetary is called Weir Cemetery, W-E-I-R Cemetery.

Q And did any of your sisters attend the private burial in Oklahoma -- excuse me, Okolona?

A They did not, but I specifically requested that they not. They all were willing to come in and make plans, but I asked them if they would allow me to do it to let me have some time, and they did.

Q And have you been back to the cemetery since you and your husband buried your uncle's ashes?

A Well, we also put a memorial stone out there, but that was within a few days. We did both of those things in June.

Q All right. Other than returning to place the stone --

A So I did not go back in July or August, no, I did not.

Q Okay.

A I do know that my sister Kathy has. Since then, she has driven to Okolona, and she has visited his grave. I don't know about the other two. Well, I know that Mary has not. Mary has not been in, but I don't know about Becky.

Q I take it from your testimony earlier, so I want to confirm with you, Mr. Lee did not provide any financial support

to you; is that correct?
A The only support that I have had from him was whenever I was a teenager. I lived on my own, and he helped me out some then, but not as an adult, no.
Q How old are you, Ms. Hastings?
A I'm 48.
Q So we're talking over 30 years ago when he would have provided some help to you.
A Yes, that's correct.
Q Have you received any medical treatment in connection with the passing of your uncle?
A No, I have not.
Q Have you taken any type of prescription medication in connection with the passing of your uncle?
A No, I haven't.
Q Okay. To make sure I've covered everything, have you obtained services from any type of counselor, psychologist, anything in connection with the loss of your uncle?
A No, I have not.
Q Did you miss any time from your employment in connection with the passing of your uncle Paul?
A I took off a couple of days, just a couple of grieving days.
Q Those were provided to you as part of your benefits with the school district?

go ahead and ask again.
A Not that I know of.
Q Did he ever make any type of claim for any injuries, workers' compensation, anything like that?
A Not that -- the only thing that I know about is the disability, and I just know about that secondhand, so I don't know.
Q Yes, ma'am, we talked about that. Okay. Ms. Hastings, that wraps up all the questions that I have. I appreciate your time today. Have all of your answers to my questions been truthful?
A Yes, they have.
Q And if there was a question that I asked that was confusing or didn't make sense, did we have a chance to clear that up to give you an opportunity to give me a truthful response?
A Yes, we did.
Q Okay.

MR. PURYEAR: That's all the questions that I have, ma'am. I thank you for your time. It's nice to meet you. I'm sorry for it to be under these circumstances.

THE WITNESS: Thank you very much.

**EXAMINATION**

BY MR. BREWER:

Q Mikki, I've just got a couple of questions. Did Paul -- you talked about how he kind of, I call it a truck patch farm, and roadside sell, and stuff like that, did he enjoy his life?
A He did.
Q Tell them a little bit about his personality and stuff of that nature.
A Well, Paul was very kind of flamboyant kind of personality. He was loud and -- but he talked to everybody. He knew everybody. You know, he would tell you stories that you couldn't believe, and then you'd find out they were true. He was a lot of fun, and, you know, whenever he came back to Arkansas, you know, I think he was just coming back to just relax and enjoy life. I think that was kind of what he was doing.
So, you know, he tinkered, was what he called what he was doing. He just called what he was doing tinkering. So he'd tinker with some appliances, and tinker with some, you know, produce and stuff. And those were just -- those were things that he enjoyed. I mean --
Q There were times that, you know -- let me ask this -- you know, I think Jeff asked you if you'd ever supplied assistance to Paul, and vice versa to you. Were there times you tried to buy stuff for Paul, and would he let you, or things of that nature?
A Oh, no. I mean, Paul was very, very proud. If -- I

didn't know what he needed. He wouldn't tell -- he would have never told me if he needed something anyway, because he just wasn't that kind of person. Me and him went out to eat occasionally, and he always bought when we went out to eat, and, I mean, he -- if he had needed anything, and I had known that he needed something, I would have, you know, absolutely provided it to him.

Now, he -- you know, he bought -- he worked with Adam some. He borrowed trailers and things like that from Adam, and they did -- they, you know -- they went out and moved things together and stuff like that, so as far as that kind of thing, you know, we did, but he didn't --

Q What was Paul and Adam's relationship kind of like? I mean, you know, I think it seems -- seems like, from listening to you today, Paul and Adam may have, you know, had a --

A They had a close --

Q -- a better one --

A They had a close relationship. I mean, he -- you know, there was things that he would talk to Adam about that he wouldn't talk to me about just because Adam's a man, and he kind of has that man's man kind of personality, so there was things that they talked about. I mean, whenever he came back, it was literally just me and Adam. He didn't have any other family around here. He came back to spend time with us, and so --

Q Why do you think he helped you get the farm?

MR. PURYEAR: Object to form.

MR. KNUTSON: Counsel is testifying.

A Because he loved me, and he cared about me. He wanted to see me succeed. I owned a double-wide trailer. I owned that double-wide -- well, I paid on that double-wide trailer for 30 years. I'd never owned it. And this was finally a place that was, you know, that I could own, that I could retire, and he just wanted to see me -- see me succeed.

Q Okay. Was Paul over at -- you said something about you-all saw each other every holiday. What holidays and how did family -- how did all that interact?

A He come to Christmas, so at Christmas -- my sisters do not attend Christmas with me because they're so spread out. Me and Becky do things occasionally, but she has young kids, and so they do their stuff at their house. So at my house, it would be me and my kids, my in-laws, and Paul is usually who we would have for holidays, so he'd come by for Christmas.

We'd do something at the lake every 4th of July, and we'd camp at Greeson, and we'd do the -- we'd watch the fireworks up there. And he came up there, you know, several times and did 4th of July with us. And he -- my birthday, I share a birthday with his mother, and so he'd always call me, and he'd always tell me that he always remembered my birthday because when it was, but we always talked on my birthday and on his birthday,

and, you know, he was just always welcome at the house.
Q You said he used to own a furniture store and a what kind of shop?
A Video store. He did video rentals.
Q Video rentals in Gurdon? Okay. Did people, in your opinion, did they like Paul and stuff of that nature?
A Yeah, yeah. He was very personable, and, you know, I wasn't really around people that he was communicating with, you know, the last several years, but after he died, I received a lot of messages from people, you know. His obituary was Willis, because that's actually his first name, but nobody knew him by Willis, so I had a lot of people messaging me, you know, asking me, for sure, if this was who it was. And then they would say, you know, some kind of way that he had helped them. And most of the time, he had done an enormous amount of free washer and refrigerator repairs for people. He'd fixed all of their stuff whenever they were in trouble, so that was what I heard the most.
Q Okay.

MR. BREWER: I may have some more questions later on in the case, but not today. I'm going to pass you back over to Mr. Puryear.

THE WITNESS: Okay.

**FURTHER EXAMINATION**

BY MR. PURYEAR:

Q Ms. Hastings, I just have one follow-up question that I intended to ask you earlier. What was Mr. Lee's weight? Was he tall? His height and weight. Tall? Short? Heavy? Thin?
A He was tall and hefty, but he wasn't fat, you know. He was a big guy. I can't tell you what his weight was, but he was a big guy.
Q And tall is relative, so --
A I'm 5 foot, so yeah, he's taller than me.
Q So he might have been 5'2". No, I'm just kidding.
A I think he was probably close to 6 foot tall, but I wouldn't have an estimate on weight. Maybe -- I don't know. Maybe -- I don't know. I would be bad if I tried to guess it. He was -- he wasn't fat, but he was -- he was hefty. He was a big guy.
Q Okay.
MR. PURYEAR: That's the only question that I have in follow- up. Thank you, ma'am, for your time.
THE WITNESS: Thank you.
(WHEREUPON, the proceedings were concluded in the matter at 4:44 p.m. on October 8, 2025.)
(WITNESS EXCUSED)

C E R T I F I C A T E

STATE OF ARKANSAS )
)ss
COUNTY OF CLEBURNE )

I, MARCY MCKENZIE, Certified Court Reporter #891 and Notary Public, do hereby certify that the facts stated by me in the caption on the foregoing proceedings are true; and that the foregoing proceedings were reported verbatim through the use of the voice-writing method and thereafter transcribed by me or under my direct supervision to the best of my ability, taken at the time and place set out on the caption hereto.

I FURTHER CERTIFY, that I am not a relative or employee of any attorney or employed by the parties hereto, nor financially interested or otherwise, in the outcome of this action, and that I have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect impartiality, that requires me to relinquish control of an original deposition transcript or copies of the transcript before it is certified and delivered to the custodial attorney, or that requires me to provide any service not made available to all parties to the action.

C E R T I F I C A T E

(Continued)

I FURTHER CERTIFY that I am not knowingly identified on a preferred provider list, whether written or oral, for any litigant, insurance company, or third-party administrator involved in this matter. This transcript is prepared at request of Counsel for defendants; and all fees are billed directly to Counsel for defendants in compliance with Arkansas Board of Court Reporter Examiners Regulations Section 19.

WITNESS MY HAND AND SEAL this 20th day of October, 2025.

_____________________________________

MARCY MCKENZIE, CCR

Certified Court Reporter #891

My Commission Expires: 2/12/2035

Arkansas Supreme Court Certified Court Reporter
Marcy McKenzie
CCR No. 891

MARCY MCKENZIE
COM. EXPIRES 2-12-35
NOTARY PUBLIC
COM. # 12694004
CLEBURNE COUNTY, ARKANSAS